## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

| | |
|---|---|
| HIAS, INC.<br>1300 Spring Street, Suite 500<br>Silver Spring, MD 20910<br>Montgomery County; | |
| | **Case No.** 8:19-cv-3346 |
| CHURCH WORLD SERVICE, INC.<br>475 Riverside Drive, Suite 700<br>New York, NY 10115; | |
| LUTHERAN IMMIGRATION AND REFUGEE<br>SERVICE, INC.<br>700 Light Street<br>Baltimore, MD 21230<br>City of Baltimore; | **COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |
| *Plaintiffs,* | |
| *– versus –* | |
| DONALD TRUMP, in his official capacity as<br>President of the United States<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500; | |
| MICHAEL POMPEO, in his official capacity as<br>Secretary of State<br>2201 C Street NW<br>Washington, DC 20520; | |
| ALEX AZAR, in his official capacity as Secretary of<br>Health and Human Services<br>200 Independence Avenue SW<br>Washington, DC 20201; | |
| CHAD WOLF, in his official capacity as Acting<br>Secretary of Homeland Security<br>3801 Nebraska Avenue NW<br>Washington, DC 20016; | |
| *Defendants.* | |

## INTRODUCTION

1.   This lawsuit challenges the President's unprecedented attempt to condition the resettlement of refugees on state and local governments providing advance written consent to refugee resettlement in their jurisdictions, which directly conflicts with the statutory scheme enacted by Congress and core principles of federalism. The President's order and resulting agency actions threaten to deprive thousands of refugees of their best chance to successfully build a new life and to burden thousands of U.S. families who are waiting to reunite with their parents, children, and other relatives fleeing persecution. They threaten to deprive local communities that want to welcome refugees of the opportunity to do so. And they threaten to systematically dismantle the organizations—including Plaintiffs—that have spent decades developing networks, expertise, and resources to carry out the American ideal of welcoming refugees. Accordingly, and in order to stop ongoing irreparable harm and to prevent greater irreparably injury in the future, Plaintiffs seek preliminary injunctive relief on an emergency basis.

2.   On September 26, 2019, the President issued an Executive Order entitled "Enhancing State and Local Involvement in Refugee Resettlement" ("Executive Order" or "Order"). Executive Order 13888, 84 Fed. Reg. 52,355 (Sept. 26, 2019). The Order directs that the placement of refugees for resettlement within the United States be preconditioned on written consent from *both* the state and locality. The Order thus establishes a default whereby refugees will not be resettled unless the state and locality take the affirmative step of providing written consent—never before required—to such resettlement. In doing so, the Executive Order contravenes the Refugee Act, exceeds the scope of the Administration's statutory authority, and violates constitutional federalism principles.

3.   In implementing the Executive Order, the U.S. Department of State ("State Department") announced that in order to continue resettling refugees in the next fiscal year, Plaintiffs must submit a proposal by January 21, 2020, that includes written consent from states and localities where refugees could be resettled. The State Department has charged Plaintiffs with soliciting and obtaining such written consent.

4.   The State Department further announced that starting on June 1, 2020, states and localities must both provide written consent for refugee resettlement to continue in their jurisdictions.

5.   The Order creates but does not resolve any number of practical problems; for example, it does not define "locality" or specify the local government office or entity required to provide written consent where there are overlapping sub-state jurisdictions. Rather than resolve the many practical concerns raised by the Order, the agencies responsible for implementing it have ignored those issues and shifted the burden for resolving them onto the Plaintiffs, by requiring them to obtain the written consents dictated by the Order if they wish to secure an agreement to continue assisting refugees in resettlement.

6.   Plaintiffs HIAS, Church World Service, and Lutheran Immigration and Refugee Service are three faith-based national resettlement agencies that hold agreements with the federal government to assist refugees admitted to the United States in their resettlement. Together with community partners and local, affiliated resettlement agencies throughout the country, Plaintiffs stand ready to welcome refugees as they have done for more than half a century. Plaintiffs and the six other national resettlement agencies provide critical support for newly admitted refugee families, including preparing a home with basic necessities before the family's arrival; organizing donations of clothing, home supplies, and other items based on the family's unique

needs; and even traveling to the airport to welcome the family as they arrive in the United States. After a refugee family is initially resettled, these resettlement agencies provide continued support designed to help refugees adjust to life in America.

7.  Plaintiffs and their affiliated organizations have been doing this work for decades. Indeed, Plaintiffs have nearly 300 years of combined experience resettling refugees in the United States, as they were doing so well before the Refugee Act of 1980 statutorily codified their longstanding role. Never in all that time has the resettlement of refugees been contingent on the prior written consent of government officials in the jurisdiction where the refugee is to be resettled. Rather, through the enactment of the Refugee Act, Congress has specified that state and local governments are to be *consulted* in decisions regarding refugee placement. The Refugee Act, moreover, expressly reflects Congress's considered judgment that refugees be resettled with their families, that they have the resources and opportunities necessary to thrive in their new communities, and that while states and localities should be consulted about resettlement, they should not get to decide where or whether refugees are resettled. Neither the federal statutory scheme nor the Constitution leaves room for a state or local veto over refugee resettlement.

8.  As a result of the Executive Order and its implementation, Plaintiffs must either seek to satisfy the prior written consent condition—causing a significant diversion of their resources and risk to their nonprofit tax status with uncertain prospects of success—or lose out entirely on securing an agreement that enables Plaintiffs to carry out their missions. Faced with this decision, Plaintiffs are also mindful that the lives of thousands of refugees and the families with whom they hope to reunite in the United States hang in the balance.

9.  The Plaintiffs respectfully request that the Court enjoin the Executive Order and its

implementation, including Defendants' conditioning of refugee placement on the prior written consent of state and local governments.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over Plaintiffs' claims under the U.S. Constitution and federal statutes. The Court has additional remedial authority under 28 U.S.C. §§ 2201-02.

11. Venue is proper under 28 U.S.C. § 1391(e) and Local Rule 501.4.b. Plaintiff HIAS resides in the Southern Division of this District. No real property is involved in this action.

## PARTIES

12. Plaintiff HIAS, Inc. is a 501(c)(3) faith-based organization and the world's oldest refugee resettlement agency. HIAS is the American Jewish community's global refugee organization and is one of the nine national refugee resettlement agencies that has an agreement with the State Department to assist with the initial placement and resettlement of refugees. HIAS works towards a world in which all refugees find welcome, safety, and freedom.  Founded as the Hebrew Emigrant Aid Society in 1881 to assist Jews fleeing pogroms in Russia and Eastern Europe (and later renamed the Hebrew Immigrant Aid Society), HIAS now serves refugees and persecuted people of all faiths and nationalities around the globe. Since HIAS's founding, the organization has helped more than 4.5 million refugees start new lives. HIAS has offices in 15 countries worldwide, including its headquarters in Silver Spring, Maryland, which is its principal place of business. HIAS provides resettlement services in the United States through 15 affiliates in 11 states.

13. Plaintiff Church World Service, Inc. ("CWS") is a 501(c)(3) faith-based organization committed to serving the world's most vulnerable people through just and sustainable responses

to hunger, poverty, displacement, and disaster. CWS is one of the nine national refugee resettlement agencies that has an agreement with the State Department to assist with the initial placement and resettlement of refugees.  Since its founding in 1946 in the aftermath of the Second World War, CWS has provided assistance and resettlement services to those displaced by violence and discrimination. Within the United States, CWS works to build welcoming communities that support refugees on a path toward self-sufficiency, full integration, and securing a bright future for their families. To date, CWS has helped to resettle more than 860,000 refugees, parolees, and other entrants across the United States. CWS has offices in 8 countries worldwide, including its headquarters in New York City and other domestic offices in Elkhart, Indiana and Washington, D.C.  CWS provides resettlement services in the United States in 19 locations in 16 states, either directly or through affiliates.

14. Plaintiff Lutheran Immigration and Refugee Service, Inc. ("LIRS") is a 501(c)(3) faith-based organization dedicated to helping refugees and migrants seek safety and hope in the United States.  LIRS is one of the nine national refugee resettlement agencies that has an agreement with the State Department to assist with the initial placement and resettlement of refugees, and one of only two national resettlement agencies that contract with the State Department to assist with the initial placement and resettlement of unaccompanied refugee minors.  Since its founding in 1939, LIRS has supported, equipped, and empowered more than half a million refugees resettling in the United States.  LIRS is based in Baltimore, Maryland.  LIRS provides resettlement services for adult refugees and families through affiliates in 30 locations; and it provides child welfare services under the Unaccompanied Refugee Minor Program through affiliates in 15 locations. In all, LIRS provides services in 23 states and the District of Columbia.

15. Defendant Donald Trump is the President of the United States. He is sued in his official

capacity. In that capacity, he issued the Executive Order challenged in this action.

16. Defendant Michael Pompeo is the Secretary of State and has responsibility for overseeing the enforcement and implementation of the Executive Order by all State Department staff. He is sued in his official capacity.

17. Defendant Alex Azar is the Secretary of Health and Human Services and has responsibility for overseeing the enforcement and implementation of the Executive Order by all Department of Health and Human Services ("HHS") staff. The Office of Refugee Resettlement ("ORR") sits within HHS as part of the Administration for Children and Families. He is sued in his official capacity.

18. Defendant Chad Wolf is the Acting Secretary of Homeland Security and has responsibility for overseeing the enforcement and implementation of the Executive Order by all Department of Homeland Security staff. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### Background on the Refugee Act and U.S. Refugee Resettlement

*The Refugee Act*

19. The United States Constitution assigns the federal government the exclusive authority to establish law and policy regarding the admission or exclusion of noncitizens, including the exclusive authority to regulate immigration. This authority "derives from various sources, including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,' its power '[t]o regulate Commerce with foreign Nations,' and its broad authority over foreign affairs." *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (citations omitted).

20. Pursuant to this authority, Congress has enacted a comprehensive statutory scheme to regulate immigration—the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*—

which empowers various federal agencies to enforce and administer immigration law.

21. Congress amended the INA in 1980 by enacting the Refugee Act, which embodies the U.S. commitment to humanitarian assistance for those fleeing persecution. Refugee Act of 1980 ("Refugee Act"), Pub. L. No. 96-212, 94 Stat. 102 (1980).

22. In enacting the Refugee Act, Congress sought to "provide a permanent and systematic procedure for the admission … of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." *Id.* § 101(b).

23. Through the Refugee Act, Congress declared that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," including through resettlement of such persons to this country. *Id.* § 101(a).

24. The Refugee Act sets out detailed policies and procedures that govern the admission and resettlement of refugees in the United States. *See* 8 U.S.C. § 1157, *et seq*.

25. Under U.S. law, and with limited exceptions, a "refugee" is a person fleeing his or her country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42).

26. Per the Refugee Act, each year the President determines, after consultation with Congress, the number of refugees whose resettlement in the United States in the upcoming fiscal year is "justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2)-(3).

27. The Refugee Act also established the Office of Refugee Resettlement ("ORR"), which sits within the Department of Health and Human Services. *See* 8 U.S.C. §§ 1521(a), 1522(b).

ORR is responsible for funding and administering federal cash and medical assistance programs for refugees beyond the initial resettlement period. 8 U.S.C. §§ 1521(b), 1522(e)(1).

28. The Refugee Act sets out detailed instructions regarding how it should be determined where admitted refugees are to be resettled within the United States.

29. Congress identified specific factors that federal agencies charged with making initial placement decisions *must* consider in administering the program. These include: (1) the proportion of refugees to the general population in the area; (2) the availability of employment opportunities, affordable housing, and public and private resources; (3) the likelihood of refugees in the area becoming self-sufficient; (4) the likelihood of secondary migration of refugees from the area; and (5) the views of the nonprofit organizations (including Plaintiffs) who provide resettlement services to refugees. *See, e.g.*, 8 U.S.C. §§ 1522(a)(2)(C)(iii)(I)-(IV), 1522(a)(2)(A).

30. The Refugee Act also requires federal agencies[1] to consult with relevant stakeholders about the refugee placement process. This includes the Resettlement Agencies and their affiliates as well as state and local governments. 8 U.S.C. §§ 1522(a)(2)(A), (D).

31. For example, the Act provides that the agencies "shall consult regularly (not less than quarterly) with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees among the States and localities before their placement in those States and localities." *Id.* § 1522(a)(2)(A).

---

[1] The Refugee Act permits the President to reassign the statutory authority of the Director of the Office of Refugee Resettlement to administer the Reception and Placement Program to another office. 8 U.S.C. § 1522(b)(1)(B). President Carter determined that the Department of State should exercise that authority; ever since, the Department of State's Bureau of Populations, Refugees, and Migration has administered the Reception and Placement Program. Accordingly, this Complaint refers to the State Department's responsibility to make grants or contracts with Resettlement Agencies "consistent with the objectives of [8 U.S.C. § 1522]." *Id.* § 1522(b)(1)(A).

32. The Act also provides that "[w]ith respect to the location of placement of refugees *within a State*"—but only within a State—"the [agencies] shall, consistent with such policies and strategies and to the maximum extent possible, take into account recommendations of the State." *Id.* § 1522(a)(2)(D) (emphasis added).

33. The legislative history of these statutory provisions confirms that this consultation requirement was "not intended to give States and localities any veto power over refugee placement decisions, but rather to ensure their input into the process and to improve their resettlement planning capacity." H.R. Rep. No. 99-132, at 19 (1985).

34. Congress has provided that assistance and services are to be provided to refugees "without regard to race, religion, nationality, sex, or political opinion." 8 U.S.C. § 1522(a)(5). ORR's regulations also incorporate this prohibition. *See* 45 C.F.R. § 400.5(g). Similarly, under their agreements with the State Department, Plaintiffs must carry out their refugee resettlement services in accordance with Title VI of the Civil Rights Act of 1964.

35. The United States has also ratified the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, which bound the United States to respect Articles 2 through 34 of the 1951 International Convention Relating to the Status of Refugees. Under the Protocol, the United States must respect a series of international obligations concerning the treatment and resettlement of refugees, including honoring the rights of refugees to choose their place of residence within their host country and to move freely within that country. *See* Art. 26 of the 1951 Convention Relating to the Rights of Refugees, 19 U.S.T. 6223.

### The U.S. Refugee Admissions Program

36. The U.S. Refugee Admissions Program is managed by the State Department with the Department of Homeland Security and the Department of Health and Human Services.

37. The State Department, through its cooperating agencies around the world, is responsible for facilitating the overall refugee application process, while the Department of Homeland Security has responsibility for determining an applicant's eligibility for refugee status under U.S. law.

38. Once the Department of Homeland Security conditionally approves an applicant for resettlement, the refugee receives a "sponsorship assurance" from one of the nine resettlement agencies ("Resettlement Agencies"), of which Plaintiffs are three.

39. The Resettlement Agencies enter into agreements with the State Department to participate in a congressionally created program that assists refugees after their resettlement. The agreements are called "cooperative agreements."

40. A refugee must receive a "sponsorship assurance" from a Resettlement Agency before she can travel to the United States. The Resettlement Agency assumes responsibility for placing the refugee with one of its affiliates, and for providing the refugee with initial services during her first 30 to 90 days in the United States.

41. In providing sponsorship assurances, Resettlement Agencies and their affiliates take responsibility for providing refugees with basic necessities and core services during their initial period of resettlement and—in coordination with publicly supported refugee service and assistance programs—assisting refugees in achieving economic self-sufficiency as soon as possible after their arrival in the United States.

42. Resettlement Agencies, directly and through affiliates, develop a close relationship with the refugee or refugee families they resettle, as they provide critical support during this vulnerable and challenging time.

43. For example, local resettlement offices provide many services that a refugee family is

likely to require immediately upon their arrival, including finding housing and furnishing it, stocking the pantry, and making the family a welcome meal for their first night. When the refugees arrive, staff often greet them at the airport, along with needed translators and caseworkers.

44. After the refugees arrive, staff help with transportation and facilitate conversation while the refugees learn English. Affiliates even provide babysitting services so that the refugees can undertake the necessary steps to transition to life in America, like taking an English placement test or getting social security cards.

45. In the past, it took refugees 18 to 24 months from application for admission as a refugee to resettlement in the United States. In recent years, however, it has taken far longer.

***Consultation and Placement***

46. Part of the sponsorship assurance process involves determining where in the United States a refugee will be resettled. This happens in two basic stages.

47. First, the State Department's Bureau of Population, Refugees, and Migration ("PRM") enters yearly into "cooperative agreements" with the nine Resettlement Agencies. Each cooperative agreement specifies both the number of refugees that the federal government and Resettlement Agency expect that the Agency will sponsor in the year ahead and their distribution among the jurisdictions in which the Resettlement Agency and/or its affiliates operate. The result is an overall annual placement plan that generally sets out the number of refugees to be placed in each location around the country.

48. In the second stage, PRM meets regularly—typically weekly—with the nine Resettlement Agencies to review individual refugee applicant case records and match the particular needs of each incoming refugee with the specific resources available in a local

community.

49. If a refugee has a relative or someone else designated as a "U.S. tie," then she must be placed in the location where that family member or friend resides, with limited exceptions. Otherwise, PRM and the relevant Resettlement Agency agree to resettle the refugee in the community whose resources best match the refugee's needs.

50. These decisions take considerable time and care and require weighing multiple factors.

51. Plaintiff HIAS, for example, has worked with outside researchers to develop software to enable it to improve its process of matching a newly admitted refugee with one of its local affiliates.

52. After a Resettlement Agency agrees to sponsor a refugee for resettlement, it notifies its local office or affiliate that it will receive the refugee for resettlement.

53. Upon receiving a notification of resettlement from a Resettlement Agency, the affiliate works to prepare for the refugee's arrival.

***Federal Funding for Refugee Assistance***

54. Federal funding for refugee resettlement and assistance falls into two main categories.

55. First, the State Department provides funding through the Reception and Placement Program, which covers up to the first 90 days a refugee is in the United States.

56. The Reception and Placement Program is administered through the cooperative agreements between the State Department and the Resettlement Agencies.

57. Resettlement Agencies use this funding to provide housing, essential furnishings, food, clothing, orientation, and assistance with access to other social, medical, and employment services. Under the cooperative agreements, Resettlement Agencies are reimbursed $2,175 per refugee they sponsor (at least $1,175 of which must be in direct assistance to the refugee, and up

to $1,000 of which may offset the cost of the affiliate's services and overhead supporting the refugee). This support is intended as a supplement to private resources the Resettlement Agencies and their affiliates are able to mobilize for the benefit of their refugee clients.

58. Second, ORR provides longer-term assistance to refugees, primarily through state governments. *See* 8 U.S.C. § 1522. ORR funds, among other things, transitional and medical services, as well as social services to help refugees become socially and economically self-sufficient. *See* 8 U.S.C. §§ 1521, 1522.

59. Additionally, ORR fully reimburses states for cash and medical assistance that they provide to refugees and their families. *See* 8 U.S.C. § 1522(e)(1).

60. The majority of refugee resettlement programs funded by ORR are administered by states. In order to receive these federal funds, a state must submit a state plan, which is approved by ORR. The state plan describes how the state will coordinate cash and medical assistance and otherwise meet the requirements imposed by the Refugee Act. *See id.* § 1522(a)(6); 45 C.F.R. §§ 400.4(a), 400.5(b).

61. If a state chooses to withdraw from the refugee resettlement program, it may do so with proper notice to ORR. *See* 45 C.F.R. § 400.301(a).

62. The Refugee Act does not condition the resettlement of refugees in a state on that state's participation in the refugee resettlement program.

63. If a state chooses to withdraw from the program, refugee resettlement continues in that state pursuant to alternative arrangements established by Congress and federal agencies. *See, e.g.,* 8 U.S.C. § 1522(e)(7); 45 C.F.R. § 400.301(c).

***The Success of the Refugee Program***

64. Since the passage of the Refugee Act in 1980, this congressionally established process for

refugee placement and resettlement has proved enormously successful, with the United States

serving as a world leader in humanitarian efforts to respond to the global refugee crisis. Refugees

from all over the world have been resettled in hundreds of locations across the country.

65. The following map reflects the total number of refugees resettled in the United States per

state over the last five fiscal years, according to data from PRM.



66. Since the passage of the Refugee Act in 1980, Plaintiffs and other Resettlement Agencies

have grown their networks of volunteers, drawing in large part from their various faith

communities, who are eager to welcome refugees.

67. Cities across the country have also sought to welcome refugees, recognizing the immense

value refugees bring to local communities. Cities with declining populations, for instance, have

been revived by the influx of newly admitted refugees. Refugees have invigorated local

economies, brought innovation, and made communities stronger through their contributions to

public life and cultural institutions.

**President Trump's Targeting of Refugees and Efforts to Dismantle the Refugee Resettlement Infrastructure**

68. In response to the global refugee crisis and the Syrian civil war, the United States began to accept more refugees. The United States raised the annual goal for refugee admissions from 70,000 to 85,000 in fiscal year 2016, and then to 110,000 in fiscal year 2017 in response to the scale of the current global refugee crisis.

69. Some politicians responded to this increase by encouraging and exploiting anti-refugee resentment. Then-Governor of Indiana Mike Pence was one of numerous state officials who attempted to block the resettlement of Syrian refugees in their states based on fearmongering that Syrian refugees represented a "Trojan horse" through which radical Islamic terrorists would enter the United States.

70. These state attempts to prevent refugee resettlement were uniformly blocked by the federal courts. *See, e.g.*, *Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902, 903-04 (7th Cir. 2016); *Tex. Health and Human Servs. Comm. v. United States*, 193 F. Supp. 3d 733, 745 (N.D. Tex. 2016); *Alabama v. United States*, 198 F. Supp. 3d 1263, 1278 (N.D. Ala. 2016). The Seventh Circuit found then-Governor Pence's actions to be discriminatory and based on nothing other than "nightmare speculation" of ISIS terrorists posing as refugees. *Exodus Refugee Immigration*, 838 F.3d at 903.

71. Amid this wave of anti-refugee sentiment, then-candidate Trump campaigned on a promise to exclude Muslim refugees, whom he vilified as "radical Islamic terrorists," from entering the United States. Within his first week in office, President Trump made good on his promise by signing Executive Order 13769, which, among other things, called for a 120-day suspension of the U.S. refugee admissions program and an indefinite ban on the resettlement of Syrian refugees. *See* Exec. Order No. 13769, Protecting the Nation From Foreign Terrorist Entry

Into the United States, 82 Fed. Reg. 8977 (Jan. 27, 2017). Executive Order 13769 also dramatically slashed the annual goal for refugee admissions set by President Obama by more than half. Federal courts immediately blocked certain provisions of Executive Order 13769, but the Trump Administration was undeterred. It continued with an onslaught of policies aimed at driving down refugee admission rates and dismantling the refugee resettlement infrastructure.

72. As a result of these efforts, the United States did not come close to meeting the annual refugee admissions goal for fiscal year 2018, which was already the lowest in the history of the United States' refugee resettlement program. Of the 45,000 admissions slots created by the Presidential Determination for fiscal year 2018, 82 Fed. Reg. 49,083 (Sept. 29, 2017), less than half that number of refugees were in fact admitted. Processing times for refugees seeking to be reunited with family members through the follow-to-join program also slowed to a near standstill.

73. As the end of fiscal year 2019 approached, the Administration announced it would propose yet another record-low refugee admissions goal of only 18,000. This represents less than one-fifth of the average (95,000) of all annual refugee admission goals set by previous presidents since the enactment of the Refugee Act in 1980.

74. Although the statute requires the President to set the annual refugee admissions goal before the beginning of the new fiscal year (that is, before October 1), *see* 8 U.S.C. § 1157(a)(2), President Trump delayed signing the Presidential Determination setting the Fiscal Year 2020 admissions goal for more than four weeks.

75. During that four-week delay, refugee admissions were yet again suspended. As a result, hundreds of refugees, many of whom have been waiting years to be resettled to safety in the United States, had their travel canceled during this period.

76. All of these actions—the suspensions of refugee admissions, the slashing of the annual refugee admissions goal, the failure to meet even slashed goals, and the delay in making the statutorily required determination—have not just harmed refugees waiting to come to the United States. They have also devastated refugees already here and the organizations that seek to help them.

77. The sharp drop in refugee admissions has forced Resettlement Agencies and their affiliates to make significant budget cuts. That, in turn, has reduced their ability to help refugees already resettled in the United States who continue to rely on Resettlement Agencies for support, including after their initial government-funded benefits run out. It has also meant the loss of community support critical to the United States' ability to resettle refugees in the future.

### The Refugee Veto Executive Order

78. On September 26, 2019, President Trump signed Executive Order 13888, entitled "Enhancing State and Local Involvement in Refugee Resettlement" ("Executive Order" or "Order"). *See* 84 Fed. Reg. 52,355 (Sept. 26, 2019).

79. The Order is similar to a provision included within President Trump's first two Muslim ban executive orders, both of which directed the Secretary of State to give states and localities the maximum possible role in determining the placement or resettlement of refugees in their jurisdictions.

80. Despite being in effect since the first week of President Trump's time in office, this directive did not materially change the limited, statutorily defined role states and localities have long played in making such determinations.

81. Thus, the Order challenged here is far more prescriptive: it requires the Secretary of State and the Secretary of HHS to "[w]ithin 90 days . . . develop and implement a process to determine

whether the State and locality both consent, in writing, to the resettlement of refugees within the State and locality, before refugees are resettled within that State and locality . . . ."  Exec. Order § 2(a). The Order also requires the Secretary of State to "publicly release any written consents of States and localities to resettlement of refugees." *Id.*

82. The Order does not define "locality," nor does it identify who within the State or "locality" is authorized to provide the written consent it requires.

83. It further directs the Secretaries of State and HHS to develop and implement a process by which "if either a State or locality has not provided consent to receive refugees under the Program, then refugees should not be resettled within that State or locality unless the Secretary of State concludes, following consultation with the Secretary of Health and Human Services and the Secretary of Homeland Security, that failing to resettle refugees within that State or locality would be inconsistent with the policies and strategies established under 8 U.S.C. § 1522(a)(2)(B) and (C) or other applicable law."  Exec. Order § 2(b).

84. The Order exempts refugees seeking to reunite with certain family members in the United States pursuant to 8 U.S.C. § 1157(c)(2)(A) from the operation of section 2(b). *See* Exec. Order § 2(c).

85. Under 8 U.S.C. § 1157(c)(2)(A), spouses and unmarried children under age twenty-one of already resettled refugees are entitled to admission to the United States in the same status as their spouse or parent so long as they are not inadmissible. *See* 8 U.S.C. § 1157(c)(2)(A). Refugees seeking admission under this statute are sometimes referred to as "follow-to-join refugees."

86. The Order does not exempt follow-to-join refugees from the operation of section 2(a).

87. Refugees resettled to the United States outside of the follow-to-join process are *also*

frequently reuniting with family members already here; yet family reunification outside of the follow-to-join process is not exempted from any of the Order's provisions.

**Defendants' Implementation of the Executive Order**

88. Defendants have already begun implementing the Executive Order.

89. Pursuant to that implementation, Defendants have decided that, as of June 1, 2020, refugees may not be resettled in a particular location unless the governments of both the "locality" and the encompassing state have affirmatively provided written consent for refugees to be resettled there.

90. Instead of soliciting those consents themselves, Defendants have decided to require the Resettlement Agencies, including Plaintiffs, to do so.

91. These decisions are reflected in the Notice of Funding Opportunity ("Funding Notice") PRM issued on November 6, 2019 for its Reception and Placement Program for Fiscal Year 2020, which will run from June 1, 2020 to September 30, 2020.

92. To be considered for the Reception and Placement Program for the 2020 fiscal year, a Resettlement Agency must submit an application according to the instructions in the Funding Notice by January 21, 2020 at 12:00 p.m. EST.

93. As stated in the Funding Notice, PRM is requiring applicants to "seek written consent for resettlement of refugees for FY 2020 from the state governor's office and the chief executive officer of the local government (county or county equivalent)."

94. The requirement to seek written consent applies not only to those applicants proposing to manage resettlement for adult refugees and refugee children traveling with their families, but also to those applicants proposing to assist with placing unaccompanied refugee minors into foster care.

95. The requirement to seek consent does not depend on whether the refugee to be resettled is a follow-to-join refugee.

96. The Funding Notice requires that applicants provide in their proposal a "list of state and local government consents."

97. For each listed state, the Resettlement Agency must also include supporting documentation in the form of "a letter of consent from the state governor's office" or, if consent is "unavailable," a "note [of] the date [the applicant] sought the consent and that it is unavailable."

98. For each listed locality, the Resettlement Agency must also include supporting documentation in the form of "a letter of consent from the chief executive officer of the local government (county or county equivalent)" or, if consent is "unavailable," a "note [of] the date the [applicant] sought the consent and that it is unavailable."

99. The Funding Notice instructs that "PRM will not permit placement in states or localities that lack such documentation."

100.     PRM will treat consents as a prerequisite to resettlement.

101.     This is evident, for example, from the Funding Notice's instructions regarding placement of refugees outside of PRM's prescribed ordinary resettlement radius of 50- or 100- miles within the state of a particular local office. Applicants proposing to manage placement of refugees outside that placement radius must propose a model that "include[s] an approach that ensures refugees are placed only in states and localities that have consented to receive refugees."

102.     The Funding Notice also advises applicants that "state and local consents are not required for refugee resettlement *before* the award period." (emphasis added).

103.     Moreover, although section 2(b) of the Executive Order suggests the possibility

that the lack of consent from a particular state or local government might not preclude refugee resettlement there, the implementation of the Order, as evidenced by the Funding Notice, does not provide for such a possibility.

**The Executive Order and Its Implementation Irreparably Harm Plaintiffs**

104. Plaintiffs are three of the nine national Resettlement Agencies with current cooperative agreements with the State Department to resettle refugees through the Reception and Placement Program.

105. Refugee resettlement lies at the heart of the Plaintiffs' work in the United States. The Plaintiffs share a mission to stand with and advocate on behalf of refugees and other persecuted people and engage their respective faith communities in welcoming refugees and newcomers.  Plaintiffs' missions and work are the product of sincerely held religious beliefs.

106. Plaintiffs collectively have resettled millions of refugees.

107. Plaintiffs' current cooperative agreements end on May 31, 2020. Starting on June 1, 2020, Plaintiffs must have a new cooperative agreement in order to continue assisting newly admitted refugees with their resettlement in the United States.

108. Per the Funding Notice's requirements, Plaintiffs must submit their proposals for refugee resettlement by January 21, 2020 in order to be considered for a new cooperative agreement.

109. For clients assigned to them through the State Department's process, Plaintiffs provide direct resettlement services or partner with other organizations across the country to do so.

110. HIAS currently provides refugee resettlement support through its various affiliate offices in 11 states: California, Delaware, Florida, Massachusetts, Michigan, New York, North

Carolina, Ohio, Pennsylvania, Washington, and Wisconsin.

111.     Either directly or through its affiliates, CWS currently maintains resettlement offices in 19 locations in 16 states: California, Florida, Georgia, Illinois, Indiana, Kentucky, Michigan, Nebraska, New Hampshire, New York, North Carolina, Ohio, Oregon, Pennsylvania, Texas, and Virginia.

112.     LIRS provides resettlement services for adult refugees and families through affiliates in 30 locations. LIRS also resettles unaccompanied refugee children through affiliates in 15 locations. In all, LIRS provides services in the District of Columbia and 23 states: Arkansas, Arizona, California, Colorado, Florida, Georgia, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, South Carolina, South Dakota, Texas, Virginia, Washington, and Wisconsin.

113.     Some of LIRS's affiliates resettle both unaccompanied refugee children and other refugees, but most of its affiliates only resettle one or the other group.

114.     Plaintiffs' success as Resettlement Agencies depends on their broad network of affiliates and offices around the country. In order to carry out their work effectively, Plaintiffs and their affiliates invest considerably in a network of individuals and entities whose cooperation is both useful and necessary to successfully resettle refugees, including landlords, medical providers, employers, government agencies, congregations, civic organizations, and foster care providers.

115.     Plaintiffs also rely heavily on the work of their volunteers, often drawing upon their faith communities that believe—as Plaintiffs do—that refugee resettlement is a fulfillment of the religious calling to welcome the stranger. In turn, Plaintiffs serve as a conduit, providing these faith communities with an opportunity to express this sense of calling.

116.     As a result of the Executive Order and its implementation, Plaintiffs must seek the written consent of all relevant state and local governments in every location where they propose to resettle refugees in the current fiscal year.

117.     Plaintiffs must document these consents before January 21, 2020, when their proposal in response to the Funding Notice is due.

118.     If Plaintiffs do not document the relevant consents by this deadline, they will be unable to continue resettling refugees in those locations.

119.     If Plaintiffs or their affiliates are not permitted to continue resettling refugees, they may be unable to sustain their operations and be forced to close local resettlement offices. This would frustrate Plaintiffs' missions and harm their overall operations.

120.     The relationships and goodwill that Plaintiffs and their affiliates have cultivated over the course of several decades is difficult to rebuild once lost and cannot be transferred to new localities and states.

121.     Moreover, if Plaintiffs are forced to close certain of their affiliates, their ability to continue to provide services under the Reception and Placement Program itself may be threatened. This is so because in awarding cooperative agreements, the State Department considers a Resettlement Agency's geographic reach and whether it has demonstrated low rates of "secondary migration," a term referring to the phenomenon in which a refugee quickly decides to move away from his or her initial placement.

122.     More generally, secondary migration creates inefficiencies and burdens because the initial Resettlement Agency affiliate must coordinate with the receiving Resettlement Agency affiliate to transfer services for the refugee who has moved. Moreover, the initial affiliate loses its investment in the refugee's initial resettlement, and the refugee must expend time and

resources to relocate.

123.     In order to try to avoid these harms, Plaintiffs must engage in considerable

lobbying activities to solicit written consents from state and local governments, as required by

the Executive Order. Plaintiffs and their affiliates expect to spend thousands of hours lobbying

scores of state and local governments if the Executive Order remains in effect.

124.     Lobbying on this scale will result in the diversion of Plaintiffs' resources, which

will threaten their ability to engage in work in furtherance of their missions.

125.     The burdens imposed by being required to document written consents are

especially severe because of uncertainty around the precise locations where refugees may have

U.S. ties or otherwise wish to resettle. Moreover, because refugees ordinarily may be placed

anywhere within a 50- or 100-mile in-state radius of an affiliate office, Plaintiffs' affiliates

generally must solicit consents from well beyond the counties in which they reside.

126.     For Plaintiff LIRS, this issue is compounded by the fact that in addition to the

services that it provides to refugees through the Reception and Placement Program, it is one of

only two national Resettlement Agencies that participates in the Unaccompanied Refugee Minor

("URM") program. Under this program, LIRS works with the State Department and HHS to

provide child welfare services to refugee children who are resettled in the United States without

a parent or custodian.

127.     This work includes identifying, screening and educating potential foster families,

and placing refugee children with those families. An appropriate foster family can be located

*anywhere within a participating state*, which means that maintaining the ability to operate the

URM program will require LIRS to obtain the written consent of every "county or county

equivalent" in every state where the program operates.

128.     Plaintiffs are concerned that time spent lobbying state and local officials for consent could expose it or its affiliates—all of whom are non-profit organizations—to liability under state or federal laws regulating lobbying, particularly by non-profits.

129.     The process for obtaining consents has been made more difficult as a result of Defendants' failure to provide sufficient guidance clarifying what the Executive Order requires. For example, the Funding Notice fails to explain its use of "county equivalent" so as to enable Plaintiffs and their affiliates to solicit consent from such an entity. As a result, Plaintiffs have been forced to divert significant resources to address questions from their affiliates about the Order.

130.     The Executive Order and its implementation burden and threaten Plaintiffs' ability to fulfill their missions in accordance with their religious values.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of the Refugee Act)

131.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

132.     The Refugee Act sets out the conditions and considerations for the domestic resettlement of refugees, including the placement of refugees among and within the states. *See* 8 U.S.C. § 1522(a).

133.     The Refugee Act also specifies that the President must "determine[]" the total number of refugees to be admitted within a given fiscal year, after consultation with Congress. *See* 8 U.S.C. § 1157(a)(2) & (e).

134.     Within this congressionally created scheme, the state and local governments' role in decisions regarding placement of admitted refugees is well-defined—they are to be consulted.

*See* 8 U.S.C. § 1522(a)(2)(A)-(D).

135.     Under the Refugee Act, refugee placement and/or resettlement may not be conditioned on either the state or the local government's approval, much less both.

136.     The Executive Order and the Defendants' implementation of it violate the Refugee Act.

**SECOND CLAIM FOR RELIEF**
**(Violation of the Administrative Procedure Act)**

137.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

138.     Defendants' actions taken to implement the Executive Order, including but not limited to Defendants' conditioning of refugee placement and resettlement on prior state and local written consent, are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

139.     Defendants' actions taken to implement the Executive Order were arbitrary and capricious because they failed to follow their own policies, procedures, and regulations.

140.     Defendants' actions taken to implement the Executive Order, including Defendants' conditioning of refugee placement on prior state and local written consent, constitute a legislative rule issued without observance of the notice and comment procedure required by 5 U.S.C. § 553.

141.     Defendants' implementation of the Executive Order must therefore be set aside pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(D).

## THIRD CLAIM FOR RELIEF
### (Violation of the U.S. Constitution – Federalism)

142.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

143.     Under the U.S. Constitution, the federal government has the exclusive authority to determine law and policy regarding noncitizens and immigration, including the exclusive authority to determine the admission and exclusion of refugees.

144.     The Executive Order and Defendants' implementation of it seek to delegate to state and local governments authority that the Constitution vested exclusively with the federal government.

145.     The Executive Order and Defendants' implementation of it are therefore preempted by the principle of federalism on which the Constitution is structured.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.  A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing any portion of the Executive Order;

B.  A declaration that the Executive Order is unlawful and invalid;

C.  A declaration that conditioning refugee placement on the written consent from state and local governments is unlawful and invalid;

D.  An order awarding Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law;

E.  Such other and further relief as the Court deems equitable, just, and proper.

Dated: November 21, 2019

Melissa S. Keaney*
International Refugee Assistance Project
PO Box 2291
Fair Oaks, CA
mkeaney@refugeerights.org
(916) 546-6125

Respectfully submitted,

/s/ Justin B. Cox
Justin B. Cox (Bar No. 17550)
International Refugee Assistance Project
PO Box 170208
Atlanta, GA 30317
jcox@refugeerights.org
(516) 701-4233

Linda Evarts*
Kathryn Austin*
Mariko Hirose*
International Refugee Assistance Project
One Battery Park Plaza 4th Floor
New York, NY 10004
levarts@refugeerights.org
kaustin@refugeerights.org
mhirose@refugeerights.org
(516) 701-4620

* Motion for *Pro Hac Vice* forthcoming