# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HIAS, INC., *et al.*,

        *Plaintiffs*,

    *v.*

DONALD TRUMP, in his official capacity as President of the United States, *et al.*,

        *Defendants*.

Civil Action No. 8:19-cv-3346-PJM

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT THEREOF

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

Introduction ............................................................................................................................. 1

Statement of Facts ................................................................................................................. 3

    I.    The Refugee Act Established a "Comprehensive and Uniform" Scheme for the Effective Resettlement of Admitted Refugees. ................................................................... 3

    II.    A Refugee's Initial Placement Within the United States Is Determined Through the Reception and Placement Program. ....................................................................... 4

    III.    A New Executive Branch Policy Conditions Refugee Placement on the Advance Written Consent of Both State and Local Government Officials. ................................. 7

    IV.    The Executive Order Threatens Plaintiffs' Core Missions. ........................................... 10

Argument ............................................................................................................................. 12

    I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Executive Order Is Unlawful. ................................................................................................................. 12

        A.    The Executive Order Violates the Refugee Act. .......................................... 13

            1.    *The Refugee Act Assigns Responsibility for Making Refugee Placement Decisions on the Federal Government, Not State and Local Governments.* ......................................... 13

                a.    Text ............................................................................................. 13

                b.    Purpose. ....................................................................................... 137

                c.    Statutory and Legislative History. .......................................... 138

            2.    *By Conditioning Refugee Placement on a State or Local Government's Prior Affirmative Consent, the Executive Order Violates the Refugee Act.* ............................... 20

            3.    *Any Construction of the Refugee Act That Would Authorize the Executive Order Must Be Rejected to Avoid Serious Constitutional Doubt.* ........................................ 22

        B.    The Implementation of the Executive Order Is Arbitrary and Capricious. .................... 23

    II.    Absent an Injunction, Plaintiffs Will Be Irreparably Harmed. ......................................... 31

    III.    The Balance of Equities Tips in Plaintiffs' Favor, and a Preliminary Injunction Serves the Public Interest. ................................................................................................................. 34

Conclusion ........................................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. United States*,
198 F. Supp. 3d 1263 (N.D. Ala. 2016) .............................................................. 18, 24

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
522 U.S. 359 (1998) ............................................................................................ 23

*Arizona v. United States*,
567 U.S. 387 (2012) ............................................................................................ 22

*CASA de Maryland, Inc. v. Trump*,
355 F. Supp. 3d 307 (D. Md. 2018) .................................................................... 31

*Chae Chan Ping v. United States*,
130 U.S. 581 (1889) ............................................................................................ 22

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ........................................................................... 21

*Chy Lung v. Freeman*,
92 U.S. 275 (1875) .............................................................................................. 22

*Clark v. Martinez*,
543 U.S. 371 (2005) ............................................................................................ 22

*De Canas v. Bica*,
424 U.S. 351 (1976) ............................................................................................ 22

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ..................................................................................... 23-24

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ........................................................................................ 23

*Envt'l Def. Ctr., Inc. v. EPA*,
344 F.3d 832 (9th Cir. 2003) .............................................................................. 15

*Exodus Refugee Immigration, Inc. v. Pence*,
838 F.3d 902 (7th Cir. 2016) .......................................................................... 16, 24

*Fed. Leasing Inc. v. Underwriters at Lloyd's*,
650 F.2d 495 (4th Cir. 1981) ........................................................................... 32-33

*Haswell v. United States*,
500 F.2d 1133 (Ct. Cl. 1974) .............................................................................. 32

*Int'l Refugee Assis. Project v. Trump*,
265 F. Supp. 3d 570 (D. Md. 2017) .................................................................... 21

*Judulang v. Holder*,
565 U.S. 42 (2011).......................................................................................... 23, 30

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ......................................................................31-32, 35

*Lopez v. Davis*,
  531 U.S. 230 (2001) .................................................................... 13

*Marx v. Gen. Revenue Corp.*,
  568 U.S. 371 (2013) .................................................................... 17

*Mayor & City Council of Baltimore v. Azar*,
  392 F. Supp. 3d 602 (D. Md. 2019) ...................................... 34, 35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................... 23

*Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*,
  918 F.3d 353 (4th Cir. 2019) ...................................................... 33

*NaturaLawn of Am., Inc. v. W. Grp., LLC*,
  484 F. Supp. 2d 392 (D. Md. 2007) ............................................ 33

*Pension Benefit Guar. Corp. v. LTV Corp.*,
  496 U.S. 633 (1990) .................................................................... 23

*Rust v. Sullivan*,
  500 U.S. 173 (1991) .................................................................... 23

*Takahashi v. Fish & Game Comm'n*,
  334 U.S. 410 (1948) ...................................................................... 7

*Texas Health & Human Servs. Comm'n v. United States*,
  193 F. Supp. 3d 733 (N.D. Tex. 2016) ................................... 17-18

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .................................................................... 34

*Truax v. Raich*,
  239 U.S. 33 (1915) ...................................................................... 22

*U.S. Telecom Ass'n v. F.C.C.*,
  359 F.3d 564 (D.C. Cir. 2004) .................................................... 30

*W.M. Schlosser Co., Inc. v. Sch. Bd. of Fairfax County, Va.*,
  975 F.2d 1075 (4th Cir. 1992) .................................................... 25

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................. 12, 34


**Statutes & Regulations**

45 C.F.R. § 400.69 .......................................................................... 16

5 U.S.C. § 706(2)(A) ................................................................. 21, 23

8 U.S.C. § 1101(a)(42) ...................................................................... 3

8 U.S.C. § 1157 ...................................................................... 1, 3, 12, 15

8 U.S.C. § 1521 ................................................................................ 4

8 U.S.C. § 1522 .......................................................................................... *passim*

Refugee Act of 1980, Pub. L. No. 96-212 ............................................ *passim*

Refugee Assistance Amendments of 1982, Pub. L. No. 97-363 .................. 19

Refugee Assistance Extension Act of 1986, Pub. L. No. 99-605 ............... 19

Treas. Reg. § 1.501(c)(3)-1(c)(3)(ii) ......................................................... 32

**<u>Introduction</u>**

Plaintiffs HIAS, Church World Service, and Lutheran Immigration and Refugee Service are three faith-based nonprofit organizations that seek a preliminary injunction of an Executive Order that aims to dismantle, and has already begun to irreparably disrupt, the U.S. refugee resettlement program as it has successfully existed since its creation nearly four decades ago. In 1980, Congress codified the United States' long-standing commitment to persons fleeing persecution in their home countries, establishing a "comprehensive and uniform" scheme for the resettlement of refugees. *See* Refugee Act of 1980 ("Refugee Act"), Pub. L. No. 96-212 § 101(a), 94 Stat. 102; *see* 8 U.S.C. § 1157. Plaintiffs are three of just nine national organizations, known as "Resettlement Agencies," that enter into agreements with the federal government to provide initial housing, necessities, and services for incoming refugees under the Refugee Act. These organizations have spent decades developing the networks, expertise, and resources to enable successful refugee resettlement, which often includes family reunification, in local communities across the United States. In these decades, states and localities were— pursuant to Congress' unmistakable intent—given a voice but not a veto in where refugees would be resettled.

In a drastic departure from this precedent, President Trump issued an Executive Order directing a new condition on refugee placement: the federal government "should resettle refugees only in those jurisdictions in which both the State and local governments have consented to receive [them]." Exec. Order No. 13888, 84 Fed. Reg. 52,355 (Sept. 26, 2019) ("Order"), Ex. A. Defendants have implemented this Order, including by announcing on November 6 that Resettlement Agencies—such as Plaintiffs—that seek to continue providing initial resettlement services beyond June 2020 must pursue prior written state and local consent for every jurisdiction in which they propose to resettle refugees. *See* U.S. Dep't of State, *FY 2020 Notice*

*of Funding Opportunity for Reception and Placement Program* (Nov. 6, 2019) ("Funding Notice"), Ex. B. Defendants' actions have thrown Plaintiffs and their local partner organizations into a frenzy, as they try to determine how to operationalize this unprecedented new condition and face the imminent prospect that, if affirmative consent from a jurisdiction cannot be secured on an extremely short deadline, then no refugees will be permitted to resettle there as of June 1, 2020—even refugees with communities standing ready to welcome them or families waiting to reunite with them.

This policy—announced in the Executive Order and implemented by the agencies—is unlawful. First, it conflicts with the Refugee Act. That Act requires the Executive to consult with Congress, Resettlement Agencies, and state and local governments on the resettlement of refugees and requires the Executive to decide how many refugees may be resettled and where they should be resettled based on its consideration of enumerated factors. The Refugee Act does not permit state or local governments to bar refugees from resettling in their jurisdictions entirely. Indeed, Congress considered and specifically rejected the possibility that the Executive could delegate these delicate decisions to state and local officials. *See* H.R. Rep. No. 99-132, at 19 (1985) (explaining that the statute's consultation requirements were "not intended to give States and localities any veto power over refugee placement decisions"). Moreover, construing the Refugee Act to allow refugee placement to be conditioned on affirmative written consent from state and local governments would raise serious constitutional concerns because the Constitution commits these decisions exclusively to the federal government. Second, Defendant agencies' implementation of the Executive Order is arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), because it is not the product of reasoned decisionmaking. Among other fatal procedural flaws, Defendants entirely failed to take account

of the factors Congress ordered the agencies to consider when deciding where to resettle refugees within the United States; the strong reliance interests engendered by its previous policy; or a multitude of obvious practical problems, like the diversity of local government arrangements. Defendants cannot ignore the APA's requirements on the whims of the President.

Plaintiffs respectfully request that the Court issue a preliminary injunction to restore the status quo ante and to stop implementation of this unlawful policy. As explained below, Plaintiffs are likely to succeed on the merits of their claim that the policy is unlawful, and they will be irreparably harmed absent preliminary injunctive relief. The Order is already requiring them to divert significant resources from their primary missions, and it imminently threatens their tax-exempt status, the ongoing viability of substantial parts of their local operations, and the associated goodwill that they have built over decades. The balance of equities, moreover, tips sharply in Plaintiffs' favor, and the public interest is served by restoring the status quo of nearly 40 years and directing the federal government to simply obey the law.

## Statement of Facts

### I.     The Refugee Act Established a "Comprehensive and Uniform" Scheme for the Effective Resettlement of Admitted Refugees.

The Refugee Act amended the Immigration and Nationality Act to provide, for the first time, "comprehensive and uniform provisions" for the resettlement of refugees in the United States. *Id.* § 101(a). It accomplished that goal in three primary ways. *First*, the Act provided a new, non-discriminatory definition of "refugee" that encompasses all people who qualify for refugee status under the U.N. Convention and Protocol on the Status of Refugees. *See* 8 U.S.C. § 1101(a)(42). *Second*, the Act permitted the President, after "appropriate consultation" with Congress, to determine the total number of refugees to be admitted into the United States each year. *See id.* § 1157(a)(2). *Third*, the Act created the Office of Refugee Resettlement ("ORR")

and charged it with administering new programs designed to help refugees resettle in their new communities. *See id.* §§ 1521, 1522(b).

Through this "comprehensive" scheme, the Act instructs—in a manner refined over the course of two subsequent amendments—that while state and local governments (along with Resettlement Agencies) are to be consulted about refugee resettlement, the federal Executive determines where newly admitted refugees are to be placed based on congressionally enumerated factors. In amendments made to the Act in 1982 and again in 1985-86, Congress responded to state complaints about the lack of consultation about refugee placement by clarifying, with increasing specificity, the consultation obligations placed on the federal agencies administering the program. These amendments, described *infra*, demonstrate conclusively that Congress did not intend "consultation" to mean approval. *See, e.g.*, 8 U.S.C. § 1522(1)(2)(C)(ii) (added in 1982, and requiring the agencies to "provide for a mechanism whereby representatives of local affiliates of [Resettlement] agencies regularly . . . meet with representatives of State and local governments to plan and coordinate in advance of [a refugee's] arrival the appropriate placement" of refugees); *id.* § 1522(a)(2)(C)(iii) (added in 1985-86 and specifying factors ORR is required to take into account in making refugee placement decisions); *see generally* Ex. I (history of congressional revisions of 8 U.S.C. § 1522(a)).

## II.     A Refugee's Initial Placement Within the United States Is Determined Through the Reception and Placement Program.

For refugees, resettlement in the United States is the culmination of a years-long process of applying for refugee status. *See* Decl. of Mark Hetfield ("Hetfield Decl.") ¶ 32, Ex. C. The U.S. Department of State ("State Department") manages Resettlement Support Centers around the world that facilitate a rigorous, multi-stage screening and review process for refugees referred for resettlement to the United States. *Id.* ¶ 34.

4

Refugees' initial resettlement in the United States is administered, according to the Refugee Act, by the "Reception and Placement Program." *See* 8 U.S.C. § 1522(b)(1). Under the Program, Resettlement Agencies—referred to in the statute as "private nonprofit voluntary agencies"—are responsible for welcoming and facilitating the initial integration of refugees, *id.* § 1522(a)-(b), as they have been doing since long before the Refugee Act codified their role, *see* Hetfield Decl. ¶¶ 8-9; Decl. of John McCullough ("McCullough Decl.") ¶¶ 4-5, Ex. D; Decl. of Krish O'Mara Vignarajah ("Vignarajah Decl.") ¶¶ 9-10, Ex. E. The federal government, in turn, is responsible for determining where in the United States those refugees should be placed, in consultation with the Resettlement Agencies and with state and local governments. 8 U.S.C. § 1522(a)(2)(A), (B).[1] This placement process has historically occurred in two stages.

At the Placement Plan stage, the State Department's Bureau of Population, Refugees, and Migration ("PRM") enters yearly into cooperative agreements with the Resettlement Agencies, including Plaintiffs. *See* Hetfield Decl. ¶ 37; McCullough Decl. ¶¶ 9, 23; Vignarajah Decl. ¶¶ 22-33; Decl. of Eric Schwartz ("Schwartz Decl.") ¶¶ 6-8, 14, Ex. F. Each cooperative agreement specifies both the number of refugees the Resettlement Agency is expected to sponsor in the year ahead and the distribution of those refugees among the jurisdictions in which the Resettlement Agency and/or its local affiliates operate. *See* Hetfield Decl. ¶ 38. In tandem with its process of

---

[1] Two defendant agencies—the State Department and the Department of Health and Human Services ("HHS")—share this role. The Refugee Act permits the President to reassign to another office the statutory authority of the Director of ORR, which sits within HHS to administer the Reception and Placement Program. 8 U.S.C. § 1522(b)(1)(B). President Carter determined that the State Department should exercise that authority; ever since, the State Department's Bureau of Population, Refugees, and Migration ("PRM") has administered the Reception and Placement Program. Because PRM is the entity that contracts with the national Resettlement Agencies, the State Department has traditionally played a significant role in determining refugee placement, even though the Refugee Act refers only to the "Director" of ORR in creating the process for determining refugee placement within the United States. *See* 8 U.S.C. § 1522(a).

negotiating and entering into cooperative agreements with the Resettlement Agencies, PRM develops a national plan for placing refugees around the United States informed by consultation by both PRM and the Resettlement Agencies with state and local governments. *See* Schwartz Decl. ¶¶ 7-8, 10-14. ORR assists PRM with the process of reviewing cooperative agreement proposals. *See* Decl. of Robert Carey ("Carey Decl.") ¶ 17, Ex. G.

At the Individual Placement stage, the State Department convenes weekly meetings with representatives of the Resettlement Agencies to determine which available affiliate and locality best match the needs of each arriving refugee. *See* Hetfield Decl. ¶¶ 42-45. At these meetings, PRM identifies refugees who have been conditionally approved for resettlement in the United States and assigns the refugee to one of the Resettlement Agencies, based on consideration of factors including the refugee's family or friends in the United States, special needs of the refugee, and the Resettlement Agency's community networks and available resources. *See id.* ¶¶ 43-45. Soon after the meeting, the Resettlement Agency assigned the refugee decides which of its local affiliates to place the case with, and by extension, which community the refugee will be placed in. *See id.* ¶ 46; Vignarajah Decl. ¶ 26. This is a complex decision requiring an individualized assessment of the refugee and the ability of different locations to meet his or her needs. Hetfield Decl. ¶¶ 47-48. The Resettlement Agency then commits to assure that the refugee will be sponsored during his or her first 90 days in the United States. *See id.* ¶ 49. Refugees must obtain such "sponsorship assurance" before they can travel to the United States. *See id.* ¶ 50; Vignarajah Decl. ¶ 26.

As Congress recognized, placing refugees in communities that will allow them to thrive is crucial to their becoming self-sufficient members of society. Relevant considerations include, among other things, whether a given refugee has friends or family already living in the United

States (as refugees tend to quickly relocate to be near their families, if they are not placed near them, *see* Carey Decl. ¶ 41), whether the refugee requires special services available only in particular locations, whether the community in which the refugee is to be resettled is affordable, and whether the community offers sufficient employment opportunities. *See* Schwartz Decl. ¶¶ 7-14; Carey Decl. ¶ 16; *see also* 8 U.S.C. § 1522(a)(2)(C)(iii) (setting forth specific factors the agencies *must* take into account when making refugee placement decisions).

Once a Resettlement Agency has been assigned a refugee, the Agency (or its local affiliate) arranges initial housing for the refugee. *See* Hetfield Decl. ¶ 49; Vignarajah Decl. ¶ 27. Once admitted to the United States, refugees have the constitutional right to move from their initial placements,[2] but PRM has traditionally sought to avoid so-called "secondary migration" because of the burden and wasted resources it entails for the government, Resettlement Agencies, and refugees themselves. *See* Hetfield Decl. ¶¶ 54-55, 60-65. It is thus in the interest of all involved to resettle refugees in communities where they are likely to stay. *See id.*

III.   **A New Executive Branch Policy Conditions Refugee Placement on the Advance Written Consent of Both State and Local Government Officials.**

On September 26, 2019, President Trump issued an Executive Order directing that the federal government should resettle refugees "only in those jurisdictions in which both the State and local governments have consented to receive refugees under the Department of State's Reception and Placement Program." Order § 1. Specifically, the Order instructs Defendants to "implement a process" that precludes resettlement of refugees in a jurisdiction if either the

---

[2] *See Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 420 (1948) ("all persons lawfully in this country shall abide in any state on an equality of legal privileges with all citizens under non-discriminatory laws" (citation and quotation marks omitted)).

relevant state or locality has not affirmatively agreed in writing to accept them.[3] *Id.* § 2. With respect to implementation, the President directed the following:

*First*, within 90 days—by Christmas Day 2019—the Secretary of State and the Secretary of HHS were to "develop and implement a process to determine whether the State and locality both consent, in writing," to refugee resettlement "before refugees are resettled within that State and locality." *Id.* § 2(a).

*Second*, within that same time period, those Secretaries were to "develop and implement a process" whereby, "if either a State or locality has not provided consent to receive refugees under the Program, then refugees should not be resettled within that State or locality." *Id.* § 2(b); *accord* White House Fact Sheet, Ex. L ("At President Trump's direction, refugees will be resettled in jurisdictions where both State and local governments consent to receive them."). The Order holds out the possibility of a limited carve-out if the Secretary of State (after consultation with the Secretaries of HHS and Homeland Security) concludes that failure to resettle refugees in a jurisdiction would violate the law and notifies the President of that decision before resettling any refugees there. *See* Order § 2(b). By its terms, the Order applies to the resettlement of all refugees. Only "the resettlement of a refugee's spouse or child following to join that refugee pursuant to 8 U.S.C. [§] 1157(c)(2)(A)" is exempted from the Order's second provision, § 2(b). This type of resettlement is a narrow category that does not include all spouses or children who are resettling to be reunited with their family already in the United States. *See id.* § 2(c); Hetfield

---

[3] The Order observed that Executive Order 13780—the second iteration of the "travel ban" affecting seven Muslim-majority countries, issued on March 6, 2017—had directed the Secretary of State to "devise a proposal" to give states and localities "greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions," Order § 1, but to date, there is no evidence that the Secretary of State devised such a proposal.

Decl. ¶ 59. Oddly, however, so-called "follow-to-join" refugees are *not* exempted from § 2(a) of the Order—*i.e.*, the part that conditions resettlement on state and local consent.

*Third*, the Secretary of State was to "publicly release any written consents of States and localities to resettlement of refugees." Order § 2(a). On a conference call the evening the Order was released, a White House representative explained that "the point of posting the letters publicly is so that people can see what their [state and local] political representatives are doing." Tr. of White House Press Briefing, Ex. H, at 6. The Order does not require publication of anything related to a state or local government's decision to refuse refugee resettlement.

Pursuant to this Order, on November 6, 2019, the State Department publicly announced the imposition of a new condition on the FY 2020 Reception and Placement Program. *See* Funding Notice at 3. "Consistent with . . . Executive Order 13888," PRM directed that each Resettlement Agency "should seek written consent for resettlement of refugees from the state governor's office and the chief executive officer of the local government (county or county equivalent)." *Id*. It should do so, PRM further provided, "[f]or each state and locality where the applicant proposes to resettle refugees during the award period." *Id.* Resettlement Agencies must solicit consents by January 21, 2020 (the date proposals are due) and must document their efforts as part of their applications. *See id.* at 8, 24, 37, 42. Starting on June 1, 2020, when the new award period begins, refugees may be resettled only where the relevant state and local officials have affirmatively consented in writing. *See id.* at 13 ("The proposed model shall include an approach that ensures refugees are placed only in states and localities that have consented to receive refugees."); *cf. id.* at 4-5, 12 ("[S]tate and local consents are not required for refugee resettlement *before* the award period." (emphasis added)). Like the Executive Order, PRM has not provided written guidance regarding how to identify the local government official who may

provide the requisite written consent. Nor has it explained what it means by "county equivalent," or even why the consent should come from a county, rather than a municipality, when the Executive Order itself requires consent merely of the "locality." The State Department itself has exhibited confusion: as initially published, the Funding Notice said that consent could be obtained from cities and mayors, but it was edited less than a week later to remove that suggestion. *See* Hetfield Decl. ¶ 75.

Thus, in addition to the longstanding requirement that prospective Resettlement Agency proposals describe the Agency's record of community engagement and consultation with state and local governments, *see* Carey Decl. ¶ 34; Schwartz Decl. ¶¶ 11-12; Hetfield Decl. ¶¶ 39-40, each Resettlement Agency must now seek affirmative written approval from each state *and* "county or county equivalent" it proposes as a placement site. A Resettlement Agency that fails to seek and document the status of approvals for its placement sites by January 21, 2020 faces exclusion from the Reception and Placement Program altogether. *See, e.g.*, Funding Notice at 7-8 ("[r]equir[ing]" "List of State and Local Government Consents" as part of application); *id.* at 25 ("Eligible submissions will be those that comply with the criteria and requirements included in this announcement."); *cf.* at 25-26 (assigning 20 of 110 points in the Resettlement Agency selection process to "clear documentation of," among other things, "a network with large geographic scope"). At the very least, the Resettlement Agency faces exclusion at the Placement Plan stage, and subsequently at the Individual Placement stage, of those jurisdictions for which it has not obtained consent. *See id.* at 12, 13.

## IV. The Executive Order Threatens Plaintiffs' Core Missions.

Plaintiffs are three nonprofit, faith-based organizations with nearly 300 combined years of experience resettling refugees in the United States that currently work with the federal government to help refugees start their lives in the United States safely and with dignity. *See*

Hetfield Decl. ¶ 6-9; McCullough Decl. ¶¶ 3-5, 9; Vignarajah Decl. ¶¶ 6, 9-11, 22. Plaintiffs'
clients are some of the most vulnerable people in the world. *See* Hetfield Decl. ¶ 15; McCullough
Decl. ¶ 3. Plaintiffs' mission is to provide these refugees with a welcoming environment and the
support that will allow them to successfully integrate into the United States. *See* Hetfield Decl.
¶¶ 7, 18; McCullough Decl. ¶¶ 4-5, 8-16, 21-22; Vignarajah Decl. ¶ 6. Their support includes
initial housing, food, and necessities obtained even before refugees first arrive in the United
States, but also extends to ongoing support in the form of cultural integration, employment
assistance, and specialized services for, among others, LGBTQ and disabled refugees. *See*
Hetfield Decl. ¶ 19; McCullough Decl. ¶¶ 11, 22; Vignarajah Decl. ¶ 27. Plaintiffs have provided
this kind of help to millions of refugees. *See* Hetfield Decl. ¶ 9; McCullough Decl. ¶ 10;
Vignarajah Decl. ¶¶ 9-11. Plaintiff LIRS, additionally, is one of just two Resettlement Agencies
that currently sponsor a particularly vulnerable subset of the refugee population—children
without a parent or legal guardian available to provide care—by recruiting and training
appropriate foster families and matching the children with families in partnership with states
participating in the Unaccompanied Refugee Minor ("URM") Program. *See* Vignarajah Decl.
¶¶ 38-43, 46-48; *see also* 8 U.S.C. § 1522(d)(2).

Plaintiffs' sponsorship of refugees depends on their partnership with the federal
government, carried out through the annual cooperative agreements described above. In addition,
local community relationships and programs cultivated over time (for example, with particular
congregations, prospective employers, and prospective landlords) are essential to successful
refugee resettlement. *See* Hetfield Decl. ¶¶ 25-31; McCullough Decl. ¶¶ 20-22, 44; Vignarajah
Decl. ¶¶ 15-20. Plaintiffs maintain and invest in networks of local nonprofit affiliate
organizations to assist in their resettlement operations, and those affiliates provide most of the

direct services to the refugees Plaintiffs serve. *See* Hetfield Decl. ¶¶ 20-24; McCullough Decl. ¶¶ 12-15, 19; Vignarajah Decl. ¶¶ 12-13, 15. But because of the Executive Order, *all* local sites— suddenly, after years of successfully resettling refugees—are presumptively unavailable for inclusion in Plaintiffs' placement plans. Plaintiffs must either swiftly lobby scores of ill-defined state and local government officials within a matter of weeks to affirmatively provide written consent to their continued operations, or else face the near certainty that they will no longer be able to participate in initial resettlement of refugees where consent is not provided. *See* Hetfield Decl. ¶¶ 80, 85-87; McCullough Decl. ¶¶ 29-30, 39-42; Vignarajah Decl. ¶¶ 65-78.

## <u>Argument</u>

To obtain a preliminary injunction, Plaintiffs must demonstrate that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities, considering the harm to be suffered by Defendants if relief is granted, tips in their favor; and (4) preliminary relief is in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each factor weighs in favor of granting relief here.

**I. Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Executive Order Is Unlawful.**

Plaintiffs are likely to succeed in showing that the Executive Order is unlawful for two reasons. *First*, the Executive Order's direction and the resulting agency action are contrary to the defined role Congress gave states and localities in the Refugee Act, through which they are to be consulted on—but not given the power to condition—where in the United States refugees are to be resettled. Indeed, the Refugee Act cannot be interpreted as authorizing the challenged actions, in view of the Constitution's exclusive vesting in the federal government of the authority to determine laws and policies regarding the admission of noncitizens, including refugees. *Second*, Defendants' implementation of the Executive Order is arbitrary and capricious.

## A.    The Executive Order Violates the Refugee Act.

### 1.    *The Refugee Act Assigns Responsibility for Making Refugee Placement Decisions to the Federal Government, Not State and Local Governments.*

The Refugee Act assigns the Executive the exclusive responsibility for making decisions about the placement of refugees, based on specific factors. While the Refugee Act also requires the Executive to "consult" with state and local governments on refugee placement, it does not permit conditioning resettlement on state and local governments affirmatively providing written consent. On this point, Congress was clear: the statute's consultation requirements were "not intended to give States and localities any veto power over refugee placement decisions, but rather to ensure their input into the process and to improve their resettlement planning capacity." H.R. Rep. No. 99-132, at 19. The Refugee Act's text, purpose, and statutory and legislative history all confirm that Congress intended that state and local governments have a voice in—not a veto over—refugee placement.

### a.    Text

Section 1522(a) sets out detailed instructions for how the Executive must decide where admitted refugees are to be resettled within the United States. *See* 8 U.S.C. § 1522(a)(2)(A)-(C). In particular, Congress directed that federal agencies set "policies and strategies for the placement . . . of refugees within the United States," specifying that they "shall . . . take into account" an array of specific factors relevant to the successful resettlement of refugees. *See id.* § 1522(a)(2)(B), (C)(iii); *see also Lopez v. Davis*, 531 U.S. 230, 231 (2001) (Congress' use of the word "shall" indicates an intent to "impose discretionless obligations"). These factors include "the proportion of refugees and comparable entrants in the population in the area"; "the availability of employment opportunities, affordable housing, and public and private resources (including educational, health care, and mental health services) for refugees"; "the likelihood of

refugees placed in the area becoming self-sufficient and free from long-term dependence on public assistance"; and the risk of "secondary migration," 8 U.S.C. § 1522(a)(2)(C)(iii)(I)-(IV), as well as family reunification, *see id.* § 1522(a)(2)(C)(i).

Section 1522 also instructs that the agencies "may not delegate to a State or political subdivision [its] authority to review or approve grants or contracts . . . or the terms under which such grants or contracts are made." *Id.* § 1522(a)(4)(C). Where refugees are to be placed is an important term in the cooperative agreements that govern the Reception and Placement Program. *See* Schwartz Decl. ¶¶ 7-14; Hetfield Decl. ¶ 38 (explaining how the cooperative agreements identify the number of refugees who are expected to be placed with each Resettlement Agency by affiliate site). Handing state and local governments the authority to dictate whether or not placement occurs in a jurisdiction delegates this "term" of the cooperative agreements to states and their political subdivisions.

Through the Act Congress also created a specific framework for the federal government to consult with states and local governments on refugee placement. The State Department and HHS "shall *consult* regularly (not less often than quarterly)" with state and local governments on "the intended distribution of refugees." 8 U.S.C. § 1522(a)(2)(A) (emphasis added); *see also* Carey Decl. ¶¶ 11-26 (describing in detail how the agencies have handled the consultation requirements in practice). They shall develop and implement policies and strategies for refugee placement in "*consultation*" with state and local governments. 8 U.S.C. § 1522(a)(2)(B) (emphasis added). And they shall prescribe regulations after "*consultation*" with state and local governments on whether an area is "highly impacted" by the presence of refugees. *Id.* § 1522(a)(2)(C) (emphasis added). To "consult" is not to delegate or to assign. Rather, "consultation" is "[t]he act of asking the advice or opinion of someone (such as a lawyer)."

14

*Black's Law Dictionary* (11th ed. 2019); *see* Carey Decl. ¶ 44 ("ORR and PRM . . . have long understood the consultation requirement to be just that: a consultation process—not an approval process."); Schwartz Decl. ¶¶ 4, 17. A crucial aspect of consultation is that the consulted party's advice or opinion may well *not* be followed. *Cf. Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 863–64 (9th Cir. 2003) (agency's statutory "consultation" obligation did not require adoption of state and local authorities' input and was met by circulation of its draft rule). The statute's provision for "consultation" excludes the possibility of a state or local veto on refugee placement.

The plain meaning of "consultation" is further confirmed by Congress' use of it in other Refugee Act provisions. For example, the Act requires the President to consult with Congress before setting the annual refugee admissions goal, *see* 8 U.S.C. § 1157, but this has always been construed as requiring simply that the President notify Congress about the administration's intention, not that Congress has the power to veto the President's determination. The Act's consultation framework also instructs the State Department and HHS to "consult" with the Resettlement Agencies concerning refugee placement. *See* 8 U.S.C. § 1522(a)(2)(A)-(C). With respect to this "consultation," then, Congress placed states and localities on equal footing with the Resettlement Agencies. The elevation of the views of state and local government officials over those of the Resettlement Agencies is yet another way that the Order seeks to alter the congressional scheme through Executive fiat.

Looking beyond the provisions governing initial placement to the Refugee Resettlement Program as a whole, *see* 8 U.S.C. § 1522(c)-(e), Congress plainly envisioned that refugee resettlement would continue in states even if they object to the refugee program. Indeed, Congress has devised an alternative program, the "Wilson-Fish Model," to deliver assistance to refugees in states whose governments have opted against participating in refugee resettlement.

*See id.* § 1522(e)(7); 45 C.F.R. § 400.69; *Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902, 905 (7th Cir. 2016) ("Indiana is free to withdraw from the refugee assistance program, as other states have done; yet withdrawal might not interrupt the flow of Syrian refugees to the state because in states that choose not to participate in the refugee assistance program the federal government has been authorized to . . . distribute[] federal aid to refugees in a state without the involvement of the state government."); *see also* Vignarajah Decl. ¶¶ 36-37.

Still other provisions of § 1522(a) reaffirm that the responsibility for deciding where refugees are placed within the United States belongs exclusively to the Executive and cannot be farmed out to state and local governments. *First*, § 1522(a) specifically provides that, "[w]ith respect to the location of placement of refugees *within a State*, the [agencies] shall . . . to the maximum extent possible, take into account recommendations of the State." 8 U.S.C. § 1522(a)(2)(D) (emphasis added). Thus, Congress specifically provided that, even when a state government should have the "maximum . . . possible" say in refugee placement (*i.e.*, in determining where refugees are placed within a state), that say is a "recommendation," not authority to decide. Defendants' attempt to give states and localities power to refuse refugee placement *entirely* cannot be squared with Congress' instruction that states may only recommend outcomes.

*Second*, in making the agencies responsible for developing "policies and strategies for the placement and resettlement of refugees within the United States," Congress required the agencies to "take into account[] the secondary migration of refugees to and from the area that is likely to occur." *Id.* §§ 1522(a)(2)(B), (C)(iii)(IV). A policy that permits state or local governments to refuse the placement of refugees takes *no* account of this statutory directive, given that refugees are very likely to quickly relocate to those jurisdictions if they have family or other ties. *See*

16

Carey Decl. ¶ 16; Hetfield Decl. ¶¶ 60, 97; Vignarajah Decl. ¶ 83. A jurisdiction's failure to provide written consent predictably increases secondary migration, burdening affected refugees and their families, creating administrative burdens for Resettlement Agencies that must coordinate the transfer of provision of services, and resulting in loss of the investment made by the Resettlement Agency where the refugee was first "placed" (such as preparing housing and arranging for provision of medical and educational services). *See* Hetfield Decl. ¶¶ 54-65; Vignarajah Decl. ¶¶ 83-84. *Finally*, § 1522(a) contains a clear nondiscrimination provision: "Assistance and services funded under this section [including Reception and Placement services] shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion." *Id.* § 1522(a)(5). If refugee placement is conditioned on the prior written consent of state and local governments, a jurisdiction's refusal to consent will directly affect how and where refugees are ultimately provided services—and the federal government could hardly ascertain as a practical matter that such refusal was not motivated by impermissible bias.

In sum, while § 1522 instructs the Executive to consult state and local governments, it unmistakably provides that the placement of refugees should not be conditioned on their consent and must instead be determined by the Executive based on congressionally enumerated factors. Even assuming *arguendo* that some states and localities want the ability to refuse refugee resettlement, § 1522 plainly demonstrates that Congress "meant to say no." *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013).

### b.    Purpose

Conditioning refugee resettlement on state and local consent also runs counter to the Refugee Act's stated purpose. "The objectives of the Refugee Act, as explained by Congress, are. . . 'to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.'" *Texas Health & Human Servs. Comm'n v.*

*United States*, 193 F. Supp. 3d 733, 739 (N.D. Tex. 2016) (quoting Pub. L. No. 96-212, § 101(b),

94 Stat. 102). By definition, refugee resettlement provisions are not "uniform" if refugee

resettlement is conditioned on the consent of state and local governments; nor is it "effective" to

resettle refugees far from their relatives already in the United States, forcing them to relocate

immediately upon arrival (or establish a home without the support provided by family networks).

Moreover, "although the Refugee Act contains several sections outlining a framework for

cooperation between the federal government and the States . . . the Act focuses on the system-

wide provision of resettlement assistance to refugees[,] [not] the needs of the States." *Alabama v.

United States*, 198 F. Supp. 3d 1263, 1272 (N.D. Ala. 2016) (internal citations omitted), *appeal

dismissed*, No. 16-15778-W, 2017 WL 3973909 (11th Cir. May 12, 2017). The Act also

contemplates that the Resettlement Agencies' infrastructure and networks are an essential

component of effective refugee resettlement. *See* 8 U.S.C. § 1522(a)-(b); *see also* Carey Decl. ¶

40. Making state and local affirmative consent a condition of refugee placement undermines the

entire purpose of § 1522—placement of refugees in the United States in a way that provides for

"effective resettlement and absorption"—by threatening to eviscerate Resettlement Agencies'

local networks and geographic reach and by giving states and localities power that Congress

never intended.

### c.    Statutory and Legislative History

Congress has repeatedly amended the Refugee Act to provide more specificity regarding

federal consultation with state and local governments, but has deliberately stopped short of

giving either the ability to turn away refugees at their borders. *See* H.R. Rep. No. 99-132, at 19

("[T]hese [amended] requirements are not intended to give States and localities any veto power

over refugee placement decisions, but rather to ensure their input into the process and to improve

their resettlement planning capacity."); Revision History of Section 1522(a)(2), Ex. I. *First*, in

1982, Congress directed that the agencies should provide a mechanism whereby representatives of Resettlement Agencies' local affiliates "meet with representatives of State and local governments to plan and coordinate . . . the appropriate placement of refugees among the various States and localities." Pub. L. No. 97-363, § 4, 96 Stat. 1734, 1735 (1982). It also added the provision directing the agencies to prescribe regulations addressing whether an area is "highly impacted" by the presence of refugees after "consultation" with state and local governments and the Resettlement Agencies. *Id. Second*, in 1986, Congress directed the agencies to "take into account" the recommendations of states with respect to the location of placement of refugees within the state "to the maximum extent possible." Pub. L. No. 99-605, § 4, 100 Stat. 3449, 3450 (1986). Importantly, however, Congress has never permitted states to prohibit refugee placement entirely.

The legislative history of the Refugee Act provides yet further confirmation that Congress declined to give states and localities a veto over refugee placement decisions. In passing the 1982 amendments, Congress was responding to a National Governors Association resolution "urging the establishment of a mechanism to insure appropriate coordination and consultation between the Federal Government and the states on the placement strategies and the identification of impact areas." H.R. Rep. No. 97-541, at 12 (1982). To address this problem, Congress required the agencies to ensure that state and local officials would meet regularly with Resettlement Agencies to discuss refugee placement. S. Rep. No. 97-638, at 9 (1982). Congress, however, took no action to give states or local governments veto power over refugee placement.

The legislative history reveals that in 1985-86 state and local governments were still upset that their "interests and concerns [were] not adequately considered," H.R. Rep. No. 99-132, at 18-19 (1985), and in response, Congress "strengthen[ed] the consultation requirement,"

*id.*, by adding § 1522(a)(2)(C)(iii). Lest there be any mistake, however, those responsible for strengthening the consultation requirements "emphasize[d] that these requirements are not intended to give States and localities *any* veto power over refugee placement decisions, but rather to ensure their input into the process and to improve their resettlement." *Id.* at *19 (emphasis added).

> **2.** **By Conditioning Refugee Placement on a State or Local Government's Prior Affirmative Consent, the Executive Order Violates the Refugee Act.**

The Executive Order violates the Refugee Act by making refugee placement preconditioned on state and local affirmative consent. The Executive Order expressly directs that refugee placement be conditioned, with the possibility of narrow exceptions, on the advance written consent of the state and locality where the refugee is to be placed. Order §§ 2(b), (c). In implementing the Executive Order, the State Department instructed that Resettlement Agencies seeking to participate in the next round of the Reception and Placement Program "should seek written consent for resettlement of refugees from the state governor's office and the chief executive officer of the . . . county or county equivalent" "[f]or each state and locality where the applicant proposes to resettle refugees during the award period." Funding Notice at 3. Moreover, the State Department has clarified that "state and local consents are not required for refugee resettlement *before* the award period" beginning June 1, 2020. *Id.* at 12 (emphasis added). The Policy is clear: starting June 1, 2020, advance written consent from both state and local governments is required if refugee placement is to continue in those jurisdictions. *See also id.* at 13 ("The proposed model shall include an approach that ensures refugees are placed only in states and localities that have consented to receiving refugees."). More imminently, if Resettlement Agencies do not "document [state and local] consents or their unavailability" for their local placement sites (potentially dozens of consents per local office or affiliate) by January

21, 2020, when their funding proposals are due, they are out of the running for future refugee placement.

Nor does it change the result that the Executive Order provides for the possibility of an exception to the general rule requiring advance written consent from both the state and locality before refugees may be placed there. By the terms of the Executive Order, the *only* possibility a refugee might be placed in a nonconsenting state or locality is after an elaborate procedure by which the Secretary of State, after consultation with the Secretary of HHS and Secretary of Homeland Security, first concludes that "failing to resettle refugees *within that State or locality*" would be unlawful or inconsistent with policies and strategies established under § 1522(a)(2)(B) and (C), and then notifies the President of the decision and his reasons "before proceeding," to await unspecified action by the White House. Order § 2(b) (emphasis added). As a result, the Executive Order's unlawful directive is not cured by adding a procedure that holds out the possibility of an exception from the rule it imposes.

Because the Executive Order violates the Refugee Act, its implementation must be enjoined. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996); *see also Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 603-04 (D. Md. 2017)("It is now well established that review of the legality of a Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." (citation and internal alterations omitted)), *aff'd*, 833 F.3d 233 (4th Cir.), *vacated on other grounds*, 138 S. Ct. 2710 (2018). For the same reason, Defendants' implementation of the Order must be set aside as unlawful. *See* 5 U.S.C. §§ 706(2)(A), (C).

**3.**     ***Any Construction of the Refugee Act That Would Authorize the Executive Order Must Be Rejected to Avoid Serious Constitutional Doubt.***

Even if the Refugee Act were susceptible of more than one construction, such that it could plausibly be understood to authorize the Executive Order, the canon of constitutional avoidance would be dispositive. Any construction of the Refugee Act that conditions resettlement on state or local government consent should be rejected because it would raise serious constitutional doubts. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (explaining that the canon of constitutional avoidance "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

The Supreme Court has frequently held that the power to admit or exclude noncitizens as "exclusively" federal, meaning that the Constitution provides that this power cannot be exercised by or delegated to the states or other non-federal actors. *See, e.g.*, *De Canas v. Bica*, 424 U.S. 351, 354 (1976) ("[T]he power to regulate immigration is unquestionably exclusively a federal power."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government."); *Chae Chan Ping v. United States*, 130 U.S. 581, 609 (1889) ("The power of exclusion of foreigners being an incident of sovereignty belonging to the government of the United States as a part of those sovereign powers delegated by the [C]onstitution . . . cannot be granted away or restrained on behalf of any one."); *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."). This allocation of power is eminently sensible, as it would be untenable for the United States to replace its single policy on admission and exclusion with a patchwork of sub-national policies. *See Arizona v. United States*, 567 U.S. 387, 395 (2012).

The Executive Order renders a refugee's admission contingent on the consent of a state and local government to their placement. A statute permitting the federal government to delegate that authority to states and their subdivisions would pose a serious constitutional problem in view of the long-held understanding that the Constitution vests the power to admit or exclude noncitizens *exclusively* in the federal government. Because it is possible to construe the Refugee Act as precluding such a delegation, that statute "must be construed . . . so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (citation omitted).

### B.    The Implementation of the Executive Order Is Arbitrary and Capricious.

Even if the Executive Order were consistent with the Refugee Act, its implementation by the agencies is arbitrary and capricious under the APA. The APA provides that a court shall "hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational."). Agency action is "arbitrary and capricious" if the agency has "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); if the agency has failed to account for reliance interests engendered by its previous policy, *see Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016); or if the action is otherwise not the product of "reasoned decisionmaking," *Judulang v. Holder*, 565 U.S. 42, 53 (2011). To withstand review, an agency must adequately explain its action so that a reviewing court can "evaluate the agency's rationale at the time of decision." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990); *accord Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019) ("The reasoned

explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."). As reflected in the Funding Notice, Defendants' implementation of the Order is arbitrary and capricious for several reasons.

*First*, Defendants failed to consider a number of important factors in implementing the Executive Order. For one, there is no evidence that in deciding how to implement the Order, Defendants considered the statutory requirements governing how policies for the placement of refugees are to be implemented, including that "secondary migration" be taken into account. *See* 8 U.S.C. § 1522(a)(2)(C). Defendants have also failed to provide a mechanism for ensuring that the "unavailability" of consent is not motivated by impermissible bias, *id.* § 1522(a)(5), even though there is good reason to expect that it will be. *See, e.g.*, *Exodus Refugee Immigration, Inc.*, 838 F.3d at 904-05 (Indiana Governor's action to prevent resettlement of Syrian refugees based on security concerns was impermissible discrimination based on nationality); *Alabama*, 198 F. Supp. 3d at 1266–67 (dismissing a lawsuit by the State of Alabama, based on similar security "concerns," in which Alabama sought the ability to veto refugee placement within its borders). Despite seemingly anticipating such discrimination, *see* Funding Notice at 37, 42 (contemplating that state or local officials might seek to furnish letters that impermissibly condition acceptance of refugees on factors "such as refugees' race, ethnicity, religion, or national origin"), the Funding Notice permits a blanket veto of refugees even when motivated by impermissible bias.

Defendants also ignore wholesale the diversity of forms of local governments, which renders incomprehensible the requirement that Resettlement Agencies solicit consent from "the chief executive officer of the local government (county or county equivalent)." Funding Notice at 3, 12, 37, 42. The Resettlement Agencies are left to guess: what is a "county equivalent"?

Could a Resettlement Agency wishing to place a refugee in the City of Miami obtain the consent of that City's mayor, as opposed to some representative of Miami-Dade County?[4] Or does "county equivalent" mean only an Alaska borough, Louisiana parish, or an independent city of, for example, Maryland, Missouri, Nevada, and Virginia? And what of Connecticut, Rhode Island, and parts of Massachusetts, which have resettled thousands of refugees in recent years, *see* Compl. ¶ 65, and "have geographic regions called counties[,] but without functioning county governments"? *See* Nat'l League of Cities, *Cities 101—Types of Local Governments*, nlc.org/resource/cities-101-types-of-local-governments (last visited Nov.22, 2019).

Even when identifying the county is straightforward enough, and assuming it has a functioning government, Defendants incorrectly presumed it necessarily will have a "chief executive officer." Not every county has a "county executive," and not all county executives have authority to act independently of a county commission.[5] In addition to the diversity of forms of local government, the powers of local government delegated by the state can vary tremendously. *See* Nat'l League of Cities, *Local US Governments*, https://www.nlc.org/local-us-governments (last visited Nov. 18, 2019) ("The United States has one of the greatest complexity of local government laws in the world."). In most states, for example, local governments can only exercise the powers specifically granted by the legislature, *see, e.g.*, *W.M. Schlosser Co., Inc. v. Sch. Bd. of Fairfax Cty.*, 980 F.2d 253 (4th Cir. 1992)—none of which would have had

---

[4] The Funding Notice initially suggested that Resettlement Agencies would have to seek consents from cities and mayors. *See* Hetfield Decl. ¶ 75.

[5] *See, e.g.*, Maryland Association of Counties, *Code Home Rule vs. Commissioner vs. Charter*, www.mdcounties.org/DocumentCenter/View/2966/1-Code-home-rule-charter-and-commisioner-government-comparisons--UPDATED-OCTOBER-2018-002?bidId=s (just within Maryland, there are three forms of counties, not all of which have a single executive officer).

any occasion before now to authorize localities to consent to or veto refugee resettlement (which would be unconstitutional in any event, for the reasons discussed above).

Defendants have not considered the heterogeneity of arrangements for political subdivisions within a state. Instead, without guidance, they foisted this problem on Resettlement Agencies, who have the responsibility (but not the authority) to unravel these knots within a matter of weeks or lose their longstanding role in the Reception and Placement Program.[6]

In defining the relevant local subdivision as "county or county equivalent," Defendants also failed to account for the important role that other subdivisions of local government—especially municipalities—play in the refugee resettlement process. Consistent with § 1522, which requires the agencies to consult with local government representatives and gives no priority to counties, mayors of cities that resettle substantial numbers of refugees have historically been actively involved in consultation regarding refugee placement. *See* Carey Decl. ¶ 19. These cities have a vested interest in continued refugee resettlement within their borders.[7] Yet Defendants, without reason, have suppressed their perspectives, permitting their desire to welcome refugees to be overridden by the mere silence or inaction of a county official.

Defendants likewise failed to account for how their implementation of the Executive Order would affect family reunification, a crucial component of successful integration of refugees into their new communities. *See* Hetfield Decl. ¶¶ 57-61, 63; DOS Allocations Handbook, Ex. J, at 16. Given that refugees are typically fleeing violent upheaval and

---

[6] *See, e.g.*, Vignarajah Decl. ¶ 68 ("The consent requirement is akin to a new program that we must learn how to implement on a very short timeframe. But unlike federal program rollouts generally, here there is no instruction manual. Also, LIRS and our affiliates have no expertise in the legal minutiae of how executive power operates at the local level across the country.").

[7] *See, e.g.*, Tim Henderson, *Shrinking Small Towns See Hope in Refugees*, Pew Charitable Trusts (Aug. 5, 2016), http://pew.org/2axftDd; Susan Hartman, *A New Life for Refugees, and the City They Adopted*, N.Y. Times (Aug. 10, 2014), https://nyti.ms/1rfSVan.

displacement in their home countries, it is common for them to become separated from their immediate family members, with one refugee making it to the United States first with the expectation that the family will be reunited later. But Defendants have failed to provide a mechanism to ensure that refugees expecting to reunite with family members will be able to do so, or provide any evidence that they considered the interests of the many refugees already in the United States whose reunification with family is at risk of delay and the burden of a move.

*Second*, Defendants failed to account for substantial reliance interests—of refugees, of the communities that have welcomed them, and of the Resettlement Agencies—engendered by the previous policy of refugee placement, governed by federal statute and in effect for decades.

Beginning with the Resettlement Agencies, the federal government's partnerships with these organizations are an essential component of the refugee placement and resettlement system, as Congress recognized. *See* H.R. Rep. No. 96-608, at 22 (1979) ("efforts of [Resettlement Agencies] are vital to successful refugee resettlement"). Resettlement Agencies operate their own portfolios of local resettlement sites around the country and are deeply rooted in those communities through relationships developed, in some cases, over decades. *See* Hetfield Decl. ¶¶ 25-28, 30-31; McCullough Decl. ¶¶ 12-14, 19-22, 46; Vignarajah Decl. ¶¶ 15-20. Defendants give no indication that they considered the consequences of the Executive Order's implementation for Resettlement Agencies, whose ability to successfully deliver Reception and Placement services through their local affiliates is not readily transferable across state lines to a new community and depends on an overall placement scheme with low rates of secondary migration. The Executive Order predictably has the effect of (at best) requiring the Resettlement Agencies to divert substantial time and resources to pursuing, collectively, hundreds of state and local written permissions and (at worst) dismantling the Resettlement Agencies' operations

across vast swaths of the country. *See, e.g.*, Vignarajah Decl. ¶¶ 66-75, 77-78. The Resettlement Agencies have spent tremendous resources and time building relationships with service providers and volunteer networks, and otherwise developing local infrastructure to coordinate refugee resettlement activities with community stakeholders—activities that the Refugee Act as well as PRM and ORR have actively encouraged. The Resettlement Agencies now face a default rule under which it will all have been for naught. The refugee resettlement infrastructure that the Resettlement Agencies have carefully built is imminently threatened with evisceration. *See* Carey Decl. ¶ 38; McCullough Decl. ¶¶ 46, 49.

Similarly, Defendants have given no indication that they considered the consequences of their implementation of the Executive Order for communities that will suffer losses on investments they have made in reliance on refugees continuing to resettle in their areas. Many communities have built up infrastructure to support arriving refugees, such as public schools designed to facilitate the cultural and academic transition of new arrivals, specialized refugee health clinics, and nonprofit organizations dedicated to refugee advocacy.[8] In states or localities that fail to provide consent, the investments of time and energy state refugee coordinators—state employees, whose positions are funded by ORR and whose role is to administer ORR funding for refugees and coordinate services for refugees, *see* Carey Decl. ¶¶ 22-23—will be wasted. And in the case of the URM Program, the effect of Defendants' implementation of the Order is that delay or inaction by a single county official can dash the hopes of a foster family who has

---

[8] *See, e.g.*, Rochester International Academy, *Mission and Vision*, www.rcsdk12.org/domain/6313 (last visited Nov. 18, 2019) (school); Denver Health, *Denver Health Refugee Clinic*, www.denverhealth.org/services/community-health/refugee-clinic (last visited Nov. 18, 2019) (health clinic); Soft Landing Missoula, *About SLM*, https://softlandingmissoula.org/learn (last visited Nov. 18, 2019) (local programming and services); *see also* McCullough Decl. ¶ 44.

spent many months training and preparing to welcome a refugee child, and waste the resources spent by Resettlement Agencies such as Plaintiff LIRS. *See* Vignarajah Decl. ¶¶ 79-82.[9]

Most importantly, Defendants failed to consider the reliance interests of refugees and their families. Refugees already assured for resettlement in particular locations based on family ties (or, in the case of URM, foster families) in those communities, or based on the capacity of those communities to meet their particular medical, language, or other needs, will lose those assurances if relevant government officials do not consent. Those refugees will have to obtain new assurances before they can travel, prolonging the time they spend stranded in dangerous conditions—and, in the case of children in the URM Program, potentially denying them a foster family altogether, if they age out of the program. *See* 8 U.S.C. § 1522(d)(2)(B)(i). And refugees expecting to reunite with family in reliance on laws and policies promoting family reunification will be unable to join family members in locations for which consents have not been provided. Even refugees who have already been resettled will be hurt, if they are in jurisdictions where a local resettlement office is forced to close, as that could deprive them of the ongoing services those offices provide resettled refugees. *See* McCullough Decl. ¶¶ 49-50; Vignarajah Decl. ¶ 83. They may be forced to relocate to other areas that can accommodate their needs, leaving behind the homes they have made, jobs they have secured, and the support network they have (re-)built. *See* Hetfield Decl. ¶¶ 95-96; McCullough Decl. ¶ 51.

*Third*, Defendants' actions are otherwise not the product of reasoned decisionmaking. Defendants have placed responsibility for soliciting consent on Resettlement Agencies applying

---

[9] *See also* Letter from Kit Taintor, President, State Coordinators of Refugee Resettlement, to Lawrence Bartlett, PRM, and Jonathan Hayes, ORR (Oct. 11, 2019) (explaining that applying the Executive Order to children arriving through the URM Program would place an undue burden on states), Ex. K.

to participate in the Reception and Placement Program. In doing so, Defendants have adopted an approach that works at cross-purposes with the statute they are required to implement. *See Judulang*, 565 U.S. at 485 ("approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system"). Section 1522(a) requires that state and local governments (and Resettlement Agencies) be consulted regarding the implementation of policies and strategies for the placement and resettlement of refugees, and that the federal agencies carry out that consultation. *See* 8 U.S.C. § 1522(a)(2)(B); *see also id.* § 1522(a)(2)(A), (a)(4)(C). Even if the Policy *could* be considered authorized "consultation" of state and local governments, then, Defendants' subdelegation to Resettlement Agencies of their responsibility to communicate with state and local stakeholders is unlawful by itself. *See U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 564, 565-66 (D.C. Cir. 2004) ("subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization"). And even if this subdelegation were not inherently unlawful, Defendants' reliance on Resettlement Agencies—which have received no funding for this task, have no specialized expertise, and are operating on a remarkably short timeline—to solicit consents as part of their funding applications, fails to ensure that any state or local government will be consulted at all. *See, e.g.*, Vignarajah Decl. ¶¶ 69-75. Finally, the Policy's application to the URM Program is both redundant (because states already opt-in to that Program annually, by submitting a State Plan signed by the Governor[10]) and nonsensical (considering that the relatively small scale of the Program means that many counties will see no URM placements in a given year). *See* Vignarajah Decl. ¶¶ 45, 81.

---

[10] *See* Letter from Kit Taintor, President, State Coordinators of Refugee Resettlement, to Lawrence Bartlett, PRM, and Jonathan Hayes, ORR (Oct. 11, 2019), Ex. K.

For all of these reasons, Defendants' implementation of the Order, including the new conditions announced through the Funding Notice, must be set aside as arbitrary and capricious.

## II.    Absent an Injunction, Plaintiffs Will Be Irreparably Harmed.

Plaintiffs will be irreparably harmed if Defendants are permitted to continue to implement the Executive Order and condition refugee placement on Resettlement Agencies' obtaining written consent of state and local government officials. Here, irreparable harm is more than just likely: it is already occurring. Because the impending January 21 deadline for the funding proposal will determine the future of their organizations, staff for Plaintiffs and their affiliates have already spent substantial amounts of time responding to the Executive Order and preparing to contact states and localities. *See* Hetfield Decl. ¶ 86; McCullough Decl. ¶ 31-33; Vignarajah Decl. ¶ 66-75. These efforts have been made more difficult, if not impossible in some locations, by the opacity in how or from whom Plaintiffs are supposed to seek consent. *See* Hetfield Decl. ¶¶ 89-90; McCullough Decl. ¶ 31; Vignarajah Decl. ¶¶ 73, 75; *see supra* pp. 9-10, 24-26. If the Policy is not enjoined, Plaintiffs expect that thousands of additional hours will be spent soliciting consents from the states and localities in which they operate. *See* Hetfield Decl. ¶ 87; McCullough Decl. ¶ 34; Vignarajah Decl. ¶ 67. The time and resources that Plaintiffs have devoted and will have to continue devoting under the Policy frustrate them from carrying out their missions, as faith-based nonprofit organizations, of welcoming, serving, and advocating for refugees. Hetfield Decl. ¶¶ 6-7, 80-90; McCullough Decl. ¶¶ 3-4, 8, 35-36, 54; Vignarajah Decl. ¶¶ 6, 68, 72. *See, e.g.*, *Casa De Maryland, Inc. v. Trump*, No. PWG-19-2715, 2019 WL 5190689, at *16 (D. Md. Oct. 14, 2019) (organization established irreparable harm from "frustration of its mission and diversion of its resources"), *appeal filed*, No. 19-2222 (4th Cir. Nov. 4, 2019); *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("obstacles [that] unquestionably make it more difficult for [organization] to accomplish [its] primary mission"

amount to irreparable harm, and "Damocles's sword does not have to actually fall . . . before the court will issue an injunction").

To make matters worse, the Policy requires Plaintiffs to engage in actions that may constitute lobbying activities—or else lose their eligibility to continue participating in the Reception and Placement Program. Plaintiffs are tax-exempt 501(c)(3) organizations, and the IRS prohibits such organizations from engaging in lobbying as a "substantial part" of their work. *See* Treas. Reg. § 1.501(c)(3)-1(c)(3)(ii) (providing that an organization engages in lobbying if it "[c]ontacts, or urges the public to contact, members of a legislative body for the purpose of proposing, supporting, or opposing legislation" or if it "[a]dvocates the adoption or rejection of legislation"); *Haswell v. United States*, 500 F.2d 1133, 1146-47 (Ct. Cl. 1974) (holding political activities a "substantial part" of an organization's operations when comprising 16 to 20 percent of expenditures). The Policy may require Plaintiffs to obtain consent from counties or "county equivalents" whose executive power is held not by an individual but by a council; urging such a body to affirmatively consent to refugee placement may constitute lobbying.[11] Thus, to pursue an award for the Reception and Placement services that have long been at the heart of their mission, Plaintiffs must risk their or their local affiliates' tax status.

Further, without preliminary injunctive relief to restore the status quo, even greater harm looms because the Executive Order threatens Plaintiffs' operations in entire jurisdictions. An organization is irreparably harmed if, absent a preliminary injunction, it will suffer a loss of goodwill built up over time or if its business is "seriously curtailed." *See, e.g.*, *Fed. Leasing Inc.*

---

[11] In addition, states or localities often have their own rules governing lobbying activities. The Executive Order thus also burdens Plaintiffs by requiring them—on a remarkably short timeline—to navigate all of these complexities and potentially risk violating such laws in order to obtain consent.

*v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4th Cir. 1981) (irreparable harm is established where a plaintiff "seeks to preserve its existence and its business," and where ongoing damage endangers "the good will built up by a heretofore successful enterprise"); *NaturaLawn of Am., Inc. v. W. Grp*., LLC, 484 F. Supp. 2d 392, 402 (D. Md. 2007) ("[P]laintiff's business opportunities in the counties at issue are being seriously curtailed, if not shut down completely, which constitutes irreparable harm."). The Executive Order and subsequent agency implementation give every indication that local affiliate sites that lack either state or "county or county equivalent" consent will be ineligible for refugee placement. And it is likely that Plaintiffs will be unable to obtain written consent from one or more of the dozens of states plus the District of Columbia—not to mention the myriad localities—in which they operate, whether because of the jurisdiction's rejection of refugees, because the request for a consent becomes lost in state or local bureaucracy, or because there is no chief executive officer with authority to provide it. *See* Hetfield Decl. ¶ 76-77; McCullough Decl. ¶ 41; Vignarajah Decl. ¶¶ 74, 76, 81. When that happens, Plaintiffs' resettlement operations will have to shut down completely in entire jurisdictions—if not altogether—or lay off staff, resulting in the irreparable loss of years of accumulated networks, relationships, goodwill, knowledge, and expertise in providing services to refugees. *See* Hetfield Decl. ¶¶ 80-82; McCullough Decl. ¶¶ 14-15, 19-22, 37-46; Vignarajah Decl. ¶¶ 14-20, 77-78, 82, 84. And the devastating impact on Plaintiffs' operations will impose a severe, immeasurable cost on their faith-based missions to welcome refugees.

Finally, "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 365 (4th Cir. 2019). Financial injuries caused by unlawful agency action are typically unrecoverable because, due to the government's sovereign immunity,

a plaintiff cannot recover compensatory damages in a subsequent lawsuit. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment). And to the extent the Executive Order results in the loss of sufficient funding as to require the closure of affiliate offices, this harm is *per se* incompensable.

### III. The Balance of Equities Tips in Plaintiffs' Favor, and a Preliminary Injunction Serves the Public Interest.

In determining whether to grant a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal quotation marks and citation omitted). "In exercising their sound discretion, courts . . . should [also] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (citation omitted). "When a preliminary injunction is sought against the government . . . the[se] last two factors merge." *Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 619 (D. Md. 2019) (internal quotation marks and citation omitted), *stay granted*, 778 F. App'x 212 (4th Cir. 2019).

On the one hand, as Congress' detailed attention to questions of refugee placement in the Refugee Act suggests, the public interest is served when refugees are placed in communities where they are likely to stay and thrive. *See* 8 U.S.C. § 1522(a)(2). If the Executive Order is fully implemented, contrary to congressional intent, refugees will be placed in suboptimal circumstances, delaying family reunification and potentially denying access to services that would help them integrate into their new home.[12] Placement of children in the URM Program

---

[12] *See, e.g.*, Nadwa Mossaad et al., *Determinants of Refugee Naturalization in the United States*, 115 PROCS. OF THE NAT'L ACAD. OF SCIS. 201802711 (Sept. 2018), www.pnas.org/content/115/37/9175 (finding that a refugee's likelihood of eventually achieving U.S. citizenship is significantly shaped by initial resettlement location).

with the foster families invested and ready to give them a home may be denied altogether. *See* Vignarajah Decl. ¶ 82.

More broadly, the public interest is served by requiring the government to comply with its obligations under the Refugee Act and the Constitution. "It is in the public's interest to ensure that government agencies abide by federal laws." *Mayor & City Council of Baltimore*, 392 F. Supp. 3d at 619; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (internal quotation marks and citation omitted)). Allowing the Defendant agencies to violate the Refugee Act at the President's direction—and to coerce Resettlement Agencies like Plaintiffs to participate in the unlawful scheme—is in no one's interest.

On the other hand, the Defendants will suffer no harm from the issuance of a preliminary injunction. Consistent with the Refugee Act, the government could continue to consult with state and local governments on the placement of refugees and account for communities' ability to accommodate additional refugees. It would simply be prohibited from enforcing an unlawful condition on the placement of refugees—the advance written consent of states and local governments. An injunction, in other words, would simply preserve the status quo, under which the federal agencies have been consulting with state and local governments since the passage of the Refugee Act in 1980. *See* Carey Decl. ¶¶ 11-26, 31-35.

## Conclusion

For the foregoing reasons, the Court should preliminarily enjoin defendants from implementing Executive Order 13888, including through the conditioning of awards for the FY 2020 Reception and Placement Program or subsequent refugee placement on the written consent of state and local government officials.

Dated: November 22, 2019

Respectfully submitted,

/s/ Melissa S. Keaney
Melissa S. Keaney*
International Refugee Assistance Project
PO Box 2291
Fair Oaks, CA 95628
mkeaney@refugeerights.org
(916) 546-6125

Linda Evarts**
Kathryn Austin*
Mariko Hirose**
International Refugee Assistance Project
One Battery Park Plaza 4th Floor
New York, NY 10004
levarts@refugeerights.org
kaustin@refugeerights.org
mhirose@refugeerights.org
(516) 701-4620

/s/ Justin B. Cox
Justin B. Cox (Bar No. 17550)
International Refugee Assistance Project
PO Box 170208
Atlanta, GA 30317
jcox@refugeerights.org
(516) 701-4233

\* Appearing *Pro Hac Vice*
\*\* *Pro Hace Vice* motion pending