**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

|  |  |
|---|---|
| HIAS, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No: 8:19-cv-3346-PJM |

**BRIEF OF *AMICI CURIAE* FORMER STATE DEPARTMENT OFFICIALS**

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ...............................................................2

ARGUMENT .......................................................................................................................3

    I.      The Refugee Act Provides A Comprehensive Framework For Refugee
          Resettlement That Requires Consultation With States ............................................3

    II.     The EO Is Inconsistent With The Refugee Act's Mandates. ..................................8

    III.    The EO Will Undermine The Federal Government's And Resettlement
          Agencies' Ability To Serve Refugees....................................................................13

    IV.    The EO's Possibility Of An Exception That Would Purportedly Permit
          Resettlement Despite A State Or Locality's Veto Does Not Cure The EO's
          Defects. ..................................................................................................................14

CONCLUSION....................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama v. United States*,
  198 F. Supp. 3d 1263 (N.D. Ala. 2016) ................................................................8

*Exodus Refugee Immigration, Inc. v. Pence*,
  165 F. Supp. 3d 718 (S.D. Ind. 2016) ...................................................................7

*Exodus Refugee Immigration, Inc. v. Pence*,
  838 F.3d 902 (7th Cir. 2016) ............................................................................3, 7

*Texas Health & Human Servs. Comm'n v. United States*,
  193 F. Supp. 3d 733 (N.D. Tex. 2016) .................................................................8

**Statutes**

8 U.S.C. § 1522 ....................................................................................... *passim*

Pub. L. No. 96-212, § 101(b), 94 Stat. 102, codified at 8 U.S.C. § 1521 ......................................4

**Other Authorities**

Jeffrey Bloem & Scott Loveridge, *The Costs of Secondary Migration:*
  *Perspectives from Local Voluntary Agencies in the USA*, 19 Int. Migration &
  Integration 233 (2018) ...........................................................................................11

Andorra Bruno, Congressional Research Serv., R44878, *Reception and Placement*
  *of Refugees in the United States* (June 21, 2017) ..............................................5, 11

Stella Burch Elias, *The Perils and Possibilities of Refugee Federalism*, 66 Am.
  U.L. Rev. 353 (2016) .............................................................................................7

Exec. Order No. 13888, 84 Fed. Reg. 52,355 (Sept. 26, 2019) ........................... *passim*

H.R. Rep. No. 99-132 (1985) ..................................................................................8

Nadwa Mossad et al., *In Search of Opportunity and Community: The Secondary*
  *Migration of Refugees in the United States* (Sept. 2019) ..................................11, 12

Office of Refugee Resettlement, *About Unaccompanied Refugee Minors* .....................7

Office of Refugee Resettlement, Dear Colleague Letter 19-05, *FY 2019 Refugee*
  *Support Services Formula Allocation* (Sept. 5, 2019) ..........................................13

Office of Refugee Resettlement, *Wilson-Fish* ............................................................7

U.S. Dept. of Health and Human Servs., *Voluntary Agencies Matching Grant Program Guidelines*...................................................................................................5

U.S. Dept. of State, Bureau of Population, Refugees, and Migration, *The Reception and Placement Program* (2009-2017) ......................................................5

U.S. Dept. of State, U.S. Dept. of Homeland Security, U.S. Dept. of Health and Human Servs., *Proposed Refugee Admissions for Fiscal Year 2019, Report to Congress in Fulfillment of the Requirements of Sections 207(D)(1) and (E) of the Immigration and Nationality Act* ........................................................................5

U.S. Gov't Accountability Off., GAO-12-729, *Refugee Resettlement: Greater Consultation with Community Stakeholders Could Strengthen Program* (July 26, 2012) ...........................................................................................................5, 12, 13, 14

*Amicus Curiae* James Nelson Purcell, Jr., Arthur E. Dewey, and Anne Claire Richard ("*Amici*"),[1] by and through its undersigned attorneys, hereby submits this Brief of *Amici Curiae* in the above-captioned action as follows:[2]

## INTEREST OF *AMICI*

*Amici* are three former State Department officials that have served as its highest official directly responsible for overseeing refugee migration to the United States. *Amici* have served as Assistant Secretary for Population, Refugees, and Migration Affairs ("PRM") or its predecessor position of Director of the Bureau for Refugee Programs in both Republican and Democratic administrations since the 1980s. *Amici* have a special interest in ensuring that the Court has the benefit of their expertise in fully understanding: (1) the process of refugee resettlement, (2) the requirements of the Refugee Act of 1980; and (3) the interplay between federal agencies, state and local governments, and private resettlement agencies in ensuring the placement and resettlement of refugees who enter this county. Amici believe their experience can assist the Court in explaining how the Sept. 26, 2019 Executive Order on Enhancing State and Local Involvement in Refugee Resettlement, Exec. Order No. 13888, 84 Fed. Reg. 52,355 (Sept. 26, 2019) ("EO") is fundamentally inconsistent with the Refugee Act and undermines the purpose that it is purported to serve.

---

[1] Additional information about *Amici*'s State Department experience is set forth on Appendix A.

[2] Counsel for amici authored this brief in whole. No counsel for a party authored this brief in whole or in part. No party or its counsel contributed money to fund the preparation and/or submission of the brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Refugee Act of 1980 and its implementing regulations provide a comprehensive framework for refugee resettlement.  In that framework, Congress has established the primacy of the federal government in matters concerning the placement of refugees.

*Amici* urge this Court to consider and echo the conclusions set forth in the declarations of Eric Schwartz, former Assistant Secretary of State for Population, Refugees, and Migration – the same position or equivalent to the position held by *Amici* – and Robert Carey, former Director of the Office of Refugee Resettlement ("ORR") that the Refugee Act's framework calls repeatedly for consultation with states and localities in the placement and resettlement of refugees.  PRM creates a national plan to distribute refugees throughout the states and makes final decisions about funding resettlement services based on that plan.

The EO contravenes this statutory framework in numerous respects.  By permitting states and localities to effectively veto refugee resettlement within their borders, the EO (1) violates Congressional intent for federal agencies to exercise ultimate authority to decide where refugees are resettled; (2) forecloses the required consultation mandated by section 1522 of the Refugee Act, 8 U.S.C. § 1522 ("Section 1522"); (3) prevents PRM from considering several of the factors it is required to weigh when making initial refugee placement decisions; (4) is, as Mr. Carey states, designed to "fix a problem that does not exist"; and (5) prevents PRM and ORR from considering and responding to the impact of secondary migration, which occurs when refugees move from their initial resettlement site to another state or locality.

The EO also will undermine PRM's and ORR's ability to perform their statutory obligations and the resettlement agencies ability to provide services to refugees.  In states or localities that veto refugee resettlement, the loss of funding is likely to force local affiliates of

2

resettlement agencies and other local providers to close or scale back services, leaving them less able to respond to unplanned secondary migration.

Nor is the EO salvaged by language purporting to foreclose any provisions that violate existing law and permitting PRM to resettle refugees in jurisdictions that refuse to consent if the Secretary of State concludes "that failing to resettle refugees within that State or locality would be inconsistent with the policies and strategies established under [Section 1522] or other applicable law." As detailed below, the central purpose of the EO – to give states and localities a veto over refugee resettlement – violates Section 1522. That is not changed by this added language, which appears designed to avoid a court challenge, but does not change the EO's meaning or impact. Either the entire EO is invalid or the EO must be interpreted in a manner that would render it a nullity. In either case, to prevent uncertainty and harm to resettlement services, this Court should enjoin the EO and hold that the President cannot grant states and localities veto power over refugee resettlement.

Accordingly, for these reasons, *Amici* urge this Court to grant Plaintiffs' Motion for Preliminary Injunction.

## ARGUMENT

I.     **The Refugee Act Provides A Comprehensive Framework For Refugee Resettlement That Requires Consultation With States**

"The regulation of immigration to the United States, including by refugees (people who have fled their homeland, and unable to return because of threat of persecution seek to relocate in a country in which they'll be safe), is a federal responsibility codified in the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq*." *Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902, 903 (7th Cir. 2016). The Refugee Act of 1980 amended the Immigration and Nationality Act ("INA") to establish "a permanent and systematic procedure for the admission to this

country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for [their] effective resettlement."  Pub. L. No. 96-212, § 101(b), 94 Stat. 102, codified at 8 U.S.C. § 1521.

Under the Refugee Act, individuals seeking admission as refugees under Section 207 of the INA are processed through the U.S. Refugee Admissions Program ("USRAP") overseen by the Department of State in cooperation from the Department of Homeland Security ("DHS") and Department of Health and Human Services ("HHS").  Through this process, PRM works closely with the United Nations High Commission on Refugees and other partners to identify candidates for resettlement through USRAP.  PRM also works closely with HHS' Office of Refugee Resettlement (ORR) to ensure that adequate services are in place for resettled refugees as governed by 8 U.S.C § 1522(b)(1).  *See* Plaintiffs' Motion for Preliminary Injunction and Memorandum of Law in Support Thereof (Pl. Mem.) at 5.

As detailed in the Schwartz and Carey declarations, the Refugee Act establishes a comprehensive framework for resettling refugees that involves cooperative efforts from the federal government, state and local government, and nine privately operated resettlement agencies.[3]  PRM selects, enters into cooperative agreements with, and provides funding to resettlement agencies.[4]  It develops a national plan for placing refugees in locations throughout

---

[3] The government works with nine privately operated resettlement agencies: Church World Service, Ethiopian Community Development Council, Episcopal Migration Ministries, Hebrew Immigrant Aid Society, International Rescue Committee, US Committee for Refugees and Immigrants, Lutheran Immigration and Refugee Services, United States Conference of Catholic Bishops, and World Relief Corporation.  *See* https://www.acf.hhs.gov/orr/resource/voluntary-agencies.

[4] Schwartz Decl., ¶¶ 5, 8-10.

the United States after reviewing applications from agencies.[5]  Those applications must detail

steps taken by the agencies to consult with state and local governments.[6]

PRM also meets regularly with resettlement agencies to determine where refugees will be

resettled.[7]  These meetings include discussions of a variety of factors that might influence the

resettlement determination, such as employment opportunities, availability of affordable housing,

existing ethnic and linguistic groups, public transportation, health care resources, and other

factors to make the "best match between a community's resources and the refugee's needs."[8]

The sponsoring resettlement agency is "responsible for placing refugees with one of its affiliated

offices and for providing initial services, which include housing, essential furnishings, food,

necessary clothing, orientation, and assistance with access to other social, medical, and

employment services during the refugee's first 30-90 days in the United States."[9]

Congress has enacted specific requirements for PRM to consider when determining initial

placements.  Among other factors, PRM, in consultation with ORR, should not initially place or

---

[5] Carey Decl., ¶ 15.

[6] *Id.*, ¶ 18-19.

[7] Andorra Bruno, Congressional Research Serv., R44878, *Reception and Placement of Refugees in the United States* (June 21, 2017), https://fas.org/sgp/crs/homesec/R44878.pdf.

[8] U.S. Dep't of State, Bureau of Population, Refugees, and Migration, *The Reception and Placement Program* (2009-2017), *archived at* https://2009-2017.state.gov/j/prm/ra/receptionplacement/index.htm; U.S. Gov't Accountability Off., GAO-12-729, *Refugee Resettlement: Greater Consultation with Community Stakeholders Could Strengthen Program ("Refugee Resettlement")*, at 11-12 (July 26, 2012), https://www.gao.gov/products/GAO-12-729.

[9] U.S. Dep't of State, U.S. Dep't of Homeland Security, U.S. Dep't of Health and Human Servs., *Proposed Refugee Admissions for Fiscal Year 2019, Report to Congress in Fulfillment of the Requirements of Sections 207(D)(1) and (E) of the Immigration and Nationality Act* 17, https://www.state.gov/wp-content/uploads/2018/12/Proposed-Refugee-Admissions-for-Fiscal-Year-2019.pdf; U.S. Dep't of Health and Human Servs., *Voluntary Agencies Matching Grant Program Guidelines* 5-12, https://www.acf.hhs.gov/sites/default/files/orr/fy_2014_matching_grant_mg_program_guidelines_for_grantees.pdf (setting forth services that resettlement agencies must provide).

resettle a refugee "in an area highly impacted . . . by the presence of refugees or comparable populations" unless the refugee has a close family member in that area.[10]  8 U.S.C. § 1522(a)(2)(C)(i).  It also is required to provide a mechanism for local affiliates of the resettlement agencies to "meet with representatives of State and local governments to plan and coordinate in advance of their arrival the appropriate placement of refugees among the various States and localities[.]"  8 U.S.C. § 1522(a)(2)(C)(ii).  Further, in making placement decisions, PRM must "take into account – (I) the proportion of refugees and comparable entrants in the population in the area, (II) the availability of employment opportunities, affordable housing, and public and private resources (including educational, health care, and mental health services) for refugees in the area, (III) the likelihood of refugees placed in the area becoming self-sufficient and free from long-term dependence on public assistance, and (IV) the secondary migration of refugees to and from the area that is likely to occur."  *Id*. § 1522(a)(2)(C)(iii).  In making placement decisions, PRM must "consistent with such policies and strategies and to the maximum extent possible, take into account recommendations of the State."  *Id*. § 1522(a)(2)(D).  PRM also must periodically assess "the relative needs of refugees for assistance and services . . . and the resources available to meet such needs[.]"  *Id*. § 1522(a)(3).  The statute also sets out requirements for the awarding of grants and contracts for services and provides that PRM "may not delegate to a State or political subdivision" the authority to review or approve such grants or contracts.  *Id*. § 1522(a)(4), (b).

---

[10] Although the "Director" referred to in section 1522 is the Director of ORR, the statute provides that the President may direct another office to oversee initial resettlement of refugees.  8 U.S.C. § 1522(b)(1)(B).  Since President Carter, that responsibility has been assigned to PRM.  Because of that assignment and how the initial resettlement process works in practice, *amici* refer to the statute as "giving" authority to PRM, despite its reference to the Director of ORR.

After PRM determines placement, states can adopt their own refugee settlement plans. In addition to refugee placement through voluntarily adopted State Plans, refugee placement also may occur through the ORR-run Wilson-Fish program that operates in 12 states and one county or through federally-funded private-public partnerships, in which the states maintain policy and administrative oversight, but resettlement agencies provide direct services to the refugees.[11]

After the initial period overseen by PRM, responsibility for federal coordination of refugee resettlement falls to ORR. As detailed by Mr. Carey, ORR reimburses states for refugee-related costs, such as social services support, medical services, and language education.[12] These funds often flow through state refugee resettlement coordinators, some of whom actively oversee and meet with resettlement agencies and others who provide services directly to refugees.[13] The role of these state coordinators varies from state to state primarily depending on the size of the refugee population in each state.[14] This permits states to have flexibility. They can be actively involved in refugee resettlement or they can leave matters to ORR.

ORR also oversees the placement of unaccompanied refugee minors, who are placed in state foster programs.[15] ORR works with two resettlement agencies to determine appropriate placements and provide services to these refugees.[16]

---

[11] *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 724 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016); Office of Refugee Resettlement, *Wilson-Fish*, https://www.acf.hhs.gov/orr/programs/wilson-fish; Stella Burch Elias, *The Perils and Possibilities of Refugee Federalism*, 66 Am. U.L. Rev. 353, 365 (2016).

[12] Carey Decl., ¶ 21

[13] *Id.*, ¶¶ 22-24.

[14] *Id.*, ¶¶ 24-25.

[15] Office of Refugee Resettlement, *About Unaccompanied Refugee Minors*, https://www.acf.hhs.gov/orr/programs/urm/about.

[16] *Id.*

**II.     The EO Is Inconsistent With The Refugee Act's Mandates.**

The EO would require each "State and locality" to consent in advance to the resettlement of refugees within its jurisdiction.  That requirement – as well as the grounds purporting to justify the new requirement – contravene the express requirements of the Refugee Act, its implementing regulations, and the comprehensive system for refugee resettlement that has developed over the past four decades.  The language and structure of the statute clearly grant ultimate authority over refugee resettlement to the federal government by requiring only that PRM consult with states and localities when making placement decisions.  Granting veto power to states and localities reverses the statutory framework.

First, the EO is inconsistent with Congress's intent to give PRM ultimate authority to decide where refugees are resettled.  Section 1522 provides for PRM to consult with state and local governments and to "the maximum extent possible, take into account recommendations of the State[,]" but the final decision is plainly left to PRM.  Indeed, as two federal courts have recognized, "the consultation requirement is 'not intended to give States and localities any veto power over refugee placement decisions, but rather to ensure their input into the process and to improve their resettlement planning capacity.'"[17]

Second, by providing states and localities with an effective veto of resettlement, the EO forecloses any of the required consultation mandated by Section 1522 for initial placement decisions with states and localities that exercise a veto.  *See, e.g.,* 8 U.S.C. § 1522(a)(2)(A) (requiring PRM to "consult regularly" with state and local governments concerning sponsorship and distribution of refugees); § 1522(a)(2)(B) (requiring consultation with state and local

---

[17] *Texas Health & Human Servs. Comm'n v. United States*, 193 F. Supp. 3d 733, 741 (N.D. Tex. 2016) (quoting H.R. Rep. No. 99-132, at 19 (1985)); *Alabama v. United States*, 198 F. Supp. 3d 1263, 1272 (N.D. Ala. 2016) (quoting same).

governments to develop "policies and strategies for the placement and resettlement of refugees"); *see also id*. § 1522(a)(2)(C)(ii) (requiring PRM to provide a mechanism for resettlement agencies to meet with state and local governments to plan and coordinate resettlement).  If states and local governments refuse all refugees, these consultation provisions are meaningless.  There would be no consultation; states and localities would have foreclosed consultation altogether by prohibiting refugee resettlement in their jurisdictions.

Third, broad exclusions of entire states or cities and counties would prevent PRM from considering several of the factors it must weigh in making initial placement decisions.  For instance, in complying with veto decisions of states and localities, PRM  simply would be unable to also comply with its statutory obligation to consider secondary migration, *i.e.*, when refugees leave their initial placement site and move to another location.  8 U.S.C § 1522(a)(2)(C)(iii)(IV).  Further, although PRM is tasked with considering the "availability of . . . public and private resources (including educational, health care, and mental health services) for refugees," *id*. § 1522(a)(2)(C)(iii)(II), PRM would be unable to consider resources in a state or locality that has vetoed refugee resettlement.  Limiting available locations for placement also is likely to place a greater burden on states and cities that accept refugees, rather than avoid placing refugees in areas already highly impacted by refugees.  *Id*. § 1522(a)(2)(C)(i).

Fourth, the EO is founded on an assumption that does not square with the reality of refugee resettlement.  The EO reasons that "[s]tate and local governments are best positioned to know the resources and capacities they may or may not have available to devote to sustainable resettlement, which maximizes the likelihood refugees placed in the area will become self-sufficient and free from long-term dependence on public assistance."  Exec. Order No. 13888, 84 Fed. Reg. 52,355, at § 1 (Sept. 26, 2019).  As Mr. Carey concludes, the EO "purports to fix a

problem that does not exist."[18]  Not only does this ignore that Congress expressly directed PRM

to ascertain the resources and capabilities of potential placement site, but it fails to account for

the fact that many states have eschewed administrating their own resettlement programs, leaving

them instead to ORR's Wilson-Fish program or to public-private partnerships.  The following

map from ORR illustrates this disparity:



**Source:** ORR, https://www.acf.hhs.gov/orr/state-programs-annual-overview

---

It defies logic to assume that state or local officials with no involvement in refugee resettlement are better positioned to assess the needs of prospective refugees than officials directly tasked with making those assessments, who regularly meet with the resettlement agencies that work with refugees and provide those services, and make placement decisions on an individualized basis.  Nor are state and local governments left out of that process.  As Mr. Schwartz points out, under the existing system, PRM makes nuanced, detailed placement decisions that consider state and local data, assess the needs and capacities of both the resettlement agencies and communities, and discuss refugee resettlement with state and local officials.[19]  PRM also takes seriously concerns from state and local officials about refugee placement.[20]

Fifth, in effectively preventing PRM from placing refugees in jurisdictions that exercise a veto, the EO defeats PRM's efforts to take into account secondary migration of refugees, *i.e.*, when refugees leave their initial placement site and move to another location.  8 U.S.C. § 1522(a)(2)(C)(iii)(IV).  Most refugees have family or other ties to individuals lawfully residing in the United States.[21]  Once placed, refugees are free to move within the United States from their initial placement location.[22]  Academic studies from 2012 and 2013 showed that between 16 and 17% of refugees moved to another state within eight months of their initial placement.[23]

---

[19] Schwartz Decl., ¶¶ 10-13, 15-16.

[20] *Id.*, ¶ 16-17.

[21] Declaration of Mark Hetfield ("Hetfield Decl."), ¶ 57.

[22] Bruno, *supra* note 7, at 2.

[23] Jeffrey Bloem & Scott Loveridge, *The Costs of Secondary Migration: Perspectives from Local Voluntary Agencies in the USA*, 19 Int. Migration & Integration 233, 235 (2018), https://link.springer.com/article/10.1007%2Fs12134-018-0538-4; *see also* Nadwa Mossad et al., *In Search of Opportunity and Community: The Secondary Migration of Refugees in the United States* 3 (Sept. 2019), http://dx.doi.org/10.2139/ssrn.3458711 (finding 17% of refugees had

ORR has found that refugees relocate for numerous reasons, including "better employment opportunities, the pull of an established ethnic community, more welfare benefits, better training opportunities, reunification with relatives, or a more congenial climate."[24]

As this data shows, states and localities that veto initial refugee resettlement may nonetheless become home to refugees through secondary migration.  It is particularly likely that refugees will move to jurisdictions where they have ties to family or other individuals lawfully residing in the United States.[25]

This is not a mere hypothetical concern.  As detailed in the Declaration of Mark Hetfield, PRM takes secondary migration seriously, because it has substantial costs for individual refugees, resettlement agencies, and the governments that provide financial support to refugees.[26] As a result of a veto, there may be no refugee resettlement infrastructure to assist those refugees. Refugees would face a dilemma between moving to a location with better job options or members of their ethnic community without refugee support or remaining in a less-desirable location, a result the statute was designed to prevent.

Permitting refugees to move to locations where they have *both* family or other ties and refugee support is the best way for refugees to integrate into society.  A study by the GAO identified numerous indicators of and barriers to the integration of refugees in society.[27] Indicators of integration included factors such as civic participation, employment, refugee

---

moved from their initial state of resettlement by the time they applied for lawful permanent resident status, which usually occurs shortly after completing one year in the United States).

[24] *Refugee Resettlement*, *supra* note 8, at 20-21; *but see* Mossad et al., *supra* note 23, at 8 (finding little correlation between secondary migration and higher welfare benefits).

[25] Hetfield Decl., ¶¶ 57, 60.

[26] *Id.*, ¶¶ 61-64.

[27] *Refugee Resettlement*, *supra* note 8, at 35-36.

culture, involvement with the host community, and social connections.[28]  Among the ways to facilitate integration, the GAO identified: "[c]ommunity organizing of refugee groups"; "[a]vailability of public service providers to educate community about refugees' cultures (and vice versa)"; "[p]reparation of the community to receive newcomers"; [b]ilingual and culturally competent staff at agencies serving refugees"; "[c]ommunity events to celebrate refugees' cultures"; and "[s]ocial support from other refugees."[29]  Some of those factors are present in communities with members of a refugee's family or ethnic group, while others depend on financial and other resources provided by resettlement agencies and local providers.  Preventing refugees from being placed in locations without both types of support would increase the difficulty of integrating those refugees into society.

### III.    The EO Will Undermine The Federal Government's And Resettlement Agencies' Ability To Serve Refugees.

Funding for refugees after arrival is based on the allocation of refugees per state.[30]  If states or localities veto resettlement, those funds will not be allocated to those states, and refugees who move there after resettlement will not receive timely and necessary services.  As the GAO has found, "federal funding does not necessarily follow [refugees] to their new communities, even though refugees continue to be eligible for some resettlement services for 5 years after arrival."[31]  Further, even when ORR provides funding to communities and states

---

[28] *Id.*

[29] *Id.*

[30] Office of Refugee Resettlement, Dear Colleague Letter 19-05, *FY 2019 Refugee Support Services Formula Allocation* (Sept. 5, 2019), https://www.acf.hhs.gov/orr/resource/fy-2019-refugee-support-services-formula-allocation.

[31] *Refugee Resettlement*, *supra* note 8, at 21.

affected by secondary migration, that funding may not be provided until a year after refugees move to the affected community.[32]

Undoubtedly, resettlement agencies will direct their efforts away from such communities. Local affiliates and other local agencies and organizations providing services to refugees will scale back operations or close entirely. Consequently, refugees who move from their initial placement site to such locations will have little to no resettlement support upon arrival. And the impact from the veto may leave those communities without the necessary infrastructure or the expertise and experience to revive resettlement services. This result is precisely what the provision mandating that PRM consider secondary migration was enacted to prevent.

**IV.     The EO's Possibility Of An Exception That Would Purportedly Permit Resettlement Despite A State Or Locality's Veto Does Not Cure The EO's Defects.**

The EO contains a provision stating "[n]othing in this order shall be construed to impair or otherwise affect: (i) the authority granted by law to an executive department or agency, or the head thereof." Exec. Order No. 13888, 84 Fed. Reg. 52,355, § 3. It also includes a provision that purportedly permit PRM to resettle refugees in jurisdictions that refuse refugees if the Secretary of State concludes "that failing to resettle refugees within that State or locality would be inconsistent with the policies and strategies established under [Section 1522] or other applicable law." *Id.*, § 2(b). As discussed above, however, the very purpose of the EO – to permit states and localities to veto refugee resettlement – contravenes numerous statutory mandates in Section 1522. Section II, above. This is true with or without language in the EO that appears designed to avoid a court challenge but does nothing to change the EO's meaning or impact. Regardless, this Court should issue the injunction. Leaving the EO intact creates

---

[32] *Id.* at 21-22.

uncertainty about whether states and localities can veto refugee resettlement and how PRM and

ORR can simultaneously comply with the EO and Section 1522.  Any attempt by agencies to

comply with the EO is likely to harm resettlement agencies and undermine their ability to serve

refugees.

## CONCLUSION

For the foregoing reasons, *Amici* request that this Court grant Plaintiffs' Motion for

Preliminary Injunction.

Dated:          December 13, 2019

AKIN GUMP STRAUSS HAUER & FELD LLP

By: */s/ Steven H. Schulman*
Steven H. Schulman (No. 17144)
Robert S. Strauss Tower
2001 K St., N.W.
Washington, D.C. 20006
Phone: 202-887-4000
Fax: 202-887-4288
sschulman@akingump.com

Jessica M. Weisel (*pro hac vice* pending)
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067
Phone: 310-229-1000
Fax: 310-229-1001
jweisel@akingump.com

*Attorneys for Amici Curiae*

## Appendix A

### Amici Curiae Former State Department Officials

**James Nelson Purcell, Jr.**
USA for IOM, Chairman of the Board of Directors, 1999-present
Director General, UN International Organization for Migration, 1988-1998
Director, Bureau for Refugee Programs, 1982-1987
Deputy Assistant Secretary, Bureau for Refugee Programs, 1979-1982

**Arthur E. Dewey**
Assistant Secretary of State for Population, Refugees, and Migration Affairs, 2002-2005
Deputy United Nations High Commissioner for Refugees, 1986-1991

**Anne Claire Richard**
Assistant Secretary of State for Population, Refugees, and Migration Affairs, 2012-2017