**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| HIAS, Inc., *et al.*, | |
| *Plaintiffs*, | No. 8:19-cv-3346-PJM |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

INTRODUCTION ..................................................................................................... 1

LEGAL AND FACTUAL BACKGROUND ............................................................. 2

    Statutory Background ....................................................................................... 2

    Executive Order 13888 ..................................................................................... 5

    Notice of Funding Opportunity and Subsequent Guidance ................................ 6

    This Litigation .................................................................................................. 9

ARGUMENT ........................................................................................................... 9

I.     Plaintiffs Are Not Likely to Succeed on the Merits........................................ 10

    A.     Neither the Executive Order Nor the NOFO Is Reviewable................................ 10

          1.     <u>The Refugee Act Does Not Provide a Cause of Action.</u>........................... 10

          2.     <u>The APA Does Not Provide an Avenue for Review in this Case.</u>............ 12

    B.     Even Assuming Review Were Available, the Executive Order and the NOFO Are Lawful. ........................................................................... 14

          1.     <u>The Executive Order and the NOFO are Consistent with the Refugee Act.</u> ............................................................................ 14

          2.     <u>Neither the Executive Order nor the NOFO Raises Constitutional Concerns.</u> ............................................................................... 19

          3.     <u>Defendants' Implementation of the Executive Order Is Not Arbitrary and Capricious.</u>.......................................................... 20

II.    Plaintiffs Have Not Established Irreparable Harm in the Absence of An Injunction. ..................................................................................................... 25

III.   The Balance of Equities and the Public Interest Also Militate Against a Preliminary Injunction. .................................................................................. 27

IV.  The Scope of Any Injunctive Relief Should Be Limited. ................................. 28

    A.     The Court Should Not Enjoin the President. ........................................ 28

    B.     Any Injunction Should Be Limited to the Named Plaintiffs................................. 30

CONCLUSION........................................................................................................ 32

i

# TABLE OF AUTHORITIES

**CASES**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ...................................................................................... 32

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ...................................................................................... 25

*Alabama v. United States*,
198 F. Supp. 3d. 1263 (N.D. Ala. 2016) ...................................................... 11

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........................................................................... 10, 11, 12

*Arizona v. United States*,
567 U.S. 387 (2012) ...................................................................................... 19

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................. 12, 13

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ........................................................................ 31

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979) ...................................................................................... 11

*Citizens Alert Regarding Env't v. EPA*,
102 F. App'x 167 (D.C. Cir. 2004) ............................................................... 13

*Citizens to Pres. Overton Park Inc. v. Volpe*,
401 U.S. 402 (1971) ...................................................................................... 20

*De Canas v. Bica*,
424 U.S. 351 (1976) ...................................................................................... 19

*Doe v. Shanahan*,
917 F.3d 694 (D.C. Cir. 2019) ..................................................................... 30

*FDIC v. Meyer*,
510 U.S. 471 (1994) ...................................................................................... 10

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ...................................................................................... 20

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ........................................................................ 12, 28, 29

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005) ............................................................ 25

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ..................................................................... 30

*Hawaii v. Trump*,
  859 F.3d 741 (9th Cir. 2017),
  vacated as moot, 138 S. Ct. 377 (2017) ......................................... 30

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) ......................................................................... 31

*IRAP v. Trump*,
  857 F.3d 554 (4th Cir. 2017),
  as amended (June 15, 2017), *vacated as moot*, 138 S. Ct. 353 (2017) ..................................... 29

*IRAP v. Trump*,
  883 F.3d 233 (4th Cir. 2018),
  as amended (Feb. 28, 2018), *vacating judgment*, 138 S. Ct. 2710 (2018) ......................... 29, 30

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
  638 F.3d 644 (9th Cir. 2011) .......................................................... 31

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ..................................................................... 30, 31

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1866) .......................................................... 29

*Nken v. Holder*,
  556 U.S. 418 (2009) ......................................................................... 27

*Planned Parenthood v. Azar*,
  316 F. Supp.3d 291 (D.D.C. 2018),
  *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019) ......................... 13

*Rattlesnake Coal. v. EPA*,
  509 F.3d 1095 (9th Cir. 2007) ........................................................ 13

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ........................................................ 30

*Texas v. Health & Human Servs. Comm'n v. United States*,
   193 F. Supp. 3d 733 (N.D. Tex. 2016) ................................................................ 11

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ........................................................................ 31, 32

*United States v. City of Los Angeles*,
   595 F.2d 1386 (9th Cir. 1979) ........................................................................ 26

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ........................................................................................ 31

*Universities Research Ass'n, Inc. v. Coutu*,
   450 U.S. 754 (1981) .................................................................................... 11, 12

*Virginia Soc'y for Human Life, Inc. v. FEC*,
   263 F.3d 379 (4th Cir. 2001),
   *overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th
   Cir. 2012) ................................................................................................ 31, 32

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) .................................................................................... 27, 31

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) .................................................................................. 9, 25, 27

*Zepeda v. INS*,
   753 F.2d 719 (9th Cir. 1983) ................................................................................ 31

**STATUTES**

5 U.S.C. § 551 ........................................................................................................ 12

5 U.S.C. § 702 .................................................................................................... 12, 32

5 U.S.C. § 703 ........................................................................................................ 32

5 U.S.C. § 704 .................................................................................................... 12, 13

5 U.S.C. § 706 .................................................................................................... 20, 31

8 U.S.C. § 1157 ................................................................................................ *passim*

8 U.S.C. § 1522 ................................................................................................ *passim*

Pub. L. No. 96-212, 94 Stat. 102 (Mar. 17, 1980) ........................................................ 2

iv

Pub. L. No. 97-363, 96 Stat. 1734 (1982)...................................................................... 18

**OTHER AUTHORITIES**

Exec. Order 13780, 82 Fed. Reg. 13,209 (Mar. 6, 2017) ............................................. 29

Exec. Order No. 13,888, 84 Fed. Reg. 52,355 (Sept. 26, 2019) ............................. *passim*

FY2020 Reception & Placement Notice of Funding Opportunity, https://www.
        grants.gov/web/grants/view-opportunity.html?oppId=322298 ................................. 6

H.R. Rep. No. 99-132 (1985)........................................................................................ 18

**INTRODUCTION**

Executive Order 13888 (Executive Order) requires enhanced consultation with States and localities before the Government resettles refugees within their borders. Plaintiffs are several private entities that voluntarily participate in refugee resettlement (called "Resettlement Agencies") who object to this common-sense requirement and seek a court order preliminarily enjoining it, as well as one forbidding Defendants' efforts to effectuate the Executive Order through grant funding awards. The Court should deny Plaintiffs' request because they have not met the stringent requirements for obtaining that extraordinary relief.

Plaintiffs cannot establish that they are likely to succeed on the merits because neither the Executive Order they challenge, nor the Notice of Funding Opportunity (NOFO) that implements it, are reviewable. Plaintiffs claim that the Refugee Act bars Defendants' actions, but it is well established that the Refugee Act does not create a private right of action. Nor does the Administrative Procedure Act (APA) provide an avenue for review, because neither the Executive Order nor the NOFO is a final agency action within the meaning of that statute.

Even assuming Plaintiffs could clear these threshold hurdles, their claims would still fail. Both the Executive Order and the NOFO are fully consistent with the Refugee Act, and Plaintiffs' arguments to the contrary are based on the faulty premise that Defendants have provided States and localities with a "veto" over refugee resettlement decisions. To the contrary, although Defendants require additional consultation with States and localities, the ultimate resettlement decision rests squarely with the Federal Government. Nor can Plaintiffs show that Defendants' actions are arbitrary and capricious. Because no funding decisions have been made, the relevant administrative record is not yet available. But even based on the materials that currently exist, Defendants' reasonable explanation for their decision is readily apparent. Defendants will continue to engage with the Resettlement Agencies regarding the ongoing application process, and

have provided more than sufficient guidance for Plaintiffs to seek funding in the upcoming fiscal year.

Plaintiffs also have not established that they will suffer imminent, irreparable harm in the absence of an injunction, or that the balance of equities tips in their favor. Although Plaintiffs have requested a decision by January 21, 2020, Plaintiffs may continue to collect and submit consents after that date on a rolling basis, undermining any claim that the alleged harm is imminent. Moreover, that Plaintiffs may need to expend time and resources in order to obtain government funding is not irreparable harm, and Plaintiffs' other allegations of harm are purely speculative. The Government and the public, on the other hand, would be harmed if they are not allowed to fulfill the Executive Order's purpose of encouraging enhanced State and local consultation in refugee resettlement. Finally, even if the Court were to enter an injunction here, the scope of any such relief should be limited; the Court should not enjoin the President, and any relief should be limited only to the specific Plaintiffs in this case.

## LEGAL AND FACTUAL BACKGROUND

### Statutory Background

Pursuant to the power to control immigration that the Constitution vests in the Federal Government, Congress enacted the Refugee Act of 1980 (Refugee Act), which amended the Immigration and Nationality Act to "provide a permanent and systematic procedure for the admission [] of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, § 101(b) (Mar. 17, 1980). The Refugee Act confers on the President the unilateral authority to determine— following consultation with Congress—the number of refugees whose resettlement in the United

States in the upcoming fiscal year is "justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2).

Under the Refugee Act, the Government may issue grants to State and local governments and private non-profit agencies—*i.e.*, Resettlement Agencies—to manage the initial resettlement of, and provide resettlement assistance to, refugees admitted to the United States. 8 U.S.C. § 1522(b)(1)(A). The State Department's Bureau of Population, Refugees, and Migration (PRM) maintains and oversees the U.S. Refugee Admissions Program (USRAP), which screens, transports, and provides resettlement services for refugees from overseas, including initial resettlement pursuant to this authority, with consideration for the national interest. *Id*. §§ 1522(b)(1); 1157(a)(1). For each fiscal year, PRM issues grants, called "cooperative agreements," between the Federal Government and the Resettlement Agencies. *See* Declaration of Andrew M. Veprek Decl. ¶ 4 (Veprek Decl.) (Exhibit 1). Each grant specifies the maximum number of refugees the Resettlement Agency may sponsor in the relevant fiscal year and the distribution of those refugees among the jurisdictions in which the Resettlement Agency and/or its local affiliates operate. *Id.* The requirements for such grants are set out in a notice of funding opportunity, or NOFO, issued by PRM. The Fiscal Year 2020 NOFO describes the available grant for the upcoming fiscal year, including, among other things, the ceiling for refugee admissions that the President has established; the amount of funds available to resettlement affiliates, through the Resettlement Agencies, for each refugee resettled; and the content and form of applications for funding. *Id.*

The Department of Health and Human Services Office of Refugee Resettlement (ORR) is also authorized to make grants to and contract with public and private non-profit agencies to assist refugees in achieving economic self-sufficiency, including job training and English-language

education. *See* 8 U.S.C. § 1522(c).  ORR may also make grants to contract with State and local governments and private non-profit agencies, and provide reimbursements to States, to cover the costs of cash and medical assistance provided to refugees.  *Id.* § 1522(e).  In order to receive federal funds for these purposes, a State must submit a plan that meets the requirements imposed by the INA.  *Id.* § 1522(a)(6).  Among other requirements, assistance and services funded under the Refugee Act must be provided to refugees "without regard to race, religion, nationality, sex, or political opinion."  *Id.* § 1522(a)(5).

The Refugee Act sets out a number of factors for federal agencies charged with making placement decisions to consider when making initial placement decisions.  In carrying out this initial program of resettlement under Section 1522(a)(2)(A), the Government shall

> consult regularly (not less often than quarterly) with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees among the States and localities before their placement in those States and localities.

*Id.* § 1522(a)(2)(A).  The Government shall also—to the extent practicable and except under unusual circumstances—ensure that refugees are not placed or resettled in an area that is highly impacted by the presence of refugees.  *Id.* § 1522(a)(2)(C)(i).  The Government must also take into account other factors, such as the proportion of refugees in the population area, the availability of employment opportunities and available resources, the likelihood that refugees placed in the area will become self-sufficient, and the likelihood of secondary migration.  *Id.* § 1522(a)(2)(C)(ii)-(iii).  The Refugee Act further specifies that "[w]ith respect to the location and placement of refugees within a State," the Federal agency resettling refugees shall "consistent with such policies and strategies and to the maximum extent possible, take into account recommendations of the State."  *Id.* § 1522(a)(2)(D).

**Executive Order 13888**

On September 26, 2019, the President signed Executive Order 13888, titled "Enhancing State and Local Involvement in Refugee Resettlement." Exec. Order No. 13,888, 84 Fed. Reg. 52,355 (Sept. 26, 2019). The Executive Order explains that it is the "policy of the United States to cooperate and consult with State and local governments, to take into account the preferences of State governments, and to provide a pathway for refugees to become self-sufficient." Executive Order § 1. These policies are mutually reinforcing, and "[c]lose cooperation with State and local governments ensures that refugees are resettled in communities that are eager and equipped to support their successful integration into American society and the labor force." *Id.* As the Executive Order explains, "State and local governments are best positioned to know the resources and capacities they may or may not have available to devote to sustainable resettlement, which maximizes the likelihood refugees placed in the area will become self-sufficient and free from long-term dependence on public assistance." *Id.* Although there is an existing process by which the Federal Government consults with State and local governments to identify the best environments for refugees, "[s]ome States and localities [ ] have viewed existing consultation requirements as insufficient, and there is a need for closer coordination and a more clearly defined role for State and local governments in the refugee resettlement process." *Id.*

To those ends, Section 2(a) of the Executive Order directs the Secretary of State to develop and implement a process within 90 days of the date of the Executive Order to determine whether the State and locality both consent in writing to the resettlement of refugees within the relevant State and locality, before any refugees are resettled within that State and locality under the U.S. Refugee Resettlement Program. *Id.* § 2(a). Section 2(a) also requires the Secretary of State to publicly release the written consents provided by States and localities to resettlement of refugees. *Id.*

Section 2(b) of the Executive Order further requires the Secretary of State to develop and implement a process by which the State's and locality's consent to resettlement is "taken into account to the maximum extent consistent with law." *Id.* § 2(b). Specifically, if either a State or locality has not provided consent to receive refugees, then refugees should not be resettled within that State or locality unless the Secretary of State concludes, following consultation with the Secretary of Health and Human Services and the Secretary of Homeland Security, that failing to resettle refugees within that State or locality would be inconsistent with the policies and strategies established under the Refugee Act at 8 U.S.C. § 1522(a)(2)(B) and (C) or other applicable law. Executive Order § 2(b). If the Secretary of State intends to provide for the resettlement of refugees within a locality that has not provided consent, then the Secretary shall notify the President of that decision, and the reasons for the decision, before proceeding.

The Executive Order further provides, in Section 2(c), that the requirements in Section 2(b) do not apply to the resettlement of a refugee's spouse or child following to join that refugee pursuant to 8 U.S.C. § 1157(c)(2)(A). Executive Order § 2(c).

**Notice of Funding Opportunity and Subsequent Guidance**

PRM issued the NOFO for the upcoming 2020 fiscal year on November 6, 2019. *See* FY2020 Reception & Placement Notice of Funding Opportunity, https://www.grants.gov/web/grants/view-opportunity.html?oppId=322298 (last visited Dec. 20, 2019). The NOFO sets a proposed submission deadline of Tuesday, January 21, 2020 at 12:00 p.m. EST. Among other things, the NOFO explains that, "[c]onsistent with Section 412(a) of the INA [*i.e.*, 8 U.S.C. § 1522(a)] and Executive Order 13888, . . . PRM and [ORR] seek to promote the involvement of states and localities in the selection of locations for initial resettlement." NOFO at 3. The NOFO further explains that "PRM and ORR seek strong environments to support resettlement and speedy integration, and regard state and local consent as important evidence of such strength." *Id.* Thus,

the NOFO provides that, "[f]or each State and locality where the applicant proposes to resettle refugees during the award period, the applicant should seek written consent for resettlement of refugees from the state governor's office and the chief executive officer of the local government (county or county equivalent)." *Id.*

As further explained in the NOFO, "PRM will take into account such consents to the maximum extent permitted by law, including [8 U.S.C. § 1522(a)] and the antidiscrimination laws, in deciding where to place refugees." *Id.* Applicants should document such consents or their unavailability in their applications for the grant award. *Id.* at 12. An applicant need not provide all such consents until the award period begins on June 1, 2020. *Id.*; *see also id.* at 5 (establishing an initial activity period beginning June 1, 2020). If a Resettlement Agency has sought consent and believes that consent will be granted, but not before the due date of the application, it may submit a proposal for resettlement in that State or locality pending receipt of consent. Veprek Decl. ¶ 11. "[A]pplicants may submit to PRM such consent letters from state and local officials on a rolling basis both before and after submission of their proposals." NOFO at 12.

Following publication of the Executive Order and the announcement of the NOFO, PRM engaged in outreach to explain the process and to answer questions from representatives of States and localities and the Resettlement Agencies. *See* Veprek Decl. ¶ 9. For instance, the PRM Deputy Assistant Secretary Andrew Veprek participated in a conference call organized by the Department of Homeland Security Office of Intergovernmental Affairs with State representatives to address questions regarding the Executive Order's requirements. *Id.* The White House Office of Intergovernmental Affairs also hosted a call on November 22, 2019 with over 150 State and local officials, representatives of associations representing State and local officials, and contacts at resettlement agencies and affiliates. *Id.* Further, either directly or through the White House and

Department of State Offices of Intergovernmental Affairs, Deputy Assistant Secretary Veprek has spoken to and corresponded through email with State and local officials from a number of States, including Utah, Iowa, Connecticut, Alabama, North Carolina, Florida, Idaho, Tennessee, and North Dakota to provide clarity regarding the consent process. *Id.*

To provide additional clarity, on December 16, 2019, in response to questions received from Resettlement Agencies through the normal grant process, PRM also issued guidance to Resettlement Agencies regarding how to obtain consents from States and localities. *See id.* ¶ 9 & Exhibit A. That guidance explains, among other things, that the U.S. Census Bureau's definition of a "county or equivalent entity" serves as the definition for "county or county equivalent" used in the NOFO. *Id.*, Exhibit A. A "county or equivalent entity" is defined by the U.S. Census Bureau as

> The primary legal subdivision of most states. In Louisiana, these subdivisions are known as parishes. In Alaska, which has no counties, the county equivalents are boroughs, a legal subdivision, and census areas, a statistical subdivision. In four states (Maryland, Missouri, Nevada and Virginia), there are one or more cities that are independent of any county and thus constitute primary subdivisions of their states. The District of Columbia has no primary divisions, and the entire area is considered equivalent to a county for statistical purposes.

The U.S. Census Bureau has created a list of counties and county equivalents, and PRM's guidance provided that list as an attachment. The guidance also addresses specific issues of confusion not addressed by the U.S. Census Bureau. For instance, the guidance explains that a "county or county equivalent" includes consolidated city-county governments (*e.g.*, Jefferson County-Louisville, Kentucky) and independent cities (*e.g.*, Alexandria, Virginia), as well as towns, cities, and municipalities in New England states that lack counties as political subdivisions. *Id.*

The guidance also provides additional information as to who qualifies as a "chief executive officer" within a locality. *Id.* And it explains that, if the Resettlement Agency cannot identify a county executive, Resettlement Agencies should contact PRM, which will review the

circumstances to identify the appropriate official. *Id.* The guidance also provides an email address for PRM where Resettlement Agencies could direct any further questions regarding how to obtain consent. *Id.*

**This Litigation**

Plaintiffs, a group of three Resettlement Agencies, filed suit on November 21, 2019, alleging that the Executive Order and Defendants' implementation of it through the NOFO violate the Refugee Act, the APA, and constitutional principles of separation of powers. *See* generally Compl. For Declaratory and Inj. Relief, ECF No. 1 (Compl.). The following day, Plaintiffs moved for a preliminary injunction on their Refugee Act and APA claims. *See* Pl.'s Mot. for Prelim. Inj. and Mem. of Law in Supp. Thereof (PI Mot.), ECF No. 18. After a status conference on November 26, 2019, the Court ordered Defendants to respond to Plaintiffs' motion for preliminary injunction by December 20, 2019; ordered Plaintiffs to file their reply by January 3, 2020, and scheduled oral argument on Plaintiffs' preliminary injunction motion for January 8, 2020. *See* Order, ECF No. 29.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Plaintiffs fail to satisfy any of these requirements.

I.       **Plaintiffs Are Not Likely to Succeed on the Merits.**

A.       **Neither the Executive Order Nor the NOFO Is Reviewable.**

1.       <u>The Refugee Act Does Not Provide a Cause of Action.</u>

Plaintiffs' request for a preliminary injunction based on the Refugee Act should be denied because that statute does not provide a cause of action.  Plaintiffs argue that Defendants have violated the Refugee Act by allegedly violating the terms for admitting refugees under 8 U.S.C. § 1157, and by frustrating their resettlement under the terms of 8 U.S.C. § 1522.  *See* Compl. ¶¶ 131-36; *see also* PI Mot. at 13-23.  But neither provision creates a private right of action that could support their claim.

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.*  Where this necessary statutory intent is absent, "a cause of action does not exist and courts may not create one." *Id.* at 286-87.

Neither section 1157 nor section 1522 has an express provision creating a private cause of action. *See generally* 8 U.S.C. §§ 1157, 1522.  And there is no basis for inferring a private cause of action in these circumstances.  To determine whether Congress intended to provide a right of action, courts "look to the text for rights-creating language." *In re Miller*, 124 F. App'x 152, 154 (4th Cir. 2005) (quotation omitted).  Rights-creating language refers to textual evidence that "the statute was enacted for the benefit of a special class of which the plaintiff is a member." *Cannon v. University of Chi.*, 441 U.S. 677, 689 (1979).  Absent such language, a right of action typically will not be inferred. Even where "an enactment is designed to benefit a particular class," moreover, that finding does "not end the inquiry; instead, it must also be asked whether the language of the statute indicates that Congress intended that it be enforced through private litigation." *Universities*

*Research Ass'n v. Coutu*, 450 U.S. 754, 771 (1981). Where a provision is "phrased as a directive to federal agencies engaged in the disbursement of public funds, its language provides no support for the implication of a private remedy." *Id.* at 772-73 (citation and quotation marks omitted).

As multiple courts have held, the Refugee Act does not contain the sort of "rights-creating language" for such persons that courts find "critical" to imputing to Congress an intent to create a private right of action. *Sandoval*, 532 U.S. at 288; *see also Alabama v. United States*, 198 F. Supp. 3d. 1263, 1271 (N.D. Ala. 2016) (finding that the Refugee Act does not contain rights-creating language); *Texas v. Health & Human Servs. Comm'n v. United States*, 193 F. Supp. 3d 733, 740 (N.D. Tex. 2016) (same). In *Sandoval*, the Supreme Court distinguished between the rights-creating language, "[n]o person . . . shall . . . be subjected to discrimination," and its antithesis, "[e]ach Federal department and agency . . . is authorized and directed to effectuate the provisions of [the statute]." 532 U.S. at 288-89.

Section 1522 falls squarely within the latter camp. It does not "explicitly confer[] [any] right directly on" private individuals. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979). Instead, it is "phrased as a directive to federal agencies engaged in the distribution of public funds." *See Sandoval*, 532 U.S. at 289. Courts typically do not infer a private remedy "where Congress, rather than drafting the legislation 'with an unmistakable focus on the benefited class,' instead has framed the statute simply as a general prohibition or command" to an agency. *See Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 772 (1981); *see also Texas Health & Human Servs. Comm'n*, 193 F. Supp. 3d at 740 (concluding that § 1522(a)(2)(A) does not contain the kind of rights-creating language necessary to convey a congressional intent to create a cause of action for a state, and thus necessarily for an individual); *Alabama*, 198 F. Supp. 3d at 1273 ("The court finds nothing in the statutory text, structure, or legislative history to show Congress intended to create a

right of action."). Similarly, section 1157 merely contains limits on and directives for federal agencies when admitting refugees. *See* 8 U.S.C. § 1157; *Universities Research Ass'n*, 450 U.S. at 772. Absent language in either section evincing a congressional intent to create a private cause of action, the Court "may not create one." *Sandoval*, 532 U.S. at 286-87. Thus, Plaintiffs' claims originating in alleged violations of these statutes must be dismissed.

### 2. The APA Does Not Provide an Avenue for Review in this Case.

Plaintiffs' request for a preliminary injunction must also be denied because Plaintiffs lack a cause of action under the APA. The APA provides judicial review solely of "agency action." 5 U.S.C. §§ 702, 704. The President is not an "agency" and thus his actions are not reviewable under that statute. As the Supreme Court has squarely held: "[T]he APA does not expressly allow review of the President's actions" and thus "we must presume that his actions are not subject to its requirements." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). Plaintiffs thus cannot invoke the APA's cause of action here with respect to the Executive Order.

Nor can Plaintiffs challenge PRM's implementation of the Executive Order through the NOFO, because, as a mere request for funding applications, it is not *final* agency action. The APA defines final "'agency action' [as] includ[ing] the whole or a part of . . . relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13). In turn, "'relief' includes the whole or a part of an agency['s] . . . grant of money." *Id.* § 551(11)(A). Final agency action must meet two criteria: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations omitted). Plaintiffs' challenge does not satisfy either of those criteria.

Whether a change to an agency's grant application process is a final agency action depends, in part, on whether that change alone is outcome determinative. Even when "Congress has specified the specific project to which funds should be allocated, the [agency] does not take a final agency action until it completes its review of the grant application and decides to disburse the appropriated funds." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007); *see also Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167, 168 (D.C. Cir. 2004) (holding that until the agency "completes its review and reaches a decision [on the grant award], there has been no final agency action . . . and the matter is not ripe for judicial review"); *Planned Parenthood v. Azar*, 316 F. Supp.3d 291, 301 (D.D.C. 2018) (concluding that a notice of funding opportunity that set out intermediate criteria by which applications would be evaluated was not final agency action because it announced only how "an agency decision *will be* made," and the plaintiffs challenged only "intermediate criteria by which applications will be evaluated"), *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019).

The NOFO does not determine rights and obligations, nor do legal consequences flow from it. Because PRM does not "complete its review of the grant application and decide to disburse the funds" until after the applications are submitted and a large number of other factors are considered, the mere issuance of the NOFO does not determine rights and obligations. Rather, the NOFO is an interlocutory determination from which no legal consequences flow. *See Bennett*, 520 U.S. at 177-78; *see also* 5 U.S.C. § 704 (explaining that "preliminary, procedural, or intermediate" agency actions are not directly reviewable, but may be reviewed on final agency action). Because the NOFO is merely a document setting out the application process for receiving funding, it has no definitive legal effect and cannot be final agency action. Even if an applicant does not provide a consent from a particular State and/or locality, that does not determine its eligibility for funding

overall; at most, it is a factor relevant to *where* the applicant may resettle refugees, and even then PRM will take into consideration other necessary statutory considerations.

The language of the NOFO itself supports this conclusion. The NOFO explains that applicants should provide consents from States and localities along with their application, or on a rolling basis thereafter; however, PRM will take into account such consents only "to the maximum extent permitted by law, including [8 U.S.C. § 1522(a)] and antidiscrimination laws, in deciding where to place refugees" before making a funding determination. *See* NOFO at 3, 12. The Executive Order, moreover, is clear that resettlement may still take place in the absence of consent from the relevant State and locality, if the Secretary of State determines that "failing to resettle refugees within [a] State or locality would be inconsistent with the policies and strategies established under 8 U.S.C. [§] 1522(a)(2)(B) and (C) or other applicable law." Executive Order § 2(b). Similarly, Deputy Assistant Secretary Veprek states in his accompanying declaration that PRM will take into account whether any particular locality's chief executive has authority to consent to resettlement when making a funding determination. *See* Veprek Decl. ¶ 10. These factors will affect grants awarded under the NOFO, and any final agency action would exist only after PRM makes a final determination with regard to grant awards, and not before.

**B.     Even Assuming Review Were Available, the Executive Order and the NOFO Are Lawful.**

1.     The Executive Order and the NOFO are Consistent with the Refugee Act.

Even if the Court were to conclude that either the Executive Order or the NOFO were somehow reviewable, the Court should still deny Plaintiffs' motion for a preliminary injunction.

Plaintiffs' argument that the Executive Order and the NOFO violate the Refugee Act's text and purpose is based on a faulty premise—that the Government has somehow delegated to the States and localities the ultimate decision as to where refugees may be resettled. That is not the

case. As explained in the Executive Order, it is the policy of the United States to cooperate and consult with State and local governments and to take into account their preferences when determining whether and where to resettle refugees. Executive Order § 1. That policy is reflected directly in the Refugee Act, which directs the Government to insure, with certain exceptions, that refugees are not placed or resettled in an area highly impacted by the presence of refugees. *See* 8 U.S.C. § 1522(a)(2)(C)(i). The Refugee Act further directs the Government to consult regularly with State and local governments concerning the distribution of refugees within those States and localities, and that the Government should take into account the recommendations of the State "to the maximum extent possible" when resettling refugees there. *See id.* § 1522(a)(2)(A), 1522(a)(2)(D).

The Executive Order and the NOFO, consistent with the Refugee Act, accomplish those objectives by requiring Resettlement Agencies to attempt to obtain consent from States and localities and to include those consents in their funding proposals. They do not, as Plaintiffs argue, provide States or localities with a "veto" over where refugees may be resettled. *See* PI Mot. at 15. To the contrary, the NOFO provides only that PRM "will take into account such consents to the maximum extent permitted by law" when deciding where to place refugees. NOFO at 3. The NOFO therefore furthers the goal of the Refugee Act to take into account the preferences of States and localities when resettling refugees—though, of course, the Government retains the authority to resettle refugees in nonconsenting States and localities as it deems necessary or appropriate. *See* Executive Order § 2(a) (providing a mechanism for the Secretary of State to resettle refugees in non-consenting States and localities upon notification to the President).

With this proper understanding of the NOFO, and the Executive Order that it implements, Plaintiffs' arguments fail. Plaintiffs claim that the NOFO does not allow for the Government to

take into account the factors described in 8 U.S.C. § 1522(a)(2)(A)-(C), including the proportion of refugees and comparable entrants in the population in the area, and the availability of employment opportunities, among other things. *See* PI Mot. at 13-14. Yet, the NOFO explicitly states that PRM will condition resettlement on State and local consent only to the extent specifically permitted by Section 1522(a) and antidiscrimination laws. NOFO at 3. Thus, the Government will, consistent with the Refugee Act, continue to take those factors into account when evaluating applications submitted in response to the NOFO and in making resettlement decisions. *See id.*

Similarly, Plaintiffs suggest that the NOFO is inconsistent with the requirement that the Government to engage in "consultation" with State and local governments. PI Mot. at 13-15 (citing 8 U.S.C. § 1522(a)(2)(A)-(C)). But the requirement that Resettlement Agencies seek consent from States and localities, in fact, furthers the consultation contemplated by Congress, by providing a clear mechanism for them to express their preferences. *See* Executive Order § 1 (explaining that the purpose of the Executive Order is to enhance the consultation between the Government and States and localities). The fact that the Government has decided to give the views of States and localities more weight than Resettlement Agencies would prefer does not result in a violation of the Refugee Act. Indeed, although the Refugee Act states that the authority to approve or review or approve grants may not be delegated to "a State or political subdivision," 8 U.S.C. § 1522(a)(3)(D), nothing in the statute provides an upper limit on the degree to which State and localities may be consulted, or in any way otherwise limits how the Government may take into account their views. Seeking the consent of a State or locality thus falls well within the statutory requirement of consultation with these governmental entities. And, as described above, the Government may still resettle refugees in areas where consultation is lacking over the objection of

the relevant State or locality.[1]  Thus, there is no merit to Plaintiffs argument that Defendants have somehow elevated the status of States and localities above what Congress contemplated in the statutory structure of the Refugee Act.  *See* PI Mem. at 15 (citing 8 U.S.C. § 1522(a)(2)(A)-(C)).

Nor does it help Plaintiffs' argument that Congress provided a mechanism for the Government to provide assistance to refugees who resettle in States that decline to participate in refugee resettlement.  *See* PI Mot. at 15-16 (citing 8 U.S.C. § 1522(c)-(e)).  There is no question under the Refugee Act that the Government *could*, if it so chose, resettle refugees in States or localities that object to resettlement, provided that it engages in the required consultation and takes into account the preferences of States to the maximum extent possible.  *See* 8 U.S.C. § 1522(a)(2)(A), 1522(a)(2)(D).  But nothing in the Refugee Act affirmatively *requires* the Government to resettle refugees in objecting States or localities, and Plaintiffs can point to nothing suggesting the opposite conclusion.  Here, the Executive Order directs the Secretary of State to consider the consent of a State or locality to the extent doing so is consistent with the requirements of the Refugee Act and other federal law—which, by definition, cannot be contrary to the dictates of the Refugee Act.

Plaintiffs rely heavily on a single remark in the legislative history to the 1986 amendments to the Refugee Act that the revised consultation requirements were "not intended to give States and localities any veto power over refugee placement decisions."  PI Mot. at 2, 18 (citing H.R. Rep. No. 99-132, at 19 (1985)).  Here again, however, Plaintiffs' argument misconstrues the

---

[1] This reservation of authority to resettle refugees over the objection of States and localities further illustrates why there is no final agency action for the Court to review.  *See* Part I.A.2, *supra*. PRM has not yet made a finding decision regarding the relevant grant applications (which have not yet been submitted), and it is therefore not yet clear whether the Government will settle refugees in States or localities that object.  The Secretary of State may still, consistent with the Executive Order, allow refugees to be resettled over State or local objection.  *See* Executive Order § 2(a).

requirements of the Executive Order and the NOFO. Neither give States or localities a "veto" over resettlement decision. The Executive Order requires the Secretary of State to develop a process for seeking consent, and then directs him to consider that consent to the maximum extent permissible by law, with the option of settling refugees in areas where the State and/or locality object if he determines doing so is necessary. It remains the final decision of the Federal Government, and not the States, where refugees are settled.

Indeed, contrary to Plaintiffs' claims, the Refugee Act's legislative history fully supports the conclusion that both the Executive Order and the NOFO are lawful. As Plaintiffs themselves acknowledge, Congress added a requirement in 1982 that agencies should provide a "mechanism whereby representatives of Resettlement Agencies' local affiliates 'meet with representatives of State and local government to plan and coordinate . . . the appropriate placement of refugees among the various States and localities,'" and added a provision directing agencies to consider whether an area is "highly impacted' by the presence of refugees. PI Mot. at 19 (quoting Pub. L. No. 97-363, § 4, 96 Stat. 1734, 1735 (1982)). Then, in 1986, Congress further amended the Refugee Act to provide additional consultation with State and local governments in response to concerns that "their interests and concerns [were] not adequately considered," H.R. Rep. No. 99-132, at 18-19 (1985), which led to a strengthening of the consultation requirement in § 1522(a)(2)(C)(iii). These amendments clearly illustrate Congress's desire for maximum participation by States and localities, which the Executive Order seeks to advance while reserving the ultimate decision to the Federal Government rather than States or localities.

2.     Neither the Executive Order nor the NOFO Raises Constitutional Concerns.

Plaintiffs also argue that the Court must enjoin the Executive Order and the NOFO in order to avoid alleged "serious constitutional doubt." PI Mot. at 22. This argument fails on its face,

because neither the Executive Order nor the NOFO even arguably affects the constitutional separation of powers between the Federal Government and the States. Plaintiffs' argument is based on the same refrain that the Federal Government has somehow given States a veto power over its exclusive power to admit or exclude noncitizens. Not so. The Federal Government has merely chosen, unilaterally, to give additional weight to the views of States and localities. Their views are not dispositive in any meaningful, constitutional sense. The Executive Order notwithstanding, the Federal Government may choose to take the views of States and localities into account when deciding whether or where to resettle refugees, or it may choose to reject those views at any time. The Federal Government still retains the ultimate power under the Constitution with respect to refugee resettlement.

None of the cases that Plaintiffs cite in support of their argument address the situation here, where the Federal Government has unilaterally decided to take into account the views of the States. *Compare, e.g.*, *Arizona v. United States*, 567 U.S. 387, 395 (2012) (holding that state statutes purporting to regulate immigration were preempted by federal law); *De Canas v. Bica*, 424 U.S. 351, 354 (1976) (remarking on the exclusively federal power to regulate immigration in the context of a challenge to state law). Because the power to admit or exclude noncitizens remains with the Federal Government, no constitutional concern exists that could make Plaintiffs likely to succeed on their claims.

3.  Defendants' Implementation of the Executive Order Is Not Arbitrary and Capricious.

Plaintiffs are also unlikely to succeed on their claim that the Executive Order's implementation through the NOFO is arbitrary and capricious. *See* PI Mot. at 23-31. As an initial matter, Plaintiffs' arguments on this front clearly illustrate why, as discussed above, there is no final agency action for this Court to review. Plaintiffs assert, at multiple points, that Defendants

19

have allegedly "failed to consider an important aspect of the problem," allegedly "failed to account for reliance interests," and allegedly failed to "explain its action so that a reviewing court can evaluate the agency's rationale." *See id*. at 23 (quotations omitted). And Plaintiffs fault the Government for not addressing their objections in the NOFO itself. Plaintiffs ignore, however, that the Government has not yet made any final funding decision with respect to grants for the upcoming fiscal year.

Under the APA, "[i]n making the [] determinations [regarding the lawfulness of agency action], the court shall review the whole record," 5 U.S.C. § 706, and the Supreme Court has long held that the whole record is "the full administrative record that was before the Secretary at the time he made his decision," *Citizens to Pres. Overton Park Inc. v. Volpe*, 401 U.S. 402, 420 (1971). *See also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard . . . to the agency decision based on the record the agency presents to the reviewing court."). The relevant record here, however, is still being developed, and will consist of additional information generated through the grant award process. For instance, as described above, PRM issued additional guidance to Resettlement Agencies on December 16, 2019 that answers many of the questions Plaintiffs raise in their Complaint and preliminary injunction motion. And PRM may provide additional relevant information as the process continues, either through similar guidance to all Resettlement Agencies or in response to specific questions from Resettlement Agencies and State and local governments. Indeed, Deputy Assistant Secretary Veprek describes in his accompanying declaration how PRM has worked, and will continue to work, with Resettlement Agencies and others to address specific questions that come up through the grant making process in the ordinary course. Veprek Decl. ¶ 9. It would, therefore, be premature to evaluate the adequacy of the Government's

decisionmaking before any grant decisions have been made—even assuming the NOFO were reviewable under the APA. And, accordingly, Plaintiffs cannot fault Defendants for failing to provide additional reasoning or evidence, when PRM has not yet settled on any grant decisions. For that reason alone, Plaintiffs have not established a likelihood of success on the merits on their arbitrary and capricious claim.

That said, even if the Court were to consider Plaintiffs' claim without the benefit of a full administrative record, it should still reject Plaintiffs' arguments. The Executive Order itself clearly states the basis for enhancing State and local involvement in resettlement decisions: "to identify the best environments for refugees" and "to be respectful of those communities that may not be able to accommodate refugee resettlement." Executive Order § 1. The Executive Order further explains that "State and local governments are best positioned to know the resources and capacities they may or may not have available to devote to sustainable resettlement, which maximizes the likelihood refugees placed in the area will become self-sufficient and free from long-term dependence on public assistance." *Id.* That common-sense rationale for seeking consent from States and localities is also reflected in the NOFO, which states that "PRM and ORR seek strong state environments to support resettlement and speedy integration, and regard state and local consent for resettlement as important evidence of such strength." NOFO at 3. Here, the Government clearly considered whether to retain the existing practice of resettling refugees in States and localities that do not consent, as well as the Resettlement Agencies' reliance interests, but determined that the better outcome—for States, localities, and refugees—would be to allow for enhanced State and local consultation.

Regarding Plaintiffs' objection to requiring the Resettlement Agencies to obtain consent from States and localities, PI Mot. at 29-30, Deputy Assistant Secretary Veprek explains that

Resettlement Agencies are better situated to obtain consents than PRM staff, which has limited contact with the many locations where refugees are initially resettled and fewer than five employees on its domestic resettlement team. *See* Veprek Decl. ¶ 6. The nine Resettlement Agencies, by contrast, have 202 affiliates in 138 communities, located in 42 states. *Id.* Defendants considered that those entities know where they would like to resettle refugees during the upcoming fiscal year and already interact with governmental entities in the States and localities through their work with the local educational and health authorities for the resettlement program. *Id.* Because the affiliates work in the local communities where resettlement takes place, they are best placed to use existing contacts to facilitate the consent process. *Id.* Moreover, to the extent these relationships do not already exist or are limited, the NOFO provides agencies and affiliates an opportunity to build additional connections and new relationships through the process of seeking consents from states and localities. *Id.* Building those stronger ties between the Resettlement Agencies and the affiliates, on the one hand, and the States and localities, on the other, is a positive outcome for the refugee resettlement program. *Id.*

Plaintiffs' arbitrary and capricious claim fails in light of the above. Even based on the limited information available absent a record of any final agency action, there is no merit to Plaintiffs' claim that Defendants failed to offer a reasoned justification for seeking State and local consents.

Plaintiffs also fault Defendants for allegedly failing to provide adequate information regarding how to obtain consent from States and localities in specific situations. PI Mot. at 24-27. In doing so, Plaintiffs incorrectly treat the NOFO as existing in a vacuum, and suggest that the Resettlement Agencies lack the tools to seek clarification from PRM regarding how to meet the NOFO's application requirements. The NOFO itself, however, instructs "[a]pplicants with

technical questions related to this announcement" to contact the PRM staff listed [in the NOFO] prior to proposal submission. NOFO at 28-29. Plaintiffs' argument also ignores the reality of the Resettlement Agencies' relationship with PRM. As repeat players that have received grants in the past, Plaintiffs are in frequent contact with members of PRM staff, and have the ability to—and often do—ask clarifying questions regarding funding requirements. *See* Veprek Decl. ¶ 9. Indeed, Deputy Assistant Secretary Veprek has participated in significant outreach with the Resettlement Agencies, as well as with States and localities, to answer questions and provide additional guidance. *Id*. And, on December 16, 2019, PRM issued additional written guidance to the Resettlement Agencies responding to questions and clarifying procedures regarding State and local consent. *Id.*

The December 16, 2019 written guidance answers many, if not all, of the concerns that Plaintiffs raise regarding how they should obtain consent from States and localities. Plaintiffs claim, for instance, that they do not know what constitutes a "county or county equivalent" in some circumstances. *See* PI Mot. at 24-25. However, the written guidance explains that the term is the same as the definition of a "county or equivalent entity" used by the U.S. Census Bureau. Veprek Decl., Exhibit A at 1. And PRM included with the written guidance a spreadsheet listing those counties and county equivalents for reference. *See id.* The written guidance also answers the other specific questions Plaintiffs raise in their motion, such whether a "county equivalent" includes an independent city of, for example, Maryland, Missouri, Nevada, and Virginia. *See* PI Mot. at 25; *see also* Veprek Decl., Exhibit A (explaining that such independent cities are county equivalents).

The December 16, 2019 guidance also addresses Plaintiffs' concern that they may not be able to identify the appropriate "chief executive officer" to execute a consent. *See* PI Mot. at 25-26. PRM explained that "chief executive officer" means, "[i]n council-manager jurisdictions, the

county manager *or* the chair of the county council/commission," and, [i]n mayor-council jurisdictions, the mayor or mayor-equivalent." Veprek Decl., Exhibit A at 2. Moreover, if Resettlement Agencies cannot identify a county executive for a county or county equivalent, PRM instructed Resettlement Agencies to contact PRM, which will "review the circumstances with the [Resettlement Agency] to identify the appropriate official." *Id.* In the event that the chief executive officer of a county or county- equivalent should determine that they lack authority to consent under the laws of that state, PRM will accept the State governor's consent as meeting the locality requirement for that county or county-equivalent. *See* Veprek Decl. ¶ 10.

The guidance available to Resettlement Agencies is fatal to Plaintiffs' arguments that they lack sufficient information to obtain consents. Yet, even if the current guidance does not answer every question that may come up through the application process, Plaintiffs' arguments still lack merit, because the application process is iterative, and Resettlement Agencies may obtain further guidance through their contact with PRM. *See* NOFO at 28-29 (directing applicants to contact PRM staff with technical questions).

Finally, there is no merit to Plaintiffs' claim that Defendants failed to account for situations when the lack of consent from a State or locality may be motivated by impermissible bias. *See* PI Mot. at 24 (citing 8 U.S.C. § 1522(a)(5)). The Executive Order is clear that refugees should not be resettled in area only if the decision not to resettle them there is consistent with applicable law, *see* Executive Order § 2(b), which includes the nondiscrimination provision in Section 1522. In addition, and more specifically, the NOFO states that "PRM will take into account such consents to the maximum extent permitted by law, including [Section 1522(a)] and antidiscrimination laws, in deciding where to place refugees." NOFO at 3; *see also id.* at 12; Veprek Decl. ¶ 8. Plaintiffs' speculation that PRM may not adequately account for any potential discrimination when

considering where to resettle refugees only highlights the prematurity of their challenge, because PRM has not yet made any final resettlement decisions for the upcoming fiscal year. The Court should therefore reject Plaintiffs' claim that Defendants have acted arbitrarily and capriciously.

## II.    Plaintiffs Have Not Established Irreparable Harm in the Absence of An Injunction.

Merits aside, a party "seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Plaintiffs cannot do so.

The requirement to seek State and local consents harms Plaintiffs only insofar as it puts Plaintiffs to a choice:  obtain the consents or forego receiving grant funding.  But of course, "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).  This is a decision all recipients of federal funds must make and does not, on its own, constitute irreparable harm. Nor can Plaintiffs establish irreparable harm based on the time and effort it will take to obtain State and local consents.  *See* PI Mot. at 31-32.  "[O]rdinary compliance costs are typically insufficient to constitute irreparable harm," *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (collecting cases), and there is no reason why this case should be treated any differently.  To the contrary, Plaintiffs—unlike regulated parties who must absorb significant costs to comply with federal regulations—can simply forgo receiving taxpayer funds if it would be more costly on balance to comply.  And if the costs of compliance are less than the funding they receive through any grant award, Plaintiffs will come out ahead.  Either way, there is no irreparable injury here. *See United States v. City of Los Angeles*, 595 F.2d 1386, 1391 (9th Cir. 1979) (agency actions "cannot be enjoined simply because those actions may require recipients of congressional largesse to expend large amounts of time and [monetary resources]").

The additional harm Plaintiffs allege is entirely speculative, and cannot constitute imminent, irreparable harm.  Plaintiffs allege that the Executive Order "threatens Plaintiffs'

operations in entire jurisdictions," and could erode Plaintiffs' "good will" in certain areas.  PI Mot. at 32-33.  But that purported harm would only occur if (1) Plaintiffs failed to obtain consents there and (2) Defendants ultimately declined to make a funding award on that basis.  Yet, Plaintiffs can only speculate where they will or will not obtain consent, and—even if they do not obtain consent in some areas—the Executive Order expressly contemplates that the Secretary of State may still resettle refugees in those areas notwithstanding.  *See* Executive Order § 2(b); *see also* NOFO at 3 (indicating that PRM will "*take into account* [ ] consents . . . in deciding where to place refugees" (emphasis added)).  This is particularly true given that Plaintiffs need not obtain the relevant consents before the January 21, 2020 application date.  *See* NOFO at 12 (indicating that consents may be provided on a rolling basis); *see also* Veprek Decl. ¶ 11 (explaining that consents may be provided on a rolling basis, and, should a Resettlement Agency receive consent later from a State or locality not included in its original proposal, the proposal may be revised during the funding process to add additional areas).  And it is also entirely speculative whether Plaintiffs would be entitled to a funding award *at all*, even in the absence of the enhanced consultation requirement, especially in light of decreased volume of the lower ceiling of 18,000 for overall refugee resettlement authorized by the President for Fiscal Year 2020.  *See* Compl. ¶ 73 (explaining that the 2020 fiscal year refugee admissions ceiling is 18,000, compared to an average of 95,000 set by previous presidents since the enactment of the Refugee Act in 1980); *see also* Veprek Decl. ¶ 8.  Thus, without any requirement that Plaintiffs finish obtaining consents before they submit their applications, and in the absence of any specific funding decision on Plaintiffs' applications, Plaintiffs' alleged harm is purely speculative rather than imminent and concrete.

Plaintiffs also cannot establish irreparable harm based on their speculation that applying for funding could "require[] Plaintiffs to engage in actions that *may* constitute lobbying activities."

PI Mot. at 32 (emphasis added). Plaintiffs theorize that, if a county or county equivalent's "executive power is held not by an individual but by a council," Plaintiffs may need to urge that body to affirmatively consent to refugee placement within that area, which Plaintiffs worry may affect their tax status. *Id.* Plaintiffs' provide no evidence that merely requesting consent from the subset of counties or county equivalents that lack a chief executive would tie up a "substantial part" of their operations. *See id.* Moreover, according to the Internal Revenue Service (IRS), charitable "[o]rganizations may [ ] involve themselves in issues of public policy without the activity being considered as lobbying." Internal Revenue Service, Lobbying, https://www.irs.gov/charities-non-profits/lobbying (last visited Dec. 20, 2019). For example, "organizations may conduct educational meetings, prepare and distribute educational materials, or otherwise consider public policy issues in an educational manner without jeopardizing their tax-exempt status." *Id.* Plaintiffs have not established why their mere request for consent to resettle refugees in certain areas would not fall within these broad IRS carve outs. Nor do Plaintiffs identify any counties or equivalents where Plaintiffs contend they would even need to approach a deliberative body for its approval. Plaintiffs' speculation regarding what they "may" need to do, PI Mot. at 32, does not rise to the type of concrete, imminent harm that would justify a preliminary injunction.

## III. The Balance of Equities and the Public Interest Also Militate Against a Preliminary Injunction.

Finally, Plaintiffs have not demonstrated that their claimed injury outweighs the harm that a preliminary injunction would cause the Government, or that "an injunction is in the public interest," *Winter*, 555 U.S. at 20; *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction."). These two factors merge where, as here the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the public interest weighs heavily against the relief that Plaintiffs' request. As explained above, Plaintiffs cannot establish any imminent, irreparable harm required for extraordinary injunctive relief. On the other side of the scale, however, an injunction would frustrate the Executive Order's goal of enhancing State and local consultations in order to be respectful of those communities and their capacity to accommodate refugee resettlement. Executive Order § 1. In turn, it would lead to poorer outcomes for refugees, who would face an increased risk of resettlement in communities that do not welcome them. Veprek Decl. ¶ 13. Refugee outcomes improve where they are resettled in welcoming environments, so forcing resettlement without State and local consent undermines one of the core purposes of the U.S. Refugee Admissions Program. *Id.* Accordingly, the balance of equities and the public interest weigh decisively against the preliminary relief that Plaintiffs request.

## IV. The Scope of Any Injunctive Relief Should Be Limited.

For the reasons discussed above, the Court should deny Plaintiffs' request for a preliminary injunction. But even if the Court were to grant some injunctive relief, it should limit the scope of its injunction as described below.

### A. The Court Should Not Enjoin the President.

The Court should not include the President within the scope of any injunction given the serious separation-of-powers concerns that would arise if the Court were to enjoin the President in the performance of his official duties. *Franklin v. Massachusetts*, 505 U.S. 788 (1992), is instructive. In that case, plaintiffs challenged the U.S. Census Bureau's decision to allocate overseas federal personnel to particular states for reapportionment purposes. A three-judge district court panel enjoined the Secretary of Commerce (who has oversight responsibilities with respect to the Census Bureau) to eliminate these overseas personnel from apportionment counts, and further enjoined the President to recalculate the number of representatives per state and to send

that new calculation to Congress. *Id.* at 791. The Supreme Court reversed. In addressing plaintiffs' Article III standing, a four-Justice plurality led by Justice O'Connor explained that "the injury alleged is likely to be redressed by declaratory relief against the Secretary alone." *Id.* at 803. That being so, even if the plaintiffs' challenge had merit (and the Court concluded it did not), the district court should not have entered injunctive relief against the President. The plurality emphasized that while "injunctive relief against executive officials like the Secretary of Commerce is within the courts' power, the . . . grant of injunctive relief against the President himself is extraordinary, and should . . . raise[] judicial eyebrows." *Id.* at 802 (citation omitted). While the Court has "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty . . . in general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" *Id.* at 802-03 (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)). Writing separately, Justice Scalia opined that courts "cannot issue a declaratory judgment against the President," as it is "incompatible with his constitutional position that he be compelled personally to defend his executive actions before a court." *Id.* at 827 (Scalia, J., concurring in part and concurring in the judgment).

The Fourth Circuit echoed the logic of *Franklin* and *Mississippi* in *IRAP v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017), as amended (June 15, 2017), *vacated as moot*, 138 S. Ct. 353 (2017) (mem.). While the *IRAP* court largely affirmed a lower court's injunction against enforcement of aspects of Executive Order 13780, it also held that in "light of the Supreme Court's clear warning that such relief should be ordered only in the rarest of circumstances . . . the district court erred in issuing an injunction against the President himself." *Id.*; *see also IRAP v. Trump*, 883 F.3d 233, 273 (4th Cir. 2018), as amended (Feb. 28, 2018) ("We . . . agree that the injunction does not apply

to the President himself but instead to the . . . agencies and agency heads[] charged with implementing" the presidential Proclamation issued subsequent to Executive Order 13780.), *vacating judgment*, 138 S. Ct. 2710 (2018).  Similarly, in *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), vacated as moot, 138 S. Ct. 377 (2017) (mem.), the Ninth Circuit held that "the extraordinary remedy of enjoining the President is not appropriate here."

Even assuming equitable relief might ever lie against the President in the performance of his official duties, it is plainly not warranted in this case, because Plaintiffs' injury, if any, could be fully redressed through an injunction against PRM—if, contrary to Defendants' submission above, preliminary injunctive relief were warranted at all.  *See Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials.").  In the interest of avoiding the profound constitutional problems that would arise if relief were sought to be entered against the President, this Court should not include the President within the scope of an injunction, if any.

**B.     Any Injunction Should Be Limited to the Named Plaintiffs.**

Any injunction should also be no broader than necessary to provide Plaintiffs relief, and should therefore extend only to the parties before the Court.  As the Supreme Court recently confirmed, any "remedy" ordered by a federal court must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established"; a court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it"; and "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 138 S. Ct. 1916, 1921, 1933-34 (2018); *see also Doe v. Shanahan*, 917 F.3d 694, 740 (D.C. Cir. 2019) (Williams, J., concurring in result) (recognizing the implications of *Gill* for nationwide

injunctions).  Equitable principles likewise require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) (noting that nationwide injunctions "are legally and historically dubious").  These principles apply with even greater force to a preliminary injunction, an equitable tool designed merely to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *accord Zepeda v. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1983).

Here, although Plaintiffs seek to enjoin the Executive Order and the NOFO on the whole, Plaintiffs fail to show that an injunction applicable to all funding applicants is necessary to redress their alleged injuries.  To start, Plaintiffs' decision to bring a facial APA claim to the Executive Order and its implementation does not necessitate such a wholesale remedy. *See, e.g.*, *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 392-94 (4th Cir. 2001) (vacating nationwide scope of injunction in facial challenge under the APA), *overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012); *California v. Azar*, 911 F.3d 558, 582-84 (9th Cir. 2018) (same); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664-65 (9th Cir. 2011) (same).  A court "do[es] not lightly assume that Congress has intended to depart from established principles" regarding equitable discretion, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and the APA's general instruction that unlawful agency action "shall" be "set aside," 5 U.S.C. § 706(2), is insufficient to mandate such a departure.  Indeed, the Supreme Court held that not even a provision directing that an injunction "shall be granted" was sufficient to displace traditional principles of equitable discretion, *Hecht Co. v. Bowles*, 321 U.S. 321, 328-30 (1944), and Congress is presumed to have been aware of that holding when it enacted the APA

two years later.  In fact, the APA confirms that, absent a special review statute, "[t]he form of proceeding for judicial review" is simply the traditional "form[s] of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction," 5 U.S.C. § 703, and that the statutory right of review does not affect "the power or duty of the court to . . . deny relief on any . . . appropriate legal or equitable ground," *id*. § 702(1).

The Supreme Court therefore has confirmed that, even in an APA case, "equitable defenses may be interposed." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967).  Accordingly, this Court should construe the "set aside" language in section 706(2) as applying only to the named Plaintiffs, especially as no federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would do so for more than fifteen years thereafter, *see Hawaii*, 138 S. Ct. at 2426 (Thomas, J., concurring); *see also Virginia Soc'y for Human Life*, 263 F.3d at 384 ("Nothing in the language of the APA . . . requires us to exercise such far-reaching power.").  If the Court does decide to enter an injunction, it should therefore limit it only to cover the specific Plaintiffs in this action.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

Dated: December 20, 2019          Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
(D.C. Bar No. 988057)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Phone: (202) 305-0878
E-mail: Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*