# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

HIAS, INC., *et al.*,

       *Plaintiffs*,

    v.

DONALD TRUMP, in his official capacity as
President of the United States, *et al.*,

       *Defendants.*

Civil Action No. 8:19-cv-3346-PJM

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
## OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.    The Executive Order and the Funding Notice Violate the Refugee Act ................. 2

      A.    Plaintiffs' Statutory Claim Is Reviewable .................................................... 2

      B.    The Executive Order and Funding Notice Conflict with the Refugee
            Act ................................................................................................................ 4

II.   The Funding Notice Violates the Administrative Procedure Act ........................... 9

      A.    The Funding Notice Is Final Agency Action ................................................ 9

      B.    Defendants' Implementation of the Executive Order Through the
            Funding Notice Was Arbitrary and Capricious ......................................... 11

III.  Plaintiffs Have Met the Other Factors Justifying a Preliminary Injunction ......... 15

      A.    Absent an Injunction, the Executive Order and Funding Notice Will
            Inflict Increasing Irreparable Harm on Plaintiffs and Refugees ............... 15

      B.    The Balance of Equities and the Public Interest Favor an Injunction ........ 17

IV.   The Court Should Enjoin the Executive Order and the Funding Notice
      Without the Limitations Defendants Request ...................................................... 19

CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

Page

**Cases**

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 318 F. Supp. 3d 370 (D.D.C. 2018) ...................2

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 698 F.3d 171 (4th Cir. 2012) ...........................................................................................................................3

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) .................................10

*Arizona v. United States*, 567 U.S. 387 (2012)..............................................................5

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ......................................3

*State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015 (N.D. Cal. 2018)...................................10

*Bennett v. Spear*, 520 U.S. 154 (1997) ...............................................................................9, 10

*Chae Chan Ping v. United States*, 130 U.S. 581 (1889)................................................................6

*Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009)..................................3

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)....................................3

*Chamblee v. Espy*, 100 F.3d 15 (4th Cir. 1996)................................................................9

*Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167 (D.C. Cir. 2004) ...............................11

*City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018) ..............8, 10

*City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ............................8, 10

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) .................................10, 11, 16

*City of Philadelphia v. Sessions*, 309 F. Supp. 3d 271 (E.D. Pa. 2018) .......................10

*Dames & Moore v. Regan*, 453 U.S. 654 (1981)..............................................................3

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018)............................20

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)...............................................................9

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005) ..................................17

*Harmon v. Brucker*, 355 U.S. 579 (1958)........................................................................3

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) ...........................................................................3

*Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570 (D. Md. 2017) ...........................4

*Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650 (D. Md. 2019) .......................2, 4

*Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233 (4th Cir. 2018) (en banc)............. *passim*

*Judulang v. Holder*, 565 U.S. 42 (2011) ....................................................................................15

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) ........................................................19

*Md. Native Plant Soc'y v. U.S. Army Corps of Eng'rs*, 332 F. Supp. 2d 845 (D. Md. 2004)........13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).........................................................................................................................14

*Multnomah Cty. v. Azar*, 340 F. Supp. 3d 1046 (D. Or. 2018) .....................................................11

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596 (4th Cir. 2012) ...............................14

*Pepper v. United States*, 562 U.S. 476 (2011) ..............................................................................7

*Planned Parenthood of N.Y.C. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308 (S.D.N.Y. 2018) ..............................................................................................11

*Planned Parenthood of Wis. v. Azar*, 316 F. Supp. 3d 291 (D.D.C. 2018) .................................11

*Rattlesnake Coal. v. EPA*, 509 F.3d 1095 (9th Cir. 2007) ...........................................................11

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018).............20

*Robinson v. United States*, 324 U.S. 282 (1945) ...........................................................................7

*SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370 (4th Cir. 2017) ..................................19

*Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635 (4th Cir. 2018)....................................20

*Stone v. Trump*, 280 F. Supp. 3d 747 (D. Md. 2017)......................................................................8

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018).......................................................................................4

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807 (2016) ...............................................9

*U.S. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ......................16

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) .......................................................18

**Statutes**

8 U.S.C. § 1522 ................................................................................................ *passim*

Refugee Act of 1980, Pub. L. No. 96-212, § 101(b) ........................................17, 18, 20

**Other Authorities**

Br. for Pet'rs, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (No. 17-965), 2018 WL 1050350 ..........4

Reply Br. for Pet'rs, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (No. 17-965), 2018 WL
        1866192 ..................................................................................................................4

Antonia Noori Farzan, *A North Dakota County Was Poised to Be First to Bar
        Refugees Under Trump's Executive Order. Residents Said No*, Wash. Post
        (Dec. 10, 2019) .....................................................................................................14

Jonathan Blitzer, *How the White House is Trying—and Failing—to Keep States
        From Resettling Refugees*, New Yorker (Dec. 20, 2019) ..................................13, 15

Press Release, City of Springfield, *In Response to City Council Resolution, Mayor
        Sarno Not to Issue Letter of Consent for Continued Refugee Resettlements in
        Springfield* (Dec. 17, 2019) ................................................................................14

Nat'l Conference of State Legislatures, *How States Define Lobbying and Lobbyist*
        (Dec. 17, 2019) .....................................................................................................17

**INTRODUCTION**

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Opp'n") (ECF No. 54) confirms that, at its base, the challenged Executive Order 13888 ("Executive Order") conditions the resettlement of refugees on the affirmative written consent of both local and state governments. Defendants quibble with Plaintiffs' description of the Executive Order as giving states and localities a "veto," characterizing it instead as "[t]he Federal Government ha[ving] merely chosen, unilaterally, to give additional weight to the views of States and localities," Opp'n at 19, but those semantic differences are of no legal significance here. Even by Defendants' characterization, the Executive Order (ECF No. 18-2) conflicts with the Refugee Act, under which Congress decided that while the Executive should consult state and local governments regarding the placement of refugees, placement decisions must be based on an objective set of statutory factors, none of which is consent. *See* 8 U.S.C. § 1522(a)(2)(C)(iii). Defendants have implemented the unlawful Executive Order through the Funding Notice (ECF No. 18-3) with a lack of aforethought for its operation or effects, in violation of the Administrative Procedure Act (APA).

Given the merits of Plaintiffs' claims, it is no surprise that Defendants argue that this Court cannot reach them, but Defendants are wrong. Plaintiffs do not need a statutory cause of action for their Refugee Act claim, because the Court has the inherent equitable authority to enjoin executive action that exceeds statutory authority. Moreover, the Funding Notice is reviewable under the APA as final agency action because it sets eligibility criteria and already has had enormous consequences by forcing Plaintiffs and other Resettlement Agencies to expend tremendous resources soliciting the consents it requires.

Defendants contend that Plaintiffs can avoid irreparable injury simply by foregoing

government funding, but they ignore that *the only way* for Plaintiffs to continue resettling

refugees to the United States is to apply for this grant funding. Thus, absent injunctive relief,

Plaintiffs' choice is between two options that both inflict irreparable harm: attempt to comply

with Defendants' unlawful directives or abandon a core part of their missions.

## ARGUMENT

Plaintiffs are likely to succeed on their claims that the Executive Order and the Funding

Notice violate the Refugee Act and that Defendants' implementation of the Order through the

Notice was arbitrary and capricious. Plaintiffs' likelihood of success on the merits of either of

these claims is a sufficient basis to enjoin Defendants' unlawful action and to stop the irreparable

harm inflicted by the Executive Order and its implementation. *See also* Pls.' Mot. for Prelim. Inj.

("PI Mot."), ECF No. 18.

## I.    The Executive Order and the Funding Notice Violate the Refugee Act

### A.  Plaintiffs' Statutory Claim Is Reviewable

Defendants' argument that Plaintiffs lack a cause of action because the Refugee Act does

not provide one, *see* Opp'n at 10-12, misses the mark because Plaintiffs' claim rests on the well-

established principle that federal courts have the inherent equitable authority to enjoin unlawful

executive action. The cases cited by Defendants—all of which concern implied statutory causes

of action, *see* Opp'n at 10-11—are therefore inapposite.

"[I]t is firmly established that a court may review presidential action to determine

whether it conflicts with, or exceeds the authority granted by, a federal statute." *Int'l Refugee

Assistance Project v. Trump*, 373 F. Supp. 3d 650, 665-67 (D. Md. 2019), *appeal docketed*, No.

19-1990 (4th Cir. 2019); *accord Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 318 F. Supp. 3d

370, 417 (D.D.C. 2018) ("[It] is now clear beyond cavil . . . that executive orders that conflict

with the purposes of a federal statute are *ultra vires*."), *rev'd and vacated on other grounds*, 929

F.3d 748 (D.C. Cir. 2019). As the Supreme Court has held, "[g]enerally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958). Courts have repeatedly re-affirmed the principle that, even absent a statutory cause of action, "in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also I.N.S. v. Chadha*, 462 U.S. 919, 953 n.16 (1983) (explaining that executive action taken pursuant to legislative authority "is always subject to check by the terms of the legislation that authorizes it; and if that authority is exceeded it is open to judicial review"); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (likewise holding that courts have the inherent authority to constrain the Executive within its legal limits even absent a statutory cause of action).

Indeed, the Supreme Court, Fourth Circuit, and this district have all recognized this principle in examining on the merits claims that the Executive has exceeded its power, notwithstanding the absence of a cause of action. *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 669-78 (1981) (reviewing whether an executive order suspending claims of American nationals against Iran exceeded the President's statutory authority); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 698 F.3d 171, 179-81 (4th Cir. 2012) (considering merits of plaintiffs' claim that the State Department's restrictions on certain imports were *ultra vires*); *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726, 733-34 (D. Md. 2009) (determining whether the challenged executive order violated a statute). The courts most recently recognized this principle in reviewing the merits of claims that President Trump's executive orders banning travel to the United States of nationals from certain Muslim-majority countries exceeded the President's statutory authority, notwithstanding the Administration's repeated argument that the

3

plaintiffs lacked a cause of action.[1] *See Trump v. Hawaii*, 138 S. Ct. 2392, 2407-15 (2018); *Int'l Refugee Assistance Project v. Trump* ("*IRAP*"), 883 F.3d 233, 257 (4th Cir. 2018) (en banc), *cert. granted, judgment vacated on other grounds*, 138 S. Ct. 2710 (Mem.); *see also id.* at 287 (Gregory, C.J., concurring) (compiling Supreme Court and appellate precedent establishing proposition that judicial review of executive action is available to determine compliance with statutory authority); *Int'l Refugee Assistance Project*, 373 F. Supp. 3d at 665-67.

As in the cases cited above, this Court is well within its inherent authority to examine (and order relief on) Plaintiffs' claim that the Executive Order conflicts with the Refugee Act, regardless of whether the Refugee Act contains a private right of action. Moreover, the APA provides a cause of action for the same claim and for the same relief (Plaintiffs do not seek an injunction against the President), and so this issue need not detain the Court in any event. *See Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 603-04 (D. Md. 2017) (noting, "'it is now well established' that '[r]eview of the legality of a Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive,'" and holding the APA provided a cause of action to challenge the President's travel ban (citation omitted)), *aff'd*, 883 F.3d 233 (4th Cir. 2018), *cert. granted*, 138 S. Ct. 2710 (2018).

### B. The Executive Order and Funding Notice Conflict with the Refugee Act

Defendants' Opposition confirms that, under the Executive Order and the Funding Notice, the generally applicable policy is that refugee resettlement in a particular location is conditioned on the advance written consent of both the governor and a county authority. *See* Opp'n at 14-19; Exec. Order § 1 (stating that the President has "determined that, *with limited*

---

[1] *See, e.g.*, Br. for Pet'rs, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (No. 17-965), 2018 WL 1050350, at *23-26; Reply Br. for Pet'rs, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (No. 17-965), 2018 WL 1866192, at *4.

*exceptions*, the Federal Government . . . should resettle refugees only in those jurisdictions in which both the State and local governments have consented" (emphasis added)). Defendants object to characterizing this arrangement as a "veto" or a "delegat[ion]," Opp'n at 14-15, and they contend that there is a theoretical possibility that the Executive will resettle some refugees even absent consent, *see id.* at 15. But the label is irrelevant, and the theoretical possibility of an exception only proves the existence of the general rule here, as do other aspects of Defendants' filings. Defendants assert, for example, that the Administration "clearly considered whether to retain the existing practice of resettling refugees in States and localities that do not consent, . . . but determined that the better outcome" is the approach set out in the Executive Order and Funding Notice, *id.* at 21, under which the policy is the reverse. Similarly, Defendants claim that an injunction is not in the public interest because it would "forc[e] resettlement without State and local consent," necessarily reflecting that resettlement without consent will *not* occur absent an injunction. *Id.* at 28; *accord* Veprek Decl. ¶ 13 (claiming an injunction "would mean that states and localities that did not wish to receive refugees would have refugees resettled there anyway"). Their argument about the savings clause illuminates as well: "the [Funding Notice] explicitly states that PRM *will condition resettlement on State and local consent* only to the extent permitted [by law]." Opp'n at 16 (emphasis added).

As Plaintiffs have explained, conditioning refugee resettlement on state and local consent conflicts with the Refugee Act, which requires that those placement decisions be made on a set of factors specified in the statute, none of which is the presence or absence of consent. *See* 8 U.S.C. § 1522(a)(2); PI Mot. at 13-17. In fact, Congress deliberately decided *not* to permit refugee placement to be conditioned on state consent. *See* PI Mot. at 18-21; *see also Arizona v. United States*, 567 U.S. 387, 395 (2012) (holding unlawful Arizona's attempt to criminally

penalize unauthorized work when Congress made a "deliberate choice" not to do so, and noting "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (quotations and citations omitted)). Defendants nonetheless defend this policy as "consistent" with the statutory scheme, and additionally claim that any illegality is cured by the possibility of exceptions referenced in § 2(b) of the Executive Order and a boilerplate savings clause. *See* Opp'n at 14-19. Their arguments fail.[2]

Defendants' explanations for why the Executive Order and the Funding Notice merely give effect to the Refugee Act, rather than conflict with it, are unpersuasive. Defendants claim that the Executive Order "furthers the consultation contemplated by Congress, by providing a clear mechanism for [states and localities] to express their preferences." Opp'n at 16 (citing 8 U.S.C. § 1522(a)(2)(A)). But as Plaintiffs have shown, the Executive Order's written consent requirement cannot be considered the statutory consultation process for a number of reasons, PI Mot. at 14-15, including that the agency cannot meet its obligation to engage in the nuanced process of quarterly consultation, *see* Carey Decl. ¶¶ 11-26; 8 U.S.C. § 1522(a)(2)(A), by outsourcing the burden of soliciting annual written consent onto the Plaintiffs, *see* PI Mot. at 30.

Defendants' other explanations for how the Executive Order gives effect to the Refugee Act further highlight the inconsistencies between the two. For example, Defendants argue that the Executive Order fulfills the Refugee Act's requirement to take into account the recommendations of states "to the maximum extent possible," Opp'n at 15 (quoting 8 U.S.C. § 1522(a)(2)(D)), but that provision only applies to the recommendations of a state about where to

---

[2] Defendants claim that no constitutional concerns are present because they have "merely chosen, unilaterally," to condition refugee placement on state and local consent, Opp'n at 19, but the law is clear that the Executive cannot "grant[] away" the authority to regulate immigration. *Chae Chan Ping v. United States*, 130 U.S. 581, 609 (1889); *see* PI Mot. at 22-23.

resettle refugees *within its own borders* (and even then, the recommendations must be consistent with the objective factors specified in the statute). *See* 8 U.S.C. § 1522(a)(2)(C) & (D). As explained by the amici states, the Executive Order violates this statutory provision because it puts localities on par with states, nullifying the congressional decision to privilege the views of states over those of their localities. *See* Amicus Curiae Br. of 12 States, ECF No. 36; *see also* PI Mot. at 16. Defendants also assert that the Executive Order reflects the Refugee Act's directive that the Executive "insure . . . that refugees are not placed or resettled in an area highly impacted by the presence of refugees." Opp'n at 15. They ignore, however, that this determination must be made "*under regulations*," 8 U.S.C. § 1522(a)(2)(C)(i) (emphasis added), not by requiring governors and county officials to provide affirmative written consent. *See* PI Mot. at 17. And Defendants' contention that "nothing in the statute . . . limits how the [Executive] may take into account the[] views" of states and localities, Opp'n at 16, is just wrong. In § 1522(a), Congress told the Executive how to decide where to resettle refugees, and Defendants are not free "to give the views of States and localities more weight," *id.*, when Congress directed that the decision be made on a different basis. *Cf. Pepper v. United States*, 562 U.S. 476, 504 (2011) (improper to privilege a subset of statutory factors when all must be considered).

The theoretical possibility that refugees may be resettled in locations even absent consent, *see* Opp'n at 15-17 (discussing the possibility of exceptions under § 2(b) of the Executive Order), does not alter the legal analysis. As noted above, there is no dispute that at least the general rule under both the Executive Order and the Funding Notice is that resettlement is conditioned on state and local consent. *See, e.g.*, Exec. Order § 1 ("with limited exceptions"). Where, as here, the general rule is unlawful, the possibility of an exception does not render the rule lawful. *See, e.g.*, *Robinson v. United States*, 324 U.S. 282, 286 (1945) (refusing to give

meaning to an exception within the statute that would "nullify the clearly expressed purpose of Congress"); *Stone v. Trump*, 280 F. Supp. 3d 747, 766 (D. Md. 2017) (refusing to accept the government's interpretation of an exception to the general rule prohibiting the government from funding sex re-assignment surgery, which the plaintiffs argued would essentially nullify President Trump's directive). What is more, the Executive Order does not even state clearly that exceptions will be approved: Section 2(b) requires the agencies, within 90 days—now passed— to "create a process" under which the Secretary of State may express an "inten[t]" to resettle refugees in a location without consent, but it does not authorize the State Department to resettle refugees in such jurisdictions. Rather, the State Department must first consult with other agencies, then "notify the President of [any] decision [to resettle refugees in a state or locality that has not given consent], along with the reasons for the decision, *before proceeding*," to await unspecified action. Exec. Order § 2(b) (emphasis added). In stark contrast, the language in § 2(c) ("Subsection (b) of this section shall not apply to the resettlement of ['follow-to-join' refugees]") demonstrates that where the Executive Order creates an exception, it does so clearly.

Finally, Defendants tautologically argue that the Executive Order and Funding Notice cannot conflict with the Refugee Act because a savings clause admonishes agencies to take the directed actions "consistent with law." Opp'n at 17. Defendants say, for example, that they will "condition resettlement on State and local consent only to the extent specifically permitted by Section 1522(a)." *Id.* at 16. But that is precisely the issue—§ 1522(a) does not permit conditioning resettlement on state and local consent *at all*. *See* PI Mot. at 12-20. As with the possibility of exceptions, because the Executive Order and Funding Notice set out a general rule that is unlawful, a boilerplate savings clause cannot cure the illegality. *See, e.g.*, *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018) (holding that because the

challenged executive order "unambiguously commands action," its "savings clause does not and cannot override its meaning," and noting that were it otherwise, "judicial review" would be "a meaningless exercise"); *accord IRAP*, 883 F.3d at 274 (affirming injunction of travel ban executive order notwithstanding its direction to implement "consistent with applicable law").

## II.    The Funding Notice Violates the Administrative Procedure Act

### A.  The Funding Notice Is Final Agency Action

Defendants are wrong that the Funding Notice is a "mere request for funding applications" that "cannot be final agency action," Opp'n at 12-13, and that the "relevant" agency action is the ultimate funding decision, *id.* at 20. The Funding Notice's implementation of the Executive Order is final agency action because through it Defendants unequivocally require Resettlement Agencies to meet new eligibility conditions to apply for funding—which require spending countless hours and resources on soliciting consents from thousands of jurisdictions—or be ineligible to resettle refugees for the first time.

As an initial matter, whether the Funding Notice qualifies as final agency action is not determined by the title that Defendants give to the document, but by the *Bennett v. Spear* guiding test for final agency action. That test considers, with specificity to each circumstance: (1) whether the agency action marks the "consummation of the agency's decisionmaking," and (2) whether the agency action is one "by which rights or obligations have been determined or from which legal consequences will flow." 520 U.S. 154, 177-78 (1997) (citation omitted); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). This test ultimately turns on the practical effects—not the form—of the agency action. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (describing Court's longstanding "pragmatic" approach to finality); *Chamblee v. Espy*, 100 F.3d

15, 17 (4th Cir. 1996) ("In determining the finality of agency action a court should consider the

'practical effect of the [agency's] determination'" (citation omitted, alteration in original)).

The Funding Notice meets the first *Bennett* prong because it is the "the end result of [the

agency's] decision-making process" on the eligibility criteria for funding. *City of Chicago v.

Sessions*, 321 F. Supp. 3d 855, 865 (N.D. Ill. 2018); *see* Funding Notice at 7-8, 12, 37

(Resettlement Agencies are "[r]equired" to list consents). It meets the second *Bennett* prong

because it imposes obligations for which there are "clear legal consequences": it requires

Resettlement Agencies to solicit consents to remain eligible to provide refugee resettlement

services. *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 961 (N.D. Cal.

2018), *appeal docketed*, No. 18-17311 (9th Cir. 2018); *see* Funding Notice at 7-8, 12, 37 ("PRM

will not permit placement [of refugees] in states or localities that lack such documentation.").

Defendants are wrong that only the ultimate funding decision can be final agency action.

An agency action that imposes unequivocal conditions or eligibility requirements like the

Funding Notice meets the test for final agency action, even if agencies have yet to apply those

conditions or eligibility requirements in individual circumstances. *See, e.g.*, *Appalachian Power

Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (holding that guidance on applications for

permits represented final agency action by imposing legal obligations on companies applying for

permits). Indeed, a series of recent decisions from across the circuits has confirmed that changes

in eligibility requirements for federal funding constitute final agency action. *See, e.g.*, *State ex

rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031-32 (N.D. Cal. 2018) (conditions imposed on

recipients of Byrne JAG funds was final agency action, regardless of fact that agency had not yet

decided whether to award funds); *City & County of San Francisco*, 349 F. Supp. 3d at 961-62

(same); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 271, 290 (E.D. Pa. 2018) (same); *City

10

*of Chicago*, 321 F. Supp. 3d at 865-66 (same); *Multnomah Cty. v. Azar*, 340 F. Supp. 3d 1046, 1056-61 (D. Or. 2018) (funding announcement describing terms for Teen Pregnancy Prevention Program grants was final agency action); *Planned Parenthood of N.Y.C. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 326-30 (S.D.N.Y. 2018) (same).

Defendants cite to cases that are inapposite, Opp'n at 13, and that, if anything, support Plaintiffs' argument that the agency action is final. *Rattlesnake Coalition v. EPA* is inapposite because it concerned whether congressional action alone constituted final agency action where the agency had not yet taken any corresponding action. 509 F.3d 1095 (9th Cir. 2007). Defendants' second inapposite case merely held that a challenge to the EPA's alleged failure to review the environmental impact of a proposed project was premature, where the agency had made only a preliminary assessment of the environmental impact and had not yet decided whether the project would move forward. *Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167, 168 (D.C. Cir. 2004) (unpub.). Finally, the now vacated opinion in *Planned Parenthood of Wisconsin v. Azar* held that a funding announcement was not final agency action where it did not limit eligibility for funding, but only introduced additional criteria to be considered by an independent panel, whose review was but one consideration in the ultimate funding decision. 316 F. Supp. 3d 291 (D.D.C. 2018), *vacated*, 942 F.3d 512 (D.C. Cir. 2019). In none of these cases had the agency finished its decisionmaking process with a decision that imposed legal consequences on the plaintiffs in the form of eligibility criteria, as is the case here.

## B. Defendants' Implementation of the Executive Order Through the Funding Notice Was Arbitrary and Capricious

Defendants fail to address most of Plaintiffs' arguments, each of which is independently sufficient to justify preliminary injunctive relief, for why the implementation of the Executive Order through the Funding Notice was arbitrary and capricious. First, Defendants do not address

Plaintiffs' argument that the agency's action is arbitrary and capricious because its delegation of the federal agencies' statutory responsibility to consult with state and local governments to the Resettlement Agencies is unlawful, and in any event, fails to ensure that any state or local government will be consulted. *See* PI Mot. at 30. Defendants likewise ignore Plaintiffs' argument that the agency's action is arbitrary and capricious because its application to the Unaccompanied Refugee Minors (URM) Program is both redundant and nonsensical. *See id.* Finally, Defendants have no response for Plaintiffs' arguments that the agency failed to consider, as it was required to do: (a) the serious reliance interests of refugees, local communities that have welcomed them, foster families (in the case of the URM Program), and Resettlement Agencies, *see id.* at 27-29; (b) the mandatory statutory factors, including the impact on secondary migration and family reunification, *see id.* at 24, 26-27; and (c) the important role municipalities play in refugee resettlement, when Defendants inexplicably decided to define locality as "county or county equivalent," and thus suppressed important local perspectives, *see id.* at 26. Defendants' decision not to defend the Funding Notice against most of the obvious reasons why it is arbitrary and capricious is reason enough to conclude that Plaintiffs are likely to succeed on this claim.

With regards to those arguments they do address, the only permissible documents Defendants proffer as explanations for the agency action are the Executive Order and the Funding Notice themselves. Defendants claim that the "reasonable explanation" for the agency's action is "readily apparent" from the face of these two documents, *id.* at 1; *see also id.* at 21, but they can point to nothing in them that explains the agency's approach. Nothing in the Executive Order or the Funding Notice even explains why the agency believed the application process for providing resettlement services was the appropriate method for implementing the Executive Order, much less why the agency decided, for example, to define "locality" as "county or county

equivalent" rather than municipality, *see* PI Mot. at 26; or to outsource the extraordinary burden of obtaining consents to the Resettlement Agencies,[3] *see id.* at 26 & n.6. In short, the agency's action was arbitrary and capricious because—contrary to Defendants' conclusory assertions—the agency entirely failed to consider important aspects of the decision it was making. *See id.* at 26.

Defendants also submitted a litigation affidavit from Andrew Veprek (ECF No. 54-1), which includes a copy of guidance the agency issued four days before Defendants filed their opposition to Plaintiffs' preliminary injunction motion. For the reasons explained in Plaintiffs' Motion to Strike (ECF No. 56), neither the Veprek Declaration nor its attachment can be considered in assessing whether Defendants acted in an arbitrary and capricious manner. But even if they were considered, these documents prove Plaintiffs' point: the post-hoc guidance, which "clarifies procedures" for the Funding Notice and responds to basic questions about it, *see* Veprek Decl. ¶¶ 9-11, makes abundantly clear that the agency had not given consideration to several important factors at the relevant time—which was when the Funding Notice was issued. *See* PI Mot. at 24-26; *Md. Native Plant Soc'y v. U.S. Army Corps of Eng'rs*, 332 F. Supp. 2d 845, 859 (D. Md. 2004) ("The required explanation must be articulated by the agency at the time of its action." (citation omitted)). That the agency's late-issued guidance gave *some* consideration to these issues—after Plaintiffs had moved for a preliminary injunction, more than a month after the Funding Notice issued, after Resettlement Agencies had already spent (at least) hundreds of hours trying to obtain consents, after many consents had already been submitted to the agency, and with just a month left before the deadline for funding proposals—serves only to confirm the

---

[3] The decision to outsource the task of obtaining consents was not obvious; even after the Executive Order issued, the agency told Resettlement Agencies that *the agency* would solicit the consents. *See* Jonathan Blitzer, *How the White House is Trying—and Failing—to Keep States From Resettling Refugees*, New Yorker (Dec. 20, 2019) ("Blitzer article").

arbitrary and capricious nature of the Funding Notice. *See N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 604 (4th Cir. 2012) (rejecting agency argument that information given during litigation could "cure[]" earlier deficiencies, as tantamount to accepting post-hoc rationalizations). There is no apparent reason why the agency did not wait to implement the Executive Order or to issue the Funding Notice until after considering and resolving these "important aspect[s] of the [implementation] problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

Moreover, even if the agency's post-hoc rationalizations and guidance could "cure" some of the deficiencies of the Funding Notice (which they cannot do under APA principles), Defendants have still failed to address most of the problems that render the Funding Notice arbitrary and capricious. Even on issues it addresses, for example, the guidance is insufficient: it states that "[t]owns, cities, and municipalities" are the relevant authority in New England states that lack county governments, but does not say whether the mayor or the city council is the relevant authority to provide consent. This has already created a problem in Springfield, Massachusetts, where the city council passed a unanimous resolution consenting to resettle refugees, but the mayor has nonetheless refused to execute a consent letter.[4] Furthermore, the guidance may have created additional problems regarding compliance. Even those counties that provided consent, but not in the form required by the December 16 guidance, could have their consents rejected. *See, e.g.*, Antonia Noori Farzan, *A North Dakota County Was Poised to Be First to Bar Refugees Under Trump's Executive Order. Residents Said No*, Wash. Post (Dec. 10, 2019), https://wapo.st/2tk612I (describing vote of Burleigh County Commission in South Dakota

---

[4] Press Release, City of Springfield, In Response to City Council Resolution, Mayor Sarno Not to Issue Letter of Consent for Continued Refugee Resettlements in Springfield (Dec. 17, 2019), https://bit.ly/2Zz0zW0.

to consent to refugee resettlement but conditioned on capping refugee arrivals in fiscal year 2020 to 25, in seeming violation of the later-issued guidance).

The implementation of the Executive Order ultimately makes clear that the agencies did not consider relevant factors when issuing the Funding Notice, and that the Funding Notice is not reasonably related to its stated purpose of "enhancing" statutory consultation with states and localities. *See Judulang v. Holder*, 565 U.S. 42, 48 (2011) (agency action arbitrary and capricious if not tied to the law's purpose); PI Mot. at 30. The Executive Order and Funding Notice do not even require that all states and localities be consulted, making even less explicable the Funding Notice's pocket veto structure—whereby, if a state or locality says nothing, whether by choice or by inadvertence, that is considered a veto.[5] Worse, the Funding Notice explicitly cuts cities out from this allegedly "enhanced" consultation process, even though the Refugee Act requires that the Executive consult them as well. *See* Amicus Curiae Br. of Cities, ECF No. 43-1, at 11-13. In short, the agency's approach is not even loosely tied to its claimed purpose of enhancing statutory consultation; rather, it actively undermines that goal, and is arbitrary and capricious for that reason as well. *See Judulang*, 565 U.S. at 48.

### III.    Plaintiffs Have Met the Other Factors Justifying a Preliminary Injunction

#### A.    Absent an Injunction, the Executive Order and Funding Notice Will Inflict Increasing Irreparable Harm on Plaintiffs and Refugees

Defendants do not dispute that Plaintiffs have suffered and will continue to suffer the harms described in Plaintiffs' declarations. *See* PI Mot. at 31-34. Instead, Defendants wrongly claim that these harms are not irreparable because: (1) rather than trying to comply with the

---

[5] *See also* Blitzer article, *supra* n.3 (reporting that on phone calls regarding the Executive Order, Deputy Assistant Secretary Veprek has actively discouraged states and localities from affirmatively providing consent unless and until approached by a resettlement agency).

unlawful Executive Order and Funding Notice, Plaintiffs can simply "forego receiving grant funding," Opp'n at 25, which means no longer resettling refugees; and (2) until ultimate funding decisions are made, Plaintiffs' injuries are too speculative to be irreparable, *see id.* at 25-26.

Defendants' assertion that Plaintiffs can simply forego funding, *id.* at 25, fails to acknowledge that only through the Funding Notice can Plaintiffs continue to resettle refugees. *See* PI Mot. at 4-7. In other words, this is not a situation where Plaintiffs could seek private funds to compensate for foregone government funds and continue to engage in the same activity. *Contra* Opp'n at 25 (erroneously asserting, without citation, that Plaintiffs are "unlike regulated parties who must absorb significant costs to comply with federal regulations"). Choosing not to apply through the Funding Notice would be a decision to stop resettling refugees to the United States altogether. In addition to sacrificing a core part of their missions, Plaintiffs would have to fundamentally change their operations, lay off staff, and abandon the networks and relationships that they have built over decades—all of which is unquestionably irreparable harm. *See* PI Mot. at 10-11, 31-34. Taken to its logical conclusion, Defendants' argument would also mean that no federal funding requirement could ever cause irreparable harm—but that is not the law. *See, e.g.*, *U.S. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-21 (2013) (funding condition violated plaintiffs' First Amendment rights); *City of Chicago*, 321 F. Supp. 3d at 877 (compliance with new funding condition would cause irreparable harm, including damage to local law enforcement's relationship with immigrant communities).

Defendants' claim that Plaintiffs' irreparable injuries are "entirely speculative" fares no better. Plaintiffs are already suffering irreparable harm from the compliance costs imposed by the unlawful Executive Order and Funding Notice, which have required them to divert their time and resources away from core programmatic activities to obtaining consents, thereby frustrating their

faith-based missions.[6] *See* PI Mot. at 31-32. Defendants have not identified any way that these injuries could be remedied at the end of this case—and there isn't one, *see id.*, which makes the harms irreparable, as even the caselaw Defendants cite confirms. *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (holding that "ordinary compliance costs" were not irreparable because if plaintiffs prevailed, they "would be recompensed after trial"). Nor does it matter that Plaintiffs might not ultimately be awarded funds, *see* Opp'n at 25; regardless of the outcome, Plaintiffs must continue seeking and obtaining the consents the Executive Order requires even to be *eligible* under the Funding Notice. Finally, Defendants' suggestion that Plaintiffs could "come out ahead" in the event that "the costs of compliance are less than the funding [Plaintiffs] receive through any grant award," *id.*, is nonsensical given that Plaintiffs cannot make a profit, are required by the federal government to spend nearly all federal funding directly on the refugees they serve, and must supplement the government funding they receive with private resources even in typical funding years. The Funding Notice itself reflects these facts. *See* Funding Notice at 3 (describing how the per capita funding may be spent "only for the direct benefit of refugees and for the delivery of services to refugees," and stating that resettlement agencies "are expected to combine PRM's financial assistance with existing and projected private resources for the provision of [Reception and Placement] services").

### B.  The Balance of Equities and the Public Interest Favor an Injunction

The balance of harms and the public interest merge here and weigh strongly in favor of a preliminary injunction. The Refugee Act itself identifies the public interest at issue: "to provide

---

[6] Defendants' argument that the harm to Plaintiffs based on lobbying is speculative focuses only on the IRS regulations, but as Plaintiffs noted, *see* PI Mot. at 32 n.11, there are at least 50 other jurisdictions with lobbying laws, *see* Nat'l Conference of State Legislatures, *How States Define Lobbying and Lobbyist* (Dec. 17, 2019), http://www.ncsl.org/research/ethics/50-state-chart-lobby-definitions.aspx.

comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Pub. L. No. 96-212, § 101(b). As Plaintiffs have described, Congress specified detailed procedures for protecting this public interest in 8 U.S.C. § 1522.

Defendants' only argument that the public interest disfavors an injunction is based on a series of faulty premises that essentially replicate errors in Defendants' merits arguments. *Cf.* Opp'n at 28 (positing that an injunction would result in "increased risk of resettlement in communities that do not welcome [refugees]" (citing Veprek Decl. ¶ 13)). First, Defendants' position is rooted in the false assumption that lack of consent reflects a sentiment that refugees are not welcome, as opposed to myriad other possible reasons, such as a jurisdiction simply not being asked, or being confused about the new requirement, or the erratic implementation of the Executive Order. Defendants' position also conflates an individual official's unwillingness to provide written consent with a *community's* unwillingness to welcome refugees. *Cf.* PI Mot. at 31-33 (describing decades of work Plaintiffs have invested in cultivating local support and partnerships); *see also* Amicus Curiae Br. of Cities at 7-10 (explaining how the Executive Order and Funding Notice effectively eliminate the role of cities); Press Release, City of Springfield, *supra* n.4 (reflecting disagreement between Springfield's mayor and city council on same issue).

In fact, the public interest strongly favors a preliminary injunction, not least because the public has an interest in government officials abiding by the law. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law . . . ." (citations omitted)). Requiring Defendants to comply with the Refugee Act also serves the public interest because it ensures refugee placement decisions are governed, as Congress intended, by the interrelated goals of reuniting families and providing newly admitted refugees with their best

opportunity to become fully integrated and self-sufficient. This in turn will lead to better outcomes for refugees themselves, which is unquestionably in the public interest.

**IV.    The Court Should Enjoin the Executive Order and the Funding Notice Without the Limitations Defendants Request**

If the Court concludes that preliminary injunctive relief is appropriate, Plaintiffs respectfully request an injunction barring enforcement of the Executive Order in full, including through the Funding Notice. Defendants contend that the Court should issue a narrow injunction that would allow them to keep enforcing their unlawful policy against all but the three Plaintiffs. *See* Opp'n at 30-32. But Defendants' proposed injunction is contrary to the public interest and precedent, is practically unworkable, would harm non-parties, and should be rejected.[7]

Defendants make no effort to describe how their proposed narrow injunction would work in practice, and with good reason. Under it, the agency would continue to subject the six other Resettlement Agencies who are not plaintiffs to the unlawful Executive Order, including through the Funding Notice. It is difficult to understand how the agency could have a fair or even coherent process for deciding how to award cooperative agreements when one-third of the applicants are subjected to one set of eligibility requirements, and two-thirds to a different set, especially given that the two groups overlap operationally. Treating those two groups the same is not possible; either one group or another will be disadvantaged. Disadvantaging Plaintiffs would mean that the preliminary injunction does not achieve what is "necessary to provide complete relief," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); yet, disadvantaging the other six Resettlement Agencies would violate the prohibition on injunctions that harm "innocent third parties," *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 388 (4th Cir. 2017).

---

[7] Plaintiffs do not seek an injunction against the President, *contra* Opp'n at 28-30.

What is more, even assuming the Court could somehow craft a narrow preliminary injunction that disadvantages no one, the result would nonetheless be a patchwork, which contravenes Congress' stated purpose in enacting the Refugee Act: to provide "comprehensive and *uniform* provisions" for refugee resettlement. Pub. L. No. 96-212, § 101(b) (emphasis added). Courts have repeatedly recognized the need for injunctions to maintain nationwide uniformity in cases involving immigration law and policy. *See IRAP*, 883 F.3d at 273 ("Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*'" (citations omitted)); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) ("In immigration matters, we have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." (citations omitted)); *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511-12 (9th Cir. 2018) (affirming nationwide preliminary injunction because "[s]uch relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress"), *pet. for cert. granted*, 139 S. Ct. 2779 (2019). Moreover, the presumed remedy in an APA case is to set aside agency action that is not in accordance with law.[8] *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 654-55 (4th Cir. 2018).

## CONCLUSION

Plaintiffs respectfully request that the Court preliminarily enjoin the implementation and enforcement of the Executive Order, including through the Funding Notice.

---

[8] Defendants' reference to Supreme Court precedent establishing that "even in an APA case, 'equitable defenses may be interposed,'" Opp'n at 32, is perplexing given that Defendants do not raise any equitable defenses in this case.

Dated: January 3, 2020                              Respectfully submitted,

                                                   /s/ Melissa S. Keaney
                                                   Melissa S. Keaney*
                                                   International Refugee Assistance Project
                                                   PO Box 2291
                                                   Fair Oaks, CA 95628
                                                   mkeaney@refugeerights.org
                                                   (916) 546-6125

                                                   /s/ Linda Evarts
                                                   Linda Evarts*
                                                   Kathryn Austin*
                                                   Mariko Hirose*
                                                   International Refugee Assistance Project
                                                   One Battery Park Plaza 4th Floor
                                                   New York, NY 10004
                                                   levarts@refugeerights.org
                                                   kaustin@refugeerights.org
                                                   mhirose@refugeerights.org
                                                   (516) 701-4620

                                                   /s/ Justin B. Cox
                                                   Justin B. Cox (Bar No. 17550)
                                                   International Refugee Assistance Project
                                                   PO Box 170208
                                                   Atlanta, GA 30317
                                                   jcox@refugeerights.org
                                                   (516) 701-4233

                                                   * Appearing *Pro Hac Vice*