# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2020 JAN 15  AM 10: 51
CLERK'S OFFICE
AT GREENBELT
BY _____ DEPUTY

**HIAS, INC.**, *et al.*,       \*

         Plaintiffs,      \*

v.      \*      Civil No. **PJM 19-3346**

**DONALD TRUMP, in his official capacity as President of the United States,** *et al.*,      \*

         Defendants.      \*

## <u>MEMORANDUM OPINION</u>

### I.    Introduction

HIAS, Inc., Church World Service, Inc., and Lutheran Immigration and Refugee Service, Inc. have sued President Donald Trump and three of his cabinet secretaries, seeking preliminary and permanent injunctive relief. They challenge Executive Order 13888, 84 Fed. Reg. 52,355 (Sept. 26, 2019) (Order), that they allege would give individual U.S. States and Local Governments the power to veto, by refusing to consent to, the resettlement in their respective jurisdictions of certain refugees from around the world. Plaintiffs are three of nine designated "Resettlement Agencies" that enter into annual agreements with the Federal Government to provide services to these refugees under the current refugee resettlement program of this country, as described more fully infra. Defendants, in their official capacities, are

the President, Secretary of State Michael Pompeo, Secretary of Health and Human Services Alex Azar II, and Acting Secretary of Homeland Security Chad Wolf, all of whom have developed and/or are responsible for implementing the Order.

The case is at the Preliminary Injunction phase.[1]

Defendants, represented by the U.S. Department of Justice, have filed an Opposition to the Motion for Preliminary Injunction to which Plaintiffs have replied. Numerous entities, with leave of Court, have filed briefs as amici curiae.[2] Oral argument by counsel for the parties has been held.

For the reasons that follow, the Court **GRANTS** the Motion for Preliminary Injunction, ECF No. 18, and reinstates the status quo immediately preceding the issuance of the proclamation of the Order on September 26, 2019, pending further order of the Court.

---

[1] Plaintiffs do not seek to enjoin the President. *See* ECF No. 60, p. 9. Rather, they seek to enjoin his cabinet officers for their roles in developing and implementing the Order. *Id.; see Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive").

[2] The Court has received amici briefs from Former State Department Officials, including individuals who have served as Assistant Secretary of State for Population, Refugees, and Migration Affairs (Anne Claire Richard) and Director of the Bureau for Refugee Program (James Nelson Purcell, Jr.)(ECF No. 35-1); from several States including California, Illinois , Maryland, Connecticut, Massachusetts, Minnesota, New Jersey, New York, Oregon, Pennsylvania, Virginia and Washington  (ECF No. 36); from Cities, including, among others, New York, Los Angeles, Chicago, Philadelphia, Minneapolis, and San Francisco; the Mayors of Detroit, Phoenix, Salt Lake City, Seattle, and San Jose and the U.S. Conference of Mayors (ECF No. 43-1); and from various faith-based organizations with hundreds of affiliates throughout the country (ECF No. 45-1). All amici are in agreement with Plaintiffs that Order 13888 is unlawful.

## II.    Who is a Refugee?

It is of critical importance to understand who a "refugee" is in the context of this case. For present purposes, a "refugee" has been defined under U.S. law, in pertinent part, as: "any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion". 8 U.S.C. § 1101(a)(42).[3] *See also* 8 U.S.C. § 1522. This definition traces back to the definition of "refugee" found in the Statute of the Office of the United Nations High Commission for Refugees (UNHCR) [1950] and the definition in the 1951 Convention Relating to the Status of Refugees.[4]

---

[3] In contrast to a "refugee" as defined herein, an "asylum-seeker" also seeks protection from persecution in his or her home country, but their claim for refugee status has not been legally determined. Asylum-seekers must apply for protection in the country of their destination – meaning that they must be within the country of their destination in order to apply. An "immigrant" may also be distinguished; he or she is a person who merely desires to leave one country and settle in another. The person's immigration into a given country, including the U.S., typically involves extensive vetting. Many immigrants are eventually able to obtain lawful immigration status and some in time may become citizens. A "migrant" is simply someone who moves from one place to another (within his or her country or across borders) – seasonal workers are a good example – but they do not assert fear of persecution or violence, and, with certain restrictions, may come and go or go between given countries. International Rescue Committee (IRC), *Migrants, asylum seekers, refugees and immigrants: What's the difference?*, https://www.rescue.org/article/migrants-asylum-seekers-refugees-and-immigrants-whats-difference (last visited Jan. 13, 2020); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987).

[4] Karen Musalo, Jennifer Moore, Richard A. Boswell & Annie Daber, *Refugee Law and Policy* 37-39 (5th ed. 2018) (*citing* Statute of the Office of U.N. High Comm'r for Refugees, G.A. Res. 428 (V), annex, (Dec. 14, 1950) and 1951 Convention Relating to the Status of Refugees art. 1, Jul. 28, 1951, 189 U.N.T.S. 137).

"The 1967 Refugee Protocol incorporated the 1951 Convention's well-founded fear definition in its first article... [such that] [t]he United States owes certain obligations to refugees under international law by virtue of its ratification of the 1967 Protocol, and the [UNHCR], speaking for the international community, is the chief guarantor of these obligations".[5] In 1980, in order to bring U.S. law into conformity with the Protocol, Congress enacted the Refugee Act of 1980.[6] In its declaration of policies and objectives prefacing the Act, Congress:

> (a) ... declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States. The Congress further declares that it is the policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible. (b) The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.

Refugee Act of 1980, Pub. L. No. 96-212 § 101, 94 Stat. 102.

---

[5] *Id.* at 73-74; *see also INS v. Stevic*, 467 U.S. 407, 416 (1984).
[6] *Id.* at 83.

"Refugees", then, in terms of the present case, comprise a special category of persons.[7]

These refugees do not apply for resettlement directly to the Country they hope to go to.[8]

In most cases, the UNHCR begins by identifying vulnerable individuals (often in conjunction with a U.S. embassy). A number of countries, including the United States, as signatories to the 1967 Protocol, have agreed to cooperate in determining which refugees designated by the UNHCR will be admitted for resettlement. Canada now accepts a greater number of refugees for resettlement under the Convention and Protocol than does the U.S., which historically has accepted the most. *See* U.N. High Commissioner on Refugees, *Global Trends: Forced Displacement in 2018* (2019) at 32.

As of December 31, 2019, the Department of State reports that 30,000 refugees were resettled in the United States in Fiscal Year 2019. *See* Dep't of State, Bureau of Population, Refugees, and Migration, Refugee Processing Center, PRM Admissions Graph Dec. 31, 2019 (available at https://www.wrapsnet.org

---

[7] Except as otherwise indicated, when the Court refers to "refugees" hereafter, it is referring to this special category of "refugees".

[8] UNHCR, Refugee Resettlement Facts, https://www.unhcr.org/un.us/resettlement-in-the-united-states.html (last visited Jan. 13, 2020); *see generally* U.N. High Commissioner on Refugees, *UNHCR Resettlement Handbook* (2011).

/admissions-and-arrivals/) (last visited Jan. 13, 2020).[9] The main countries of origin

of refugees who settled in the U.S. in FY 2018 were the Democratic Republic of

Congo, Myanmar, and Ukraine. Dep't of State, Dep't of Homeland Security & Dep't

of Health and Hum. Servs., Report to Congress: Proposed Refugee Admissions for

Fiscal Year 2020 (2019) at 25. The top U.S. States accepting refugee resettlement in

FY 2018 were Texas, Washington, Ohio, California, New York, and Arizona. *Id.* at

27.

### III.   A Brief Summary of Resettlement History

Anastasia Brown and Todd Scribner in the Journal of Migration and Human

Security briefly summarize the history of the refugee settlement system in the United

States:

> World War II caused the displacement of millions of people throughout Europe. In response, the United States initiated a public-private partnership that assisted in the resettlement of hundreds of thousands of the region's displaced persons. For nearly 40 years after the War, the US commitment to refugee resettlement played out in an *ad hoc* fashion as it responded to emerging crises in different ways. During this period the government's involvement with resettlement became gradually intertwined with that of nongovernmental resettlement agencies, which came to play an increasingly vital role in the resettlement process. The budding relationship that began in the middle decades of the twentieth century set the foundation for an expansive and dynamic public-private partnership that continues to this day. The Refugee Act of 1980

---

[9] An estimated 150,000 to 200,000 persons outside the U.S. (where proposed refugees must reside until ready for resettlement) are currently seeking to be designated as refugees in order to resettle in the U.S. *See* Transcript of Oral Argument at 37 (Jan. 8, 2020) (Civ. No. PJM-19-3346).
UNHCR estimates that 25.9 million individuals world-wide were in need of resettlement at the end of Fiscal Year 2018. *See* Dep't of State, Dep't of Homeland Security & Dep't of Health and Hum. Servs., Report to Congress: Proposed Refugee Admissions for Fiscal Year 2020 (2019) at 11; *see also* UNHCR, Figures at a Glance, https://www.unhcr.org/en-us/figures-at-a-glance.html (last visited Jan. 13, 2020).

solidified the relationship between resettlement agencies and the federal government, established political asylum in US law, and created the refugee resettlement program and a series of assistance programs to help refugees transition to life in the United States. This legislation marked a decisive turning point in the field of refugee resettlement.

Anastasia Brown and Todd Scribner, *Unfulfilled Promises, Future Possibilities: The Refugee Resettlement System in the United States*, 2 J. Migration and Hum. Security, No. 2, 101, 101 (2014).

## IV.    The Resettlement Process in the U.S.

After the UNHCR identifies and recommends a potential refugee for resettlement in the U.S., the U.S. undertakes its own vetting process (including, for example, administering medical tests and checking global fingerprint databases). The President, after consultation with Congress, determines the numerical ceiling for refugees each year (known as the "Presidential Determination"). *See* 8 U.S.C. §1157(a)(2). For Fiscal Year 2020, for example, President Trump has set the ceiling at 18,000, *see* Presidential Determination on Refugee Admissions for Fiscal Year 2020, 84 Fed. Reg. 65,903 (Nov. 1, 2019), as compared to a ceiling of 110,000 set by President Obama in 2016, *see* Presidential Determination on Refugee Admissions for Fiscal Year 2017, 81 Fed. Reg. 70,315 (Sept. 28, 2016). Eligible refugees are then interviewed by officers of the U.S. Citizenship and Immigration Services (USCIS), which is part of the Department of Homeland Security (DHS), and if deemed admissible, are resettled through what is known as the Refugee Admissions

Program (RAP), which is jointly administered by a division within the Department of State (DOS) and the Department of Health and Human Services (HHS). *See* U.S. Citizenship and Immigration Services, Refugee Screening Fact Sheet (2018) (available at https://www.uscis.gov/sites/default/files/USCIS/Refugee%2C%20Asylum%2C%20and%20Int%271%20Ops/Refugee_Screening_and_Vetting_Fact _Sheet.pdf). *See also Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902, 903 (7th Cir. 2016) (Posner, J.) ("all persons seeking to enter the United States as refugees are required to undergo multiple layers of screening by the federal government, following screening by the United Nations High Commissioner for Refugees, before they can be admitted to the United States. The process can take up to two years").

Once DHS conditionally approves an applicant for resettlement, the prospective refugee receives "sponsorship assurance" from one of the nine Resettlement Agencies that has entered into a cooperative agreement with the State Department to assist in the resettlement of refugees.

The "sponsorship assurance" must be received before the prospective refugee may travel to the U.S. *See* ECF No. 1 ¶ 40. The Resettlement Agency then assumes responsibility for placing the prospective refugee with one of its affiliates, and commences to provide services to the candidate, which are intended to help him or her obtain self-sufficiency. *See id.* ¶ 41. In the past, it has taken between 18 to 24

months from the time of the individual's application for admission to actual resettlement, although more recently it has reportedly taken longer. *See id.* ¶ 45.

Through its Reception and Placement Program the State Department provides funding up to a certain amount to the Resettlement Agencies for each refugee they resettle (e.g. to pay for housing, furnishings, food, clothing and the like). *See* 8 U.S.C. § 1522(b)(1). This is intended to cover the first 90 days a refugee is in the U.S. Thereafter, the Office of Refugee Resettlement (ORR), which is within HHS, reimburses the States for paying for longer-term assistance, including social services, as well as medical assistance, and even cash. *See* ECF No. 1 ¶ ¶ 58-59; 8 U.S.C. § 1521.

Heretofore, pursuant to 8 U.S.C. § 1522(a) (Appendix I hereto), the Federal resettlement authorities and the Resettlement Agencies have been directed to meet and consult with State and Local Governments in order to establish policies and strategies for the placement and resettlement of the refugees, in the course of which, acting in concert, they are directed to take into account several factors, including the availability of employment opportunities, affordable housing, and public and private

resources in the destination (e.g. educational, healthcare, and mental health resources).[10]

If the refugee is deemed acceptable for resettlement, the State Department assigns his or her case to one of nine Resettlement Agencies (Plaintiffs being three of the nine), which help the refugee integrate into his or her new U.S. community.

## V.   The Challenged Executive Order

On September 26, 2019, President Trump issued Executive Order 13888 proposing to modify what from at least the mid-1980s to date has been the heart of resettlement practice. Instead of merely giving States and Local Governments an active voice over whether refugees will be resettled in their jurisdictions, the Order provides that the Federal Government "should resettle refugees only in those jurisdictions in which both the State and local governments have consented to receive refugees under the Department of State's Reception and Placement

---

[10] Resettlement Agencies such as Plaintiffs are given an express consultative role in the resettlement process that, as to nonconsenting States and Local Governments, the Order would abolish. As will be shown, Plaintiffs' prospective loss of their statutory right to be consulted in the resettlement process and their consequent financial losses and prospective loss of good will are "concrete" and "particularized" and "actual and imminent, not conjectural or political" and are of the type "traditionally thought to be capable of resolution through the judicial process." In other words, Plaintiffs have established injury-in-fact, traceable to Executive Order 13888, that could be favorably addressed by enjoining the enforcement of the Order in whole or part. This means Plaintiffs have satisfied each of the elements required for Article III standing. *See Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1547 (2016); *Raines* v. *Byrd*, 521 U.S. 811, 819 (1997). Plaintiffs also satisfy any requirement for prudential standing since they are clearly within the zone of interest contemplated by 8 U.S.C. § 1522. *See Bank Am. Corp* v. *City of Miami*, 137 S. Ct. 1296, 1302-03 (2017).

Program". Order § 1. In other words, the Order gives individual States and Local Governments veto power over resettlement.[11]

Of immediate concern, as announced by Defendants on November 6, 2019, Resettlement Agencies, including Plaintiffs, that seek to continue providing initial resettlement services beyond June 1, 2020 must obtain prior written consent from any State and Local Government jurisdiction in which they propose to resettle refugees. *See* U.S. Dep't of State, Bureau of Population, Refugees, and Migration, 2020 Notice of Funding Opportunity for Reception and Placement Program (Nov. 6, 2019) (Funding Notice). Of even more pressing concern, the State Department has announced that – by January 21, 2020 (the date proposals are due) – the Resettlement Agencies must submit proposals demonstrating to the Federal

---

[11] Defendants argue that the Order does not give veto power to the State and Local Governments, suggesting that instead the purpose of the Order "is to enhance the consultation between the Government and States and localities". ECF No. 54, p. 22. This borders on Orwellian Newspeak. Giving States and Local Governments authority to block resettlement unless they consent in writing more than "enhances" their authority. It grants them veto power. Period.

Defendants' suggestion that the Secretary of State can theoretically require a non-consenting State or Local Government to accept refugees is not only extremely unlikely to occur; neither the Executive Order nor the Funding Notice disclose how the matter might be presented to the Secretary to decide. Defense counsel, at oral argument, was unable to elaborate. But, insofar as Defendants rely upon a "savings clause" in the Order, viz. that the Secretary can direct a non-consenting State or locality to accept refugees if the Secretary concludes that "failing to resettle refugees within [a non-consenting] State or locality would be inconsistent with the policies and strategies established under 8 U.S.C. 1522(a)(2)(B) and (C) or other applicable law", Order § 2(b), the clause is essentially meaningless. Section 8 U.S.C. § 1522(a)(2)(B) requires that "[t]he Director shall develop and implement, in consultation with representatives of voluntary agencies and State and local governments, policies and strategies for the placement and resettlement of refugees within the United States". While subsection (C) refers to the traditional factors for resettlement, "other applicable law" includes, among other things, all of the rest of § 1522. But that is precisely the point of Plaintiffs' claim. The Order, they say, is "inconsistent" with 8 U.S.C. § 1522(a)(2)(B) and (C) because the "voluntary agencies", i.e. Plaintiffs, would have their consultative role with non-consenting States taken away by the Order. *Cf. City and County of San Francisco v. Trump et al.*, 897 F.3d 1225, 1239 (9th Cir. 2018) ("Savings clauses are read in their context, and they cannot be given effect when the Court… would override clear and specific language").

resettlement authorities that they have solicited and obtained the written consents from the State and Local Governments where the refugees will be placed after June 1, 2020. *Id.* at 8, 37, 42.[12]

The Resettlement Agencies understand that any federal funding they receive for services rendered after June 1, 2020 (the award period) will be limited by the number of State and Local Governments that, by January 21, 2020, have given (or have been solicited to give) their written consent to receive refugees. However, beginning June 1, 2020 refugees may only be resettled where State and Local Governments have in fact given such consents.

## VI.    Judicial Review of Executive Orders

Executive Orders are of course subject to judicial review. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935); *see generally* David M. Driesen, *Judicial Review of Executive Orders' Rationality*, 98 Bos. U. L. Rev. 1013 (2018). The question is, What standard should the courts apply in reviewing the Orders? Although the Supreme Court has held that the President is not subject to the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq., and by implication that the "arbitrary and capricious" and "abuse of discretion" standards of the APA do not apply to him,

---

[12] Defendants state that Plaintiffs will actually be able to submit consents until June 1, 2020 when the grant period begins.

*see Franklin v. Massachusetts*, 505 U.S. 788 (1992), subordinate officers (three of whom are Defendants here) are subject to the Act, *see id.* at 828 (Scalia, J., concurring) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive"). In evaluating the President's Orders the Supreme Court has applied a rationality standard – deferential to be sure. *See, e.g., Trump v. Hawaii*, 138 S. Ct. 2392, 2411, 2420 (2018) ("We may assume that § 1182(f) does not allow the President to expressly override particular provisions of the [Immigration and Naturalization Act]. But plaintiffs have not identified any conflict between the statute and the Proclamation that would implicitly bar the President from addressing deficiencies in the Nation's vetting system"). Constitutional challenges are simply evaluated as such. The actions either are or they are not unconstitutional.

Justice Jackson's "three part scheme" for evaluating Presidential Powers, as set forth in his concurring opinion in the *Youngstown* case, endorsed by Justice Kennedy and three other Justices in a concurring opinion in *Hamdan v. Rumsfeld*, 548 U.S. 557, 638 (2006), provides useful context when assessing whether executive action is authorized:

> 1.    When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.
>
> *        *        *

2.      When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain.

*      *      *

3.      When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

*Youngstown*, supra, 343 U.S. at 635-638 (Jackson, J., concurring). *Cf. Panama Ref. Co.*, supra, 293 U.S. 388, 431 ("If it could be said that from the four corners of the statute any possible inference could be drawn of particular circumstances or conditions which were to govern the exercise of the authority conferred, the President could not act validly without having regard to those circumstances and conditions").[13]

## VII.  Core Arguments of the Parties

Plaintiffs submit that, in giving State and Local Governments veto power over refugee resettlement, the Order contravenes statutory text and purpose, express Congressional intent, executive practice, multiple judicial holdings and clear

---

[13] It has been argued that, even though the APA does not apply to the President, many cases ostensibly proceeding on the basis of the rationality test of the President's authority have in fact tacitly applied an arbitrary and capricious standard. *See* Driesen. op. cit., 1018 et seq. The Court need not probe this argument, however, since insofar as the Order is unlawful, as the Court believes Plaintiffs have preliminarily shown, it would fail both the rationality and arbitrary and capricious tests.

Constitutional doctrine. They also say that, if implemented, the Order will cause Plaintiffs and their refugee "clients" irreparable harm and that the balance of equities and public interest militate strongly in favor of issuing a preliminary injunction.

The consequence of the Order, say Plaintiffs, will be the evisceration of a long-standing, smooth-functioning humane program, with disastrous consequences not only for Plaintiffs and eligible refugees but for the image of the United States as the beacon of liberty.

Defendants submit that neither the Order nor the Funding Notice is reviewable because the Refugee Act of 1980 does not provide a private cause of action. But, they say, even if review were available, the Order and Funding Notice are lawful, raise no constitutional concerns and are not otherwise arbitrary and capricious. They also appear to suggest that, because the President has authority to determine how many refugees may be resettled each year – a power not really in dispute, *see* 8 U.S.C. § 1157(a)(2) – as a subset he has the power to decree that States and Local Governments should have the authority to determine, without respect to any consultative process established by statute, whether, if at all, refugees may inhabit their communities. Particularly, say Defendants, State and local authorities know best what resources they have available to accommodate the refugees in their jurisdictions, *see* Order § 1, and therefore they should have the final say on whether or not they can come. Defendants see no harm to Plaintiffs in the absence of a

preliminary injunction and argue that the balance of equities and public interest tilt in their favor.

Plaintiffs reply that not only is the proposed modification illegal; it is little more than a politically motivated decision that will engender hate and divisiveness throughout the country.[14]

## VIII. Factors for Issuance of Preliminary Injunction

For Plaintiffs to obtain a preliminary injunction, they must make a clear showing (1) that they are likely to succeed on the merits; (2) that they will suffer irreparable harm that is neither remote nor speculative but actual and imminent if the injunction is not granted; (3) that the balance of equities favor their position, i.e. that the harm Plaintiffs will suffer if the injunction is not granted outweighs the detriment Defendants will suffer if it is and; (4) that the relief they seek is in the public interest. *See Winter v. National Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated and remanded on other grounds*, 559 U.S. 1089 (2010).

---

[14] The States and Cities and Mayors, in their amici briefs, have declared their willingness to receive refugees, stressing the positive impacts the refugees have on economic conditions, as well as the social and cultural contributions they make in their respective locales.

### IX.   Is a Preliminary Injunction Warranted in the Present Case?

### A. Likelihood of Success on the Merits

The Court begins with the <u>text of the statute</u>. *See Trump v. Hawaii*, 138 S. Ct. at 2408.

Section 8 U.S.C. § 1522, which sets forth the "conditions and considerations" for authorizing for programs for the initial resettlement of and assistance to refugees, provides that

> "The Director and the Federal agency administering [the program of initial resettlement] *shall consult regularly (not less often than quarterly) with State and local governments and private nonprofit voluntary agencies* concerning the sponsorship process and the intended distribution of refugees among the States and localities before their placement in those States and localities". 8 U.S.C. § 1522(a)(2)(A) (emphasis supplied).

and that

> "The Director shall develop and implement, *in consultation with representatives of voluntary agencies and State and local governments,* policies and strategies for the placement and resettlement of refugees within the United States." *Id*. at (a)(2)(B) (emphasis supplied).

including such factors as that

> "a refugee is not initially placed or resettled in an area highly impacted (as determined… *after consultation with such agencies and governments)…" Id*. at (a)(2)(C)(i) (emphasis supplied).

and that there be

> "a mechanism whereby *representatives of local affiliates of voluntary agencies regularly (not less often than quarterly) meet with*

*representatives of State and local governments* to plan and coordinate in advance of their arrival…" *Id.* at (a)(2)(C)(ii) (emphasis supplied).

which takes into account

> (I)   "the proportion of refugees and comparable entrants in the population in the area,
> (II)  the availability of employment opportunities, affordable housing, and public and private resources (including educational, health care, and mental health services) for refugees in the area,
> (III) the likelihood of refugees placed in the area becoming self-sufficient and free from long-term dependence on public assistance, and
> (IV)  the secondary migration of refugees to and from the area that is likely to occur." *Id.* at (a)(2)(C)(iii).

and that

> "With respect to the location of placement of refugees within a State, the Federal agency administering [the program] shall, consistent with such policies and strategies and to the maximum extent possible, *take into account recommendations of the State.*" *Id.* at (a)(2)(D) (emphasis supplied).

This is the language of a Congressional statute. It speaks in terms of "consulting" and "consultation" between and among the Resettlement Agencies and the State and Local Governments; establishes that the Resettlement Agencies and State and Local Governments must regularly "meet" to "plan and coordinate"; even acknowledges that "maximum consideration" be given to "recommendations" States make to the Federal Government. The challenged Order definitely appears to undermine this arrangement. As to States or Local Governments that refuse to give written consents, there will be no consultation, no meetings with the Resettlement

Agencies, not just "recommendations".[15] Those State and Local Governments can simply give or withhold their written consents to the resettlement of refugees within their borders. If they do not consent – apparently for any reason or for no reason – there will be no resettlement in that entire State or in that local community. Resettlement Agencies will be totally sidelined. In other words, as the screens in e-sports inevitably register: "Game Over".

By its terms, the current statute, 8 U.S.C. § 1522(a), hardly seems to "exude[…] deference to the President in every clause". *Compare Trump v. Hawaii*, 138 S. Ct. at 2408. It delegates no authority and establishes no "facially broad grant of power" to the President at all – certainly nothing that would permit him to disregard, much less put asunder, what is obviously carefully a crafted statutory scheme. *Id.* at 2410.

Moreover, the Order appears to run counter to the Refugee Act's stated purpose, which is "… *to provide comprehensive and uniform provisions* for the effective resettlement and absorption of those refugees who are admitted". Refugee Act of 1980, Pub. L. No. 96-212 § 101(b), 94 Stat. 102 (emphasis supplied); *see also Alabama v. United States*, 198 F. Supp. 3d 1263, 1268 (N.D. Ala. 2016); *Texas Health and Human Servs, Comm'n v. United States*, 193 F. Supp. 3d 733, 739 (N.D.

---

[15] At oral argument, defense counsel was unable to articulate why or how consultations and meetings with the Resettlement Agencies might continue if a State's consent to resettlement is not forthcoming. *See* Transcript of Oral Argument at 77, 79-80 (Jan. 8, 2020) (Civ. No. PJM-19-3346).

Tex. 2016). The state-by-state, locality-by-locality approach under the Order stands in sharp contrast to the Act's aim of uniformity. *Id.*

Lest there be any doubt, giving States and Local Governments the power to consent to the resettlement of refugees – which is to say veto power to determine whether refugees will be received in their midst – <u>flies in the face of clear Congressional intent</u>, as expressed in the legislative history of the statute. *Compare Trump* v. *Hawaii*, 138 S. Ct. at 2412.

Thus, in the run-up to the Refugee Assistance Extension Act of 1986 amending the Refugee Act of 1980, which came about very much at the vigorous urging of some States and Local Governments to strengthen their right to be heard, the House Committee on the Judiciary report sets forth at the outset that while:

> [t]he Committee amendment… strengthens the consultation requirement… to consult regularly with State and local governments… on the sponsorship and placement process *** *[t]he Committee emphasizes that these requirements are not intended to give States and localities any veto power over refugee placement decisions, but rather to ensure their input into the process and to improve their resettlement planning capacity.*

H.R. Rep. No. 99-132, at 19 (1985) (emphasis supplied).[16] In short, the Order clearly appears to fall within the third level category of assessing Executive Power that Justice Jackson described in the *Youngstown* case, namely – it seems to be a measure

---

[16] *See also* 8 U.S.C. § 1522 (a)(4)(c) ("The Director may not delegate to a State or political subdivision the authority to review or approve grants or contracts under this chapter or the terms under which such grants or contracts are made").

"incompatible with the expressed or implied will of Congress", "a power at once so conclusive and preclusive [that it] must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." 343 U.S. at 637-8 (Jackson, J., concurring).

Executive practice vis-à-vis the statutorily mandated consultation arrangement is also highly relevant. *Compare Trump v. Hawaii*, 138 S. Ct. at 2413. Consultation between and among the State and Local Governments and the Resettlement Agencies has, from all reports, worked quite smoothly since the 1986 amendments to the Refugee Act gave States and Local Governments a more active voice in the process. In searching for a rational basis justifying the Order (or, alternatively, a basis that is not arbitrary and capricious), one is left to wonder exactly what the rationale is for doing away entirely with a process that has worked so successfully for so long. And why now?

Not surprisingly, three federal court decisions of recent vintage have declared in effect that, while the Federal resettlement authorities are obviously empowered to make the final decision as to where refugees will be resettled, State and Local Governments do not have the authority to block the Federal resettlement decisions. *See Exodus Refugee Immigration, Inc. v. Pence, et al.*, 838 F.3d 902 (7th Cir. 2016) (Posner, J.) (affirming issuance of preliminary injunction against then-Governor Pence of Indiana and others who directed state agencies not to pay federal grant

funds to private refugee settlement agencies for social services provided to Syrian refugees that might be settled in Indiana); *Alabama v. United States*, 198 F. Supp. 3d. 1263, 1266 (N.D. Ala. 2016) (granting Federal Government's motion to dismiss where Governor of Alabama directed all Alabama agencies "to utilize all lawful means to prevent resettlement of Syrian refugees in the State of Alabama"): *Texas Health and Human Services Commission v. United States*, 193 F. Supp. 3d. 733 (N.D. Texas 2016) (granting Federal Government's and Resettlement Agency's motion to dismiss action by Texas commission seeking declaratory judgment that would effectively permit State to block resettlement of Syrian refugees).[17]

More important, perhaps most important − beyond analysis of the statutory text, statutory structure and purpose, beyond legislative history, beyond executive practice and judicial decisions − a potentially insuperable Constitutional barrier looms. *See Trump v. Hawaii*. 138 S. Ct. at 2415. Which is precisely this: The power to admit or exclude non-citizens is "exclusively" federal in nature. *See DeCanas v.*

---

[17] Relying principally on the Texas and Alabama cases, Defendants devote a considerable portion of their Opposition Brief to arguing that Plaintiffs have no private right of action under the Refugee Act of 1980. *See* ECF No. 18, p. 17. It is true that those two cases discussed the right to a private cause of action in the context of the Refugee Act of 1980, but notably, as indicated in the text, supra, both cases effectively held that State Governments had no right to block federal enforcement of the Act in their respective States. Neither case, moreover, involved an attempt by the Executive, potentially unconstitutionally, to abolish altogether any role the States might have in consulting with respect to the resettlement of refugees, determining only that the Federal Government was not obliged to provide information demanded by the States relating to the proposed resettlement of refugees. In any event, whether it was necessary or even appropriate to delve into the existence *vel non* of the private right of action issue in those two cases, it is clear that that issue has not even been raised much less discussed in the most recent challenges to Presidential authority in regard to immigration issues. *See, e.g., Trump v. Hawaii*, 138 S. Ct. 2392 *passim*. That is because no specific cause of action is required. *See, e.g., INS v. Chadha*, 462 U.S. 919, 953, n. 16 (1983) (executive action "is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review").

*Bica*, 424 U.S. 351, 354 (1976) (the "[p]ower to regulate immigration is unquestionably exclusively a federal power"); *Truax v. Raich*, 239 U.S. 33, 42 (1915) (enjoining enforcement of Arizona anti-alien labor law: "The authority to control immigration – to admit or exclude aliens – is vested solely in the Federal Government... The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the state would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work. And, if such a policy were permissible, the practical result would be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the states as chose to offer hospitality"). Making the resettlement of refugees wholly contingent upon the consents of State or Local Governments, as the veto component of the proposed Order would have it, thus raises four-square the very serious matter of federal pre-emption under the Constitution. It is hard to see how the Order, if implemented, would not subvert the delicate federal-state structuring contemplated by the Refugee Act.

But there is more: Plaintiffs have raised several <u>valid concerns under the Administrative Procedure Act</u>, 5 U.S.C. § 551 et seq., which, even if not applicable to the President, do apply to Defendants Pompeo, Azar and Wolf.   Most

fundamentally, of course, the Order appears to be "unlawful", 5 U.S.C. § 706(2); it may also fairly be characterized as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", *id.* at 2(A), among other things because it "entirely fails to consider an important aspect of the problem", *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). For instance, one matter glaringly omitted is the effect of the Order on the reliance interests of the Resettlement Agencies, and State and Local Governments, engendered by previous policy. *See Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117, 2126 (2016).

The Court finds that Plaintiffs have preliminarily demonstrated that, <u>as of the date of the promulgation of the Funding Notice,</u>[18] Defendants Pompeo, Azar, and Wolf failed to adequately consider a number of critical factors in promulgating the

---

[18] Defendants argue that there has been no final agency decision regarding the Order, which they say will not occur until the grant period beginning June 1, 2020. *See* ECF No. 54, p. 14. They cite *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997), which establishes two elements for there to be finality: (1) The action must be outcome-determinative, not merely tentative or interlocutory in nature and (2) rights and obligations must have been determined, from which legal consequences will flow. Continuing, Defendants say, a "mere request for funding applications... does not satisfy [these] criteria". ECF No. 54, p. 18. Plaintiffs accept *Bennett* as controlling. *See* ECF No. 60, p. 14. But the Court agrees with Plaintiffs that they have in fact demonstrated the finality of the Order and Funding Notice. Applying a pragmatic rather than a formulaic analysis, *see U.S. Army of Eng'rs. v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016), Plaintiffs point out that the Order and Funding Notice are most definitely outcome-determinative because they determine eligibility for funding in certain jurisdictions in the first place. ECF No. 60, p. 15. Rights and consequences clearly flow from both the Order and Funding Notice for the same reason. Absent consents, there is no eligibility for a grant to provide resettlement services in a non-consenting State or locality.

Notice:[19]  For example: (1) precisely why should the prior statutory policy of consultation involving Resettlement Agencies should be modified; (2) how would the matter of "secondary migration", *see* 8 U.S.C. § 1522(a)(2)(C)(iii)(IV), be handled, i.e. what would happen if a refugee admitted to one jurisdiction were to re-migrate to a nonconsenting State or locality, especially if the refugee had family or other ties there; (3) to what extent might State and Local Governments' decisions to exclude refugees be based on bias or other prohibited discriminatory considerations,[20] particularly if the State or Local Government declines to give any reason for not consenting – which the Order permits them to do; (4) how could the Resettlement Agencies be expected to deal with the complexity of identifying and gaining the consent of multiple State and Local Governments, given their highly

---

[19] Defendants, in their Opposition Brief, rely heavily on a declaration from Andrew M. Veprek, Deputy Assistant Secretary of State in the Bureau of Population, Refuges, and Migration (PRM) of the Department of State, who oversees the Department's functions in the U.S. Refugee Admissions Program (RAP) under the Refugee Act of 1980. Plaintiffs have moved to strike the declaration as being post-hoc rationalizations as to why and how Executive Order 13888 came into being. *See, e.g., Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("In applying [the APA's arbitrary and capricious standard], the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). That said, much of the affidavit, as Plaintiffs concede, is merely explanatory and unobjectionable. Plaintiffs' objection, as clarified by their counsel at oral argument, is that, whether or not they were entitled to prior notice and an opportunity to comment (on either the Order or Funding Notice), the record leading up to the promulgation of the Order and Funding Notice is bare. See Transcript of Oral Argument at 7 (Jan. 8, 2020) (Civ. No. PJM-19-3346). Yet, Plaintiffs submit, Defendants do not contend there was no record at the time of promulgation; they deem it irrelevant and simply decline to disclose it. *Id.* Apart from what in fact do appear to be post-hoc rationalizations, the Court sees nothing in the affidavit that runs counter to the Government's apparently unilateral, unexplained, and unalterable decision that, unless State or Local Governments consent in writing by a date certain – for any reason or no reason – there will be no resettlement of refugees in that State or local community. With these observations in mind, Plaintiffs' Motion to Strike, ECF No. 56, is **DENIED.**

[20] *See* 8 U.S.C. 1522(a)(5) ("Assistance and services funded under this section shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion"); *see also Exodus Refugee Immigration, Inc.*, 838 F.3d at 904-05 (holding that then Indiana Governor Pence's attempt to prevent resettlement of Syrian refugees based on "security concerns" amounted to discrimination based on nationality).

diverse nature; (For example, does the "State" mean the Governor of the State or a State regulatory agency or both?; Does the "Local Government" mean the County – the county executive or the county commissioners or both? And why a County? What about States that have geographic regions called counties, but no real county governments?; It is not entirely clear if any cities could be considered a "Local Government" under the Order. But if so, who would speak for the city – the city council, the mayor, or some other entity or person? Add to this the reasonable prospect of collateral litigation, even public referenda, challenging who has authority under the Order to decide whether consent should be given or withheld by a State or Local Government and whether the refusal to consent by an unwelcoming State will prevent resettlement of refugees in a willing county or city within that State);[21] (5) what account was taken or should have been taken with respect to the reliance of Resettlement Agencies on the previous policy of resettlement over many years, including their well-developed relationships with local organizations, as well as their establishment and maintenance of local resettlement sites and their undertakings with local suppliers and vendors; (6) what consideration was given to foster families that have undergone extensive preparations to take in refugee children in accordance

---

[21] Defendants concede that the Governor of a State, appealing to some constituents, could block resettlement in a city that in fact declares itself wholly disposed to welcome the refugees. The reverse situation is also problematic. As the States argue in their amicus brief, see ECF No. 36, p. 10, if a State consents to resettlement, but a county (or city) objects, allowing the localities to veto resettlement in their jurisdictions would appear to interfere with the sovereign prerogative of the State to set statewide policy.

with the Unaccompanied Refugee Minors (URM) Program, *see* 8 U.S.C. § 1522(d)(2); and (7) what will be the effect of the Order on investments, including infrastructure improvements, that some States and local communities have made over the years in reliance on the presence of refugees, if they are no longer permitted to resettle in those jurisdictions?

At a minimum, the Court is persuaded that, on the merits, Plaintiffs will be able to demonstrate, at least as to the cabinet secretaries, that in one or more respects, the Order's grant of veto power is arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A), as well as inherently susceptible to hidden bias.

Over all, then, Plaintiffs have demonstrated to the Court's satisfaction, based on statutory text and structure, purpose, legislative history, judicial holdings, executive practice, the existence of a serious constitutional concern over federal pre-emption, and numerous arbitrary and capricious administrative deficiencies, that, on the merits, they are clearly likely to succeed in showing, that, by giving States and Local Governments veto power over the resettlement of refugees within their borders, the Order is unlawful.

## B. Irreparability of Harm

Plaintiffs submit they have also shown that they will be irreparably harmed (indeed they say they are already irreparably harmed) if the Order and Funding

Notice continue in effect and if refugee resettlement becomes conditioned upon obtaining written consents from State and Local Governments. The Court agrees.

By January 21, 2020, just 13 days following briefing and oral argument on the Motion for Preliminary Injunction, Plaintiffs must complete their submissions of proposals to cover their imminent operations. Until then, indeed during the run-up since the Order was promulgated at the end of September 2019, in addition to having to puzzle through the exact reach of the Order and Funding Notice, Plaintiffs suggest they have been and will continue to be in a "frenzy" to obtain written consents from State and Local Governments in order to be in compliance. ECF No. 18, p.7. This can hardly be disputed. Plaintiffs will continue to be in a scramble, required to spend excessive hours in manpower and resources trying to obtain the required written consents. As a result, they will continue to be diverted from their main purpose and mission. The hours and resources they have been and will be required to expend will not only be irretrievable; they represent efforts and expense that could much more appropriately be used to provide the multiple services that Plaintiffs traditionally provide for refugees. With the Order, moreover, Plaintiffs will almost certainly need to reduce the number of their personnel and continue to close down operations in the non-consenting States and locales. These are immediate tangible concerns of material dimension. The almost inevitable loss of good will and harm to reputation, at least in non-consenting States and localities, will compound Plaintiffs' injuries.

*See, e.g., Fed. Leasing Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981) (irreparable harm established where a plaintiff "seeks to preserve its existence and its business" and where a defendant's ongoing acts endanger "the good will built by a heretofore successful enterprise").[22]

Monetary damages cannot fairly compensate for most, if not all, of the highly likely consequences just described. The Court finds more than enough substance in Plaintiffs' overall parade of horribles to demonstrate that, as of this very moment, they will be irreparably harmed if a preliminary injunction does not issue.[23]

### C & D.   Balance of Equities and the Public Interest

Since the Government is a party to the suit, the balance of equities and the public interest may be considered in tandem. *See, e.g., Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs urge the importance of maintaining for the present the long-standing, carefully crafted humane program that places refugees in communities where they can thrive – informed, to be sure, by at least some input from the Resettlement Agencies themselves and the States and local communities as to where

---

[22] Plaintiffs also raise a not implausible concern over whether their solicitation of written consents from State and Local Governments might constitute lobbying activities affecting their status or tax-exempt 501(c)(3) status. *See* Treas. Reg. § 1.501(c)(3)-1(c)(3)(ii). While Defendants suggest that this is an unfounded fear, the Court finds it unnecessary to consider the merits of this argument.

[23] Defendants suggest that "[t]he requirement to seek State and local consents harms Plaintiffs only insofar as it puts Plaintiffs to a choice: obtain the consents or forego receiving grant funding". ECF No. 54, p. 31. This is a Hobson's choice. It implies that the Resettlement Agencies have freedom to decide, but in fact the only options the Order and Funding Notice offer are obtaining the consents or taking nothing. But, as Plaintiffs point out, by foregoing grant funding in a given jurisdiction they would essentially be out of the business of resettling refugees in the jurisdiction altogether, a core part of their mission. *See* ECF No. 60, p. 20. And even if private funding were available, Plaintiffs could, presumably, still not go into those States or localities that refuse to consent to resettlement.

the refugees will actually go. On the other hand, if the Order is implemented, apart from the considerable dislocations Plaintiffs will suffer, many refugees may find themselves at least in limbo, denied services congressionally intended to help them effectively integrate into new homes.

The Court finds no countervailing equity considerations favoring Defendants' desire that the Order be implemented without delay, other than to finally cede to some States and Local Governments a power that for several years they have attempted to secure but have been squarely blocked from securing by legislation and litigation: To keep unwanted refugees out of their communities. There is no imminent harm to the Government if it is simply required to keep on doing what it has been doing for decades. The balance of equities for preliminary injunction purposes clearly favors Plaintiffs.

As for the public interest, there is without a doubt public interest in keeping "the President from slipping the boundaries of a statutory policy and acting based on irrelevant policy preferences". Driesen, supra, at 1045; *see also Panama Ref. Co*, 293 U.S. at 431-33, 446 (1935) (majority and dissenting opinions). There is also a substantial public interest in having governmental agencies abide by federal laws that govern their existence and operations. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). By giving States and Local Governments the power to veto where refugees may be resettled – in the face of clear statutory

text and structure, purpose, Congressional intent, executive practice, judicial

holdings, and Constitutional doctrine to the contrary – Order 13888 does not appear

to serve the overall public interest. Granting the preliminary injunctive relief

Plaintiffs seek does. Refugee resettlement activity should go forward as it developed

for the almost 40 years before Executive Order 13888 was announced.[24]

## X.    Conclusion

For the following reasons, Plaintiffs' Motion for Preliminary Injunction with

respect to the Order and the Funding Notice will be **GRANTED**.

A separate Order will issue.

**January** __15__ **, 2020**

/s/

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

---

[24] Defendants ask, if the Court is inclined to issue a Preliminary Injunction, that it be limited to the three named Plaintiffs. ECF No. 54, p. 36. Defense counsel, at oral argument, conceded that this would "create potential difficulties" and could not describe how the distinction between the three Resettlement Agencies that are Plaintiffs and the six which are not might work in practice. Transcript of Oral Argument at 105 (Jan. 8, 2020) (Civ. No. PJM-19-3346). Presumably the three Plaintiff Resettlement Agencies could continue to exercise the right to consult and meet with State and Local Governments that might otherwise not want to consent to the presence of refugees, whereas the six non-plaintiff Resettlement Agencies would be completely cut off from engaging with those same State and Local Governments. With impractical, unfair consequences such as this, Defendants' request falls of its own weight.

31